## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States,<br><br>            -v-<br><br>Philip Priolo.<br><br>                  Defendant. | 2:21-cr-566<br>(NJC) |

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

Defendant Philip Priolo ("Priolo") is charged with conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349, and four counts of mail fraud in violation of 18 U.S.C. § 1341, arising out of his alleged involvement in a fraudulent sweepstakes mailing scheme. (Indictment ¶¶ 1, 30–33, ECF No. 1.) The Indictment alleges that between March 2015 and December 2016, Priolo conspired with others to send fraudulent letters notifying letter recipients that they had won a cash prize as part of a sweepstakes and could reclaim the prize upon payment of a fee (the "charged sweepstakes scheme"). (*Id.* ¶ 5.) The Indictment also alleges that Priolo committed the charged counts of mail fraud when he sent these mailings through the U.S. Postal Service and received checks sent through the U.S. Postal Service in response to those mailings. (*Id.* ¶ 33.) The Court has severed the trial against Priolo from the trials of the two other defendants and co-conspirators named in the Indictment, Jeffrey Novis ("Novis") and Shawn Phillips ("Phillips"). (Status Conf., Feb. 28, 2024; Status Conf.,

Dec. 16, 2024.)[1] The Indictment specifically names two other co-conspirators who are not

charged as defendants, Sean Novis[2] and Gary Denkberg ("Denkberg"), who were prosecuted for

their alleged involvement in a separate action in this District. *Id.* ¶ 3; *see generally United States*

*v. Sean Novis and Gary Denkberg*, No. 20-cr-335 (E.D.N.Y.) ("*United States v. Sean Novis*, No.

20-cr-335").

Before me are Motions in Limine filed by the government and Priolo. (Gov't's Mot. Lim.

("Gov't's Mot."), ECF No. 99;[3] Def.'s Mot. Lim. ("Def.'s Mot."), ECF No. 106; Def.'s Suppl.

Ltr., ECF No. 126; Gov't's Suppl. Mot. Lim. ("Gov't's Suppl. Mot."), ECF No. 127.)[4]

The government's Motion in Limine concerns its intent to offer two types of evidence at

Priolo's trial. First, the government seeks to offer evidence relating to Priolo and Novis's

involvement in a previous similar sweepstakes mailing scheme in the late 1990s and early 2000s,

which is not charged in the Indictment (the "uncharged sweepstakes scheme"). (Gov't's Mot.)

The government argues that this evidence is probative of the fact that Priolo and Novis entered

---

[1] On February 28, 2024, Judge Joan M. Azrack, to whom this action was previously assigned, ordered a separate trial for all counts against Phillips because the government was still seeking Phillips's extradition from Canada. (Status Conf., Feb. 28, 2024, ECF No. 43; *see also* ECF No. 39.) On December 16, 2024, I severed the trials against Priolo and Novis in light of pending litigation over whether Novis is competent to stand trial. (*See* Min. Entry, Dec. 16, 2024.)

[2] This Opinion and Order discusses both Jeffrey Novis and his son, Sean Novis. Any reference to "Novis" refers to Jeffrey Novis. Sean Novis will be identified by his full name.

[3] The government filed its Motion on January 1, 2025 at ECF No. 78. Because the government did not redact certain private information concerning Novis as required under Rule 49.1 of the Federal Rules of Criminal Procedure, I restricted access to the government's Motion at ECF No. 78 and ordered the government to re-file the motion with proper redactions. (Elec. Order, Feb. 4, 2025.) The government filed a public version of the Motion with the information of concern redacted at ECF No. 99. Throughout this Opinion and Order, I refer to the government's public filing at ECF No. 99, which is substantively identical to the Motion docketed at ECF No. 78.

[4] The government has a separate pending motion to permit one of its witnesses to testify remotely, ECF No. 90. I will address this motion in a separate order.

2

into a conspiracy to commit mail or wire fraud and that Priolo and Novis both had knowledge

and the intent to defraud. (Gov't Mot.) The evidence at issue consists of testimony from four

witnesses and twenty documentary exhibits. (Gov't Mot. at 2–3, 5 & 5 n.6; Gov't Suppl. Ltr.,

ECF No. 100.) Second, the government seeks to offer the information and judgment against

Novis in *United States v. David Dobin & Jeffrey Novis*, No. 95-cr-250 (E.D.N.Y.) ("*United

States v. Dobin*"), which shows that Novis was convicted in 2001 of conspiracy to commit mail

fraud.[5] According to the government, this evidence is probative of Priolo and Novis's knowledge

and intent to defraud. (Gov't Mot. at 4–5.) Priolo objects to all of this evidence under Rules

403 and 404(b) of the Federal Rules of Evidence ("Fed. R. Evid.," "Rule 403," and "Rule

404(b)") and further objects to evidence of Novis's conviction under the Confrontation Clause of

the Sixth Amendment to the U.S. Constitution. (Def.'s Opp'n Gov't Mot. Lim. ("Def.'s

Opp'n"), ECF No. 85.)

 Priolo's Motion in Limine seeks to exclude certain additional evidence the government

has indicated it will offer at trial. (Def.'s Mot.) Priolo seeks to preclude the following: (1)

evidence of out-of-court statements alleged victims made to their relatives about mailings they

received; (2) evidence of alleged victims "being victimized by other, unspecified 'scams' and/or

'scammers' that are not charged in this case"; (3) evidence or argument regarding "payments

made by alleged victims to entities related to Sean Novis and/or Gary Denkberg which are not

part of the charges in this case;" (4) evidence or argument regarding complaint letters from mail

recipients in the charged sweepstakes scheme and letters from state attorneys general or similar

officials concerning mail recipients' complaints; and (5) evidence relating to a temporary

---

[5] Although Novis pled guilty in 1995, his sentence and judgment were not entered until 2001.
(Gov't Mot., Ex. 5 at 3.)

restraining order issued in a civil enforcement action to which Priolo was not a party, which are pre-marked for trial as Proposed Government Trial Exhibits 168 and 169. (*Id.* at 1–2.) Priolo also moves to preclude the government from using or eliciting the term "Prize Notices" during the examination of witnesses and to direct the government to use a neutral term instead. (*Id.* at 2.) Finally, Priolo also provides additional argument against the admission of evidence of Novis's 2001 conviction in *United States v. Dobin*. (*Id.* at 2.)

Finally, in a supplemental letter filed after oral argument on his Motion, Priolo argues that the Court should exclude the deposition testimony of Alemitu Teshale ("Teshale"), the wife of an alleged victim, in its entirety and should preclude "the testimony of other relative witnesses whose testimony is similar" to Teshale's testimony. (Def.'s Suppl. Ltr.)[6] The government's supplemental Motion in Limine seeks to admit Teshale's testimony in full. (Gov't's Suppl. Mot.)

For the reasons set forth below, both the government and Priolo's Motions are granted in part and denied in part.

I grant the government's Motion with respect to the government's proffered evidence of Priolo's involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s. The government provided Priolo reasonable notice of this evidence under Rule 404(b)(3), Fed. R. Evid., and this evidence is admissible as direct evidence of the charged conspiracy and, in the alternative, as proof of Priolo's knowledge and intent to defraud under Rule 404(b). Further, I find that this evidence is admissible under Rule 403.

---

[6] The Court granted the government's motion, made on Priolo's consent, to depose Teshale in advance of trial pursuant to Rule 15 of the Federal Rules of Criminal Procedure and to permit the government to offer her deposition testimony at trial in lieu of in-person testimony. (Elec. Order, Feb. 21, 2025; *see also* ECF No. 121.)

I deny the government's Motion, however, with respect to the government's proffered evidence of Novis's conviction in *United States v. Dobin* under Rule 403 because its probative value is substantially outweighed by the risk of unfair prejudice to Priolo, confusing the issues, and misleading the jury. Finally, because I deny the government's motion to offer evidence of Novis's prior conviction, I do not reach the question of whether admitting this evidence would violate Priolo's right to confront the witnesses against him under the Sixth Amendment's Confrontation Clause.

Priolo's Motion is granted in part and denied in part. First, evidence of payments made in response to mailings sent by the Sean Novis, Denkberg, and Phillips business entities is only admissible under Rule 403 to the extent that the mailings themselves were issued by or on behalf of Priolo or one of his and Novis's business entities. Additionally, admitting such evidence does not amount to a constructive amendment of the Indictment.

Second, Alemitu Teshale's deposition testimony is admissible. Teshale's testimony based on her own first-hand experiences and observations is relevant and thus admissible under Rule 402, Fed. R. Evid. Her testimony regarding her husband's statement indicating that he believed he won a prize is also admissible because it is relevant and not hearsay because it is not offered for its truth but to establish Priolo's fraudulent intent and the materiality of any misrepresentations in the mailings attributable to him. Even if this statement did constitute hearsay, it would be admissible under Federal Rule of Evidence 803(3) as a statement of her husband's then-existing state of mind. Accordingly, I grant the Government's Supplemental Motion to permit Teshale's deposition testimony.

Third, I reserve decision about the admissibility of the testimony of any other alleged victims' relatives. By March 5, 2025, the government shall provide the Court with proffers of the

specific testimony it intends to elicit from each of the relatives of alleged victims. The government shall identify what testimony it intends to elicit regarding: (1) statements from the alleged victims concerning their beliefs about the mailings they received; (2) any financial impact on the alleged victims beyond the direct payments that are allegedly attributable to Priolo and/or the Priolo-Novis entities; and (3) a breakdown of the money paid by each victim that is attributable to mailings by or on behalf of Priolo or Priolo-Novis entities and the losses attributable to other mailings.

Fourth, testimony regarding any other "scam" that is unrelated to the charged sweepstakes scheme or uncharged sweepstakes scheme from the late 1990s and early 2000s is precluded under Rules 402 and 403.

Fifth, complaint letters from mailing recipients and notices from state attorneys general on behalf of mailing recipients are admissible under Rules 402 and 403 as evidence of Priolo's knowledge of the conspiracy and intent to defraud.

Sixth, Proposed Government Trial Exhibits 168 and 169, which concern the temporary restraining order issued in *United States v. Sean Novis, et al.*, No. 16-cv-5263 (E.D.N.Y.), are inadmissible under Rule 403. Although these exhibits are probative of Priolo's fraudulent intent and knowledge of the charged conspiracy after September 26, 2016, when he received notice of the TRO, the risk of unfair prejudice and confusing the issues substantially outweighs the probative value of this evidence.

Seventh, the government is precluded from referring to an exhibit as a "Prize Notice" during witness examinations where the language "Prize Notice" or synonymous terms do not appear on the exhibit because to do so would assume facts not in evidence. However, the

government may refer to an exhibit as a "Prize Notice" if that term or synonymous terms *do* appear on the exhibit itself.

## BACKGROUND

The Indictment alleges that from approximately March 2015 through December 2016, Priolo worked with Novis, Sean Novis, Gary Denkberg ("Denkberg"), and others to mail out hundreds of thousands of fraudulent mailings. (Indictment ¶¶ 1, 5, 7.) These notices represented that the recipient was chosen to receive a large cash prize—typically, more than $1,000,000— and that the recipient could claim that prize by paying a fee ranging from $20 to $40 by cash, check, or money order. (*Id.* ¶¶ 5–6, 7.) The government alleges that the mailings often included a disclaimer stating that the recipient did not win any money or prize but asserts that this language was included only on the back of the mailing "buried" in a block of all-capital text "that purports to also address a host of other issues." (*Id.* ¶ 8; Gov't's Tr. Mem. at 10, ECF No. 104.)

### I.     Priolo and Novis's Companies—Winners Circle and Feel Lucky

The government alleges that Priolo and Novis operated this scheme through two shell companies—Winners Circle International Inc. ("Winners Circle") and Feel Lucky Group Inc. ("Feel Lucky")—to obscure their personal involvement in the scheme and to obtain payments that the mailing recipients sent via check and mail order. (Gov't's Tr. Mem. at 7, 9.)

The Indictment alleges that Priolo opened and used an account with PacNet Services Ltd. ("PacNet"), a payment processor based in Canada, to wire the fees that mailing recipients paid via check and money order to Priolo and Novis's bank accounts and to pay their other co-conspirators who provided various services to facilitate the scheme. (Indictment ¶¶ 10–11; *see also* Gov't's Tr. Mem. at 7.) The Indictment also alleges that mailing recipients who paid the requested fee never received the promised cash prizes. (Indictment ¶ 5.)

## II.    Sean Novis, Denkberg, and Phillips's Business Entities

The government alleges that Priolo's co-conspirators used separate shell companies to send out similar mailings. (Gov't Tr. Mem. at 16–17, 17 n.48.) The government asserts that Sean Novis and Denkberg used several shell companies, including Horizon Marketing Services Inc. ("Horizon") and Quantum Marking Inc. ("Quantum"), and Phillips used several additional shell companies: Haven, Prime Source, and Lakeside. (*Id.* at 17 n.48.) The government does not allege that Priolo was involved in the operation of any of these other companies. (*See generally* Gov't Tr. Mem.) The government alleges that when operating Winners Circle and Feel Lucky, Priolo and Novis paid Sean Novis and Denkberg's companies for services, including data management, production and mail schedules, and customer service. (*Id.* at 17.) The government also alleges that Priolo and Novis "followed the example" set by Sean Novis and Denkberg to anonymize their mailings. (Gov't Opp'n to Priolo's Mot. Lim. ("Gov't Opp'n") at 5, ECF No. 120.) Specifically, the government asserts that, like the mailings sent out by Sean Novis and Denkberg through Quantum and Horizon, Priolo and Novis's names did not appear on their mailings and their mailings referred to three-letter acronyms or "fake, official-sounding businesses"—like "Prize Advisory Board" and "Million Dollar Prize Exchange"—and did not reference Winners Circle or Feel Lucky at all, with the exception of one promotion that used the name "Winners Circle Sweeps." (*Id.*)

The government also alleges that Priolo and Novis sent mailings to the same alleged victims as their co-conspirators. (*Id.* at 6–7.) The government alleges that Winners Circle, Feel Lucky, and each of the co-conspirators' companies maintained their own individual mailing lists and shared lists with each other. (*Id.* at 6.) Thus, Priolo and Novis shared the lists maintained by Winners Circle and Feel Lucky with their co-conspirators, and their co-conspirators shared their companies' lists with Priolo and Novis. (*Id.*)

The government does not intend to introduce mailings sent out by Sean Novis, Denkberg, or Phillips, but does intend to introduce evidence of payments that alleged victims made to the business entities operated by Sean Novis, Denkberg, and Phillips. (*Id.*; *see also* Gov't's Proposed Tr. Exs. 390–91.)

Denkberg and Sean Novis were separately indicted and later convicted by a jury of conspiracy to commit mail fraud and individual counts of mail and wire fraud based on the mailings they sent out through their own companies and were convicted of aiding and abetting mail fraud based on their involvement with the mailings sent out by Priolo, Novis, and Phillips. Mem. & Order, *United States v. Sean Novis*, No. 20-cr-335, ECF No. 128 at 4. Neither Novis nor Priolo were defendants or named co-conspirators in the prosecution of Sean Novis and Denkberg. *See* Superseding Indictment, *United States v. Sean Novis*, No. 20-cr-335, ECF No. 33.

### III.    September 22, 2016 TRO

The government intends to offer a temporary restraining order ("TRO") that another judge of this Court issued on September 22, 2016 in *United States v. Sean Novis, et al.*, No. 16-cv-5263 (E.D.N.Y.) ("*United States v. Sean Novis*, No. 16-cv-5263"), restraining Sean Novis, Denkberg, and the other defendants from engaging in mailings the government argues are similar to those at issue in this case. (Gov't's Proposed Tr. Ex. 168.) In the TRO, the court found "probable cause to believe" that Sean Novis, Denkberg, Cathy Johnson, Horizon, Quantum, DMCS INC., and Direct Marketing Consulting Services, Inc. "are violating and are about to violate 18 U.S.C. § 1341." (*Id.* at 1.) Under the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345, the court temporarily restrained these defendants, as well as "their agents, officers, and employees, and all other persons and entities in active concert or participation with them" from "committing mail fraud under 18 U.S.C. § 1341" (*id.* at 2), and from, among other things:

using the United States mail, or causing others to use the United States mail, to distribute any advertisements, solicitations, or promotional materials:

(a) that represent, directly or indirectly, expressly or impliedly that the recipient of the solicitation has won, will win, or will receive cash, prizes or awards; or

(b) that offer for sale information regarding sweepstakes or lotteries;

(c) that represent, directly or indirectly, expressly or impliedly, that the recipient of the solicitation was specifically selected to receive the mailing based on a reason other than the fact that the recipient's name appears on a mailing list;

(d) that represent, directly or indirectly, expressly or impliedly, that services or items offered for purchase will, or could, improve the victim's financial condition; or

(e) that contain any other false or misleading representations. . . .

(*Id.* at 2–3, ¶ (ii)(a)–(e).) The TRO also ordered that the defendants were temporarily restrained from:

receiving, handling, opening, or forwarding any mail that responds, by sending payment or otherwise, to the materials described in paragraph (ii)(a)–(e), *supra*; . . . . [and] performing "caging services" on mail received from U.S. residents in response to any of the materials described in paragraphs (ii)(a)–(e), *supra*, including opening mail received from U.S. residents; . . . handling, forwarding, or depositing any checks received from U.S. residents, including currency, bank checks, certified checks, money orders, or credit card charge authorizations, or handling any mail received from U.S. residents. . . .

(*Id.* at 3, ¶¶ (iii), (v).) The TRO further ordered the named defendants to provide notice of the TRO to all "brokers, printer/distributors, mailing houses, and/or caging services with which they do business regarding the materials described in Paragraph (ii)(a)–(e), *supra*, informing them that they are subject to the [TRO] as an entity *in active concert or participation* with Defendants." (*Id.* at 4 (emphasis added).)

Although Priolo was not a named defendant in that civil case, the government intends to offer the TRO and a Certificate of Notice filed in that action in which counsel for then-defendant Cathy Johnson asserted that, on September 26, 2016 and September 28, 2016, in compliance

10

with the TRO, notice of the TRO was provided to "Phil Priolo," among others. (Gov't's Proposed Tr. Ex. 169 at 1, 3.) The government also intends to offer an email from Cathy Johnson dated September 26, 2016 to "Phil Priolo <philpriolo8@yahoo.com>" and "Jeffrey Novis <jeffnovis@gmail.com>," which states, "Please find attached a copy of the temporary restraining order issued against me and/or my company." (Gov't's First Suppl. Ltr., ECF No. 125; ECF No. 125-1 at 2.) The government also intends to offer a follow-up email from Johnson to Priolo and Novis on September 28, 2016, stating: "Further as to the below email and attached court order, please see the first paragraph of Page 4 thereof stating that you 'are subject to the Temporary Restraining Order as an entity in active concert or participation with defendants.'" (ECF No. 125-1 at 1.)

## IV.    Alleged Victims' Relatives

The government intends to offer testimony from some of the alleged victims—people who received the mailings and paid the fee as the mailings instructed—as well as relatives of some of the alleged victims. (Gov't's Tr. Mem. at 31.) The government proffers that relatives who did not themselves receive the mailings will testify about statements the alleged victims— their family members who *did* receive and respond to the mailings—made indicating their belief that they had won a large cash prize. (*Id.* at 31–32.)

As an example, the government proffers that one of its witnesses, Sharon Soltis ("Soltis") will testify that her late father, John Single ("Single"), sent payments in response to mailings he received, and that he told her that he was sending the money because he believed he had won millions of dollars, and needed to pay to collect his winnings. (*Id.* at 31–32.) The government intends to present additional evidence that Single responded to 237 mailings associated with the charged sweepstakes scheme, including 7 responses to Feel Lucky mailings, and 66 responses to Winners Circle mailings. (*Id.* at 32.)

The government also seeks to present to the jury the video of the February 26, 2025 deposition of Teshale, whose husband is an alleged victim, but who did not herself receive any sweepstakes mailings during the charged timeframe. (Gov't's Suppl. Mot. at 1.) During her deposition, Teshale testified that between 2015 and 2016, her husband, Alemu Kore ("Kore"), received letters that were:

> normal, medium-sized letter which would say, you are going to win this amount of money, you are the next person to win, and his name. And it will be with, the figure would be with a big letter, number, and some writings on it. And then he would bring that from the post, and then he will send money.

(Tr. Teshale Dep. ("Teshale Dep.") at 8:13–14, 13:5–19, ECF No. 126-1.)

Teshale testified that when Kore first started receiving these letters, she was able to see the letters because she would be in the kitchen with her husband while he was "writing checks" in response. (*Id.* at 14:2–6.) She testified at that that time: "I would be there around cooking and I would watch it. And I would see that." (*Id.* at 14:6–8.) Counsel for the government showed Teshale Proposed Government Trial Exhibit 9, which the government alleges is a Winners Circle mailing to which Kore responded in June 2016 by paying $34 dollars. (*Id.* at 14:9–16; *see also* Gov't's Suppl. Mot. at 2 n.1; Gov't's Proposed Tr. Ex. 9.) The government asked Teshale whether this exhibit is "an example of the letters that [she was] talking about a moment ago" and Teshale responded "[y]es." (Teshale Dep. at 14:12–18.) Teshale later testified several times, however, that while she saw a large number and Kore's name on the mailings, she "didn't read the letters." (*Id.* at 31:2–6.)[7]

---

[7] *See also* Teshale Dep. at 26:14–15 ("At that time I didn't read all these things."); *id.* at 27:13–16 ("As I told you, I just see the number and the, I always disagree with my husband so I don't go detail to read the letters. That I didn't do."); *id.* at 28:6–7 (stating, in response to a question about whether she had seen the second page of the mailing that provided consumer information: "I don't read all this. . . . No. I didn't read it. I don't read it."); *id.* at 28:11–15 ("We don't read

Teshale testified that these letters came in the mail "maybe two times or three times a week" and that they were "all over the house." (*Id.* at 17:23; 18:1–7.) Teshale further testified that while she and other family members told her husband that he did not "have to do money for these people[,] . . . he thought he might win the lottery and he might get money. That's what his thinking was." (*Id.* at 15:12–17.) She testified that when she asked him "why are you paying them[,] . . . [h]e would say, I'm going to win." (*Id.* at 15:20–24.)

## V.    Complaint Letters from Alleged Victims and Government Agencies

The government intends to offer letters about the mailings from state attorneys general, other governmental officials, consumer advocates, and other complaints, inquiries, and notes from or concerning mailing recipients regarding the mailings in this case. (Gov't's Tr. Mem. at 24.)[8] These letters were directed to the various business entities referenced in the mailings, and the government asserts that these documents were recovered from Sean Novis and Denkberg's office and Cathy Johnson's home, which the government alleges served as a caging office. (*Id.* at 15–16.) The government alleges that Cathy Johnson ("Johnson") performed "customer service" work for Priolo and Novis, responding to these letters. (*Id.* at 14–15.) The government anticipates that Johnson will testify that mailing recipients frequently sent letters demonstrating their belief that they had won a large cash prize. (*Id.* at 16.) In many of these letters, a mailing recipient or an attorney general writing on behalf of a mailing recipient complained about not receiving the promised cash prize and requested a refund or complained about the mailings and

---

that. The only thing we see, I see, is the number what he's going to win and his name. That's what I see.").

[8] Specifically, the government proffers Proposed Government Exhibits 52, 60– 62, 151, 160–62, 171, 173–75, 175A, 177–78, 353, 363–64, and 368A–D. (Gov't's Second Suppl. Ltr., ECF No. 128.)

asked to be removed from a mailing list. (Gov't Tr. Mem. at 15; *see also generally* Gov't Proposed Tr. Ex. 162.) In other letters, the writer merely inquired about the prize money. (Gov't Tr. Mem. at 15.)

The government alleges that Priolo was usually involved in responding to letters from government entities and demands for refunds from alleged victims. (*Id.*) Where a letter only inquired about the prize money without requesting a refund or removal from the mailing list, the government alleges that the operation would respond with a "rules letter" under the pseudonym "Christine Peters," a fake customer service employee. (*Id.*) These "rules letters" would restate the language from the disclaimer on the mailings stating that the recipient had not won any prize or money and would inform the recipient that they were not automatically refunded but could request a refund. (*Id.* at 11, 15.)

## VI.    Uncharged Sweepstakes Scheme in the 1990s and 2000s

The government alleges that Novis and Priolo were both previously involved in the uncharged sweepstakes scheme—an alleged sweepstakes mailing scheme in the 1990s and early 2000s, which the government alleges was "identical or nearly identical" to the charged sweepstakes scheme allegedly carried out from approximately March 2015 through December 2016. (Gov't Mot. at 2, 4.) The government alleges that Novis was involved in the scheme starting in the early 1990s and that Priolo was involved in the late 1990s and early 2000s. (*Id.* at 2, 4.)

### A.    Novis's Conviction Based on Involvement in the Uncharged Sweepstakes Scheme from 1993–1994

At trial, the government seeks to introduce the information and the judgment as to Novis in *United States v. Dobin*, showing that Novis was convicted in 2001 of conspiracy to commit mail fraud based on his mailing of similar fraudulent sweepstakes notices between 1993 and

1994. (Gov't's Mot. at 3; *see also* Gov't's Mot., Ex. 5, ECF No. 99-5.)[9] The information alleges that Novis conspired with David Dobin between May 1993 to September 1994 to mail announcements that were designed to lead recipients to believe that each recipient had won $12,000. (Gov't's Mot., Ex. 5 ¶¶ 2, 5.) The announcements stated that, if the recipient paid a particular sum—typically between $6.98 and $10.98—the recipient would receive additional "entitlements" purportedly worth thousands of dollars. (*Id.* ¶ 6.) The judgment shows that Novis pleaded guilty to one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 for the period from May 1993 to September 1994 and that he was sentenced to fifteen months of incarceration to be served starting on March 5, 2001, and to be followed by a three-year term of supervised release. (*Id.* at 3–5.)

B. Priolo's Involvement in the Uncharged Sweepstakes Scheme in the Late 1990s–Early 2000s

The government alleges that after Novis was convicted, Sean Novis continued operating the mailing scheme along with Priolo, Denkberg, and Phillips. (Gov't's Mot. at 4.) The government seeks to prove Priolo's involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s through testimony from individuals who were involved in the uncharged sweepstakes scheme—Johnson and Tom Ressler ("Ressler")—as well as documents relating to the scheme. (*Id.* at 2–3.) The government proffers that Johnson will testify that she began working with Sean Novis in 2000, and that at that time, both Novis and Priolo were working with Sean Novis to send out sweepstakes mailings very similar to those sent out in the charged sweepstakes scheme under the name "Winner[]s Circle." (*Id.* at 2.) The government also seeks to introduce documents showing that in the 2000s, Novis and Priolo was involved with two

---

[9] The government has pre-marked this exhibit for trial as Proposed Government Trial Exhibit 381.

companies, Justin Grant, Ltd. ("Justin Grant") and Sweepstakes Advisory Network, Inc.

("Sweepstakes Advisory Network"), and other documents showing that these two companies

were used to send fraudulent sweepstakes mailings in the late 1990s and early 2000s. (*Id.* at 2–

3.)[10] The government proffers that Ressler will testify that he created the Justin Grant and

Sweepstakes Advisory Network notices used by the co-conspirators during the late 1990s and

early 2000s, and that he will testify about the artistic and linguistic techniques he employed when

creating the notices in order to mislead recipients. (*Id.* at 3.) The government represented at the

February 4, 2025 hearing that it expects Ressler to testify that he met Priolo at the time. (Hr'g,

Feb. 4, 2025.)

---

[10] *See* Gov't's Mot., Ex. 1, ECF No. 99-1 (letter dated February 28, 2000 stating that Novis and Priolo are currently employed by Justin Grant) (pre-marked for trial as Proposed Government Trial Exhibit 188); Gov't's Mot., Ex. 2, ECF No. 99-2 (Sweepstakes Advisory Network certificate of dissolution) (Gov't's Proposed Tr. Ex. 383 at 7–8); Gov't's Mot., Ex. 3, ECF No. 99-3 (emails and letters between December 2000 and April 2005 regarding complaints about the notices sent by Sweepstakes Advisory Network and Justin Grant); Gov't's Mot., Ex. 4, ECF No. 99-4 (notices sent by Sweepstakes Advisory Network and Justin Grant) (pages 9–12 of this exhibit have been pre-marked for trial as Proposed Government Trial Exhibit 403).

The government has also proposed the following trial exhibits that pertain to the uncharged sweepstakes scheme: (1) the certificate of incorporation for Justin Grant, dated April 10, 1998 (Gov't's Proposed Tr. Ex. 382); (2) the certificate of incorporation of the Sweepstakes Advisory Network, dated November 10, 1999 (Gov't's Proposed Tr. Ex. 383 at 1–6); (3) an additional document signed by Sean Novis consenting to the dissolution of the Sweepstakes Advisory Network, filed with the New York Department of State on January 11, 2002 (*id.* at 9–10); (4) internal records from Justin Grant, including sweepstakes notices (Gov't's Proposed Tr. Ex. 384); (5) letters from March and April of 2000 from Priolo regarding a real estate purchase (Gov't's Proposed Tr. Ex. 399); (6) payment records for Justin Grant and the Sweepstakes Advisory Network and various invoices from 2000 for the Sweepstakes Advisory Network, including invoices for rent and water charges, electrical work and locksets (Gov't's Proposed Tr. Ex. 380); and (7) mailings from Justin Grant and Sweepstakes Advisory Network (Gov't's Proposed Tr. Exs. 401–13).

C. Priolo's Knowledge of Novis's Conviction

The government also seeks to prove that Priolo knew about Novis's conviction based on, among other things, Priolo's involvement with Novis in the uncharged sweepstakes scheme and through evidence that other individuals involved with the uncharged sweepstakes scheme in the late 1990s and early 2000s knew that Novis had been involved with the legal system. (Gov't's Mot. at 5.)

The government proffers that Johnson will testify that she knew Novis went to prison, although she believed he was sentenced for tax evasion. (*Id.*) The government also seeks to offer testimony from Cheryl Jacquard ("Jacquard"), an employee for the uncharged sweepstakes scheme hired "years after . . . Novis's release from prison," that she knew Novis was "prohibited from being involved in running the operation because of his legal troubles." (*Id.*) The government also seeks to offer testimony from Jason Spector ("Spector"), who worked with Sean Novis and Denkberg until 2012, that Novis "told him about his conviction and imprisonment" for mail fraud "in connection with prize-notice mailings." (*Id.* at 5 n.6.)

Lastly, the government alleges that Novis's prior conviction affected the ways in which Novis and Priolo operated the charged sweepstakes scheme in 2015 and 2016. (Gov't's Mot. at 5–6.) The government seeks to offer evidence that payment processing companies, including PacNet, had previously rejected accounts associated with Novis because of his criminal conviction. (*Id.* at 5.) The government alleges that because of this, even though Novis and Priolo jointly owned Winners Circle, Priolo falsely represented to PacNet that he had 100% ownership of Winners Circle and was the sole shareholder of that company when he applied for an account.

17

(*Id.* at 5–6; Gov't's Mot., Ex. 7, ECF No. 99-7.)[11] The government also seeks to admit emails from Novis to Priolo, which forward an email that a representative from PacNet had addressed to Priolo at a Winners Circle email address. (Proposed Government Trial Exhibits 356A and 356B; *see* Hr'g, Feb. 27, 2025; Gov't's Tr. Mem. at 7–8.) The government alleges that these emails further demonstrate that Novis "disguised" his participation in Winners Circle from PacNet. (Gov't's Tr. Mem. at 7–8.)

### VII.    Procedural History

Priolo's trial is scheduled to begin on March 10, 2025. (*See* Elec. Order, Feb. 10, 2025.) One year earlier, on March 11, 2024, the government emailed counsel for Novis and Priolo with a letter stating its intent to introduce evidence at trial related to the prior uncharged sweepstakes scheme. (Gov't's Mot., Ex. 8, ECF No. 99-8.) On January 10, 2025, the government filed the instant Motion, along with supporting exhibits. (ECF No. 78; *see supra* note 3.) Priolo opposed the Motion on January 24, 2025, raising objections to evidence of the uncharged sweepstakes scheme under Rule 404(b), Rule 403, and the Confrontation Clause. (Def.'s Opp'n.) The government filed a reply on January 30, 2025. (Gov't's Reply Supp. Gov't's Mot. Lim. ("Gov't's Reply"), ECF No. 95.) The government submitted its proposed trial exhibits to the Court on February 3, 2025.

On February 4, 2025, I heard argument on the government's Motion. (Hr'g, Feb. 24, 2025.) The government noted that its proposed trial exhibits included documents relating to Priolo's prior involvement in the uncharged sweepstakes scheme in the late 1990s and early

---

[11] *See also* Gov't's Mot., Ex. 6 (August 2014 emails showing that PacNet denied an application from COL Trading International Corporation due to Novis's "criminal record," and that an individual named Ronald Clinton asked PacNet to reconsider the denial because Novis would no longer be involved in that company).

2000s which were not attached to the government's Motion. (*Id.*) I directed the government to file a letter indicating which of its proposed trial exhibits related to this period of time, and the government filed the requested letter later that day. (ECF No. 103.) The proposed trial exhibits identified by the government included some of the documents the government filed in support of its Motion[12] as well as several additional exhibits.[13]

On February 7, 2025, the government filed a Trial Memorandum. (Gov't Tr. Mem. at 23.) On February 10, 2025, Priolo filed a Motion in Limine seeking to exclude certain government evidence at trial. (Def.'s Mot. at 7.) On February 20, 2025, the government filed a reply to Priolo's Motion in Limine. (Gov't Opp'n.) On February 24, Priolo filed a reply in support of his Motion. (Def.'s Reply Supp. Def.'s Mot. Lim. ("Def.'s Reply"), ECF No. 124.)

On February 27, 2025, I held an oral argument on Priolo's Motion and heard additional argument on the government's Motion. (Hr'g, Feb. 27, 2025.) On February 28, 2025, the parties filed four supplemental submissions to address issues raised during the oral argument. First, the government submitted a supplemental letter addressing the notice Priolo was given of the TRO in *United States v. Sean Novis*, No. 16-cv-5263, and attached a copy of the email that Johnson sent to Priolo and Novis providing service. (Gov't First Suppl. Ltr.; ECF No. 125-1.) Second, Priolo submitted a supplemental letter attaching the deposition of proposed government witness Teshale and provided additional argument that Teshale's testimony is inadmissible as irrelevant and because she testifies to inadmissible hearsay. (Def.'s Suppl. Ltr. at 1–2.) In this letter, Priolo

---

[12] *See supra* notes 9–10 (identifying the Proposed Government Trial Exhibits that correspond with exhibits to the government's Motion).

[13] Proposed Government Trial Exhibits 380, 382–83 at 1–6 and 9–10, 384, 399, and 401–13 were not attached to the Motion. *See also supra* note 10 (describing the contents of these proposed trial exhibits.)

also provided additional argument in support of his motion to exclude the TRO in *United States v. Sean Novis*, No. 16-cv-5263. (*Id.* at 3.)[14] Third, the government filed a supplemental motion in limine to admit Teshale's deposition testimony and also attached a copy of Teshale's deposition. (Gov't's Suppl. Mot.; ECF No. 127-1.) Fourth, the government filed a letter providing a list of exhibits it seeks to offer, which consists of complaints and notes from mailing recipients and government entities. (Gov't's Second Suppl. Ltr., ECF No. 128.)

## STANDARD OF REVIEW

A motion in limine provides the court with the opportunity to rule in advance of trial on the admissibility of certain forecasted evidence. *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996);[15] *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Courts should only exclude evidence in response to a motion in limine if the proffered evidence is "clearly inadmissible on all potential grounds." *United States v. Pugh*, 162 F. Supp. 3d 97, 100 (E.D.N.Y. 2016).

## LEGAL STANDARDS

### I.    The Charged Offenses

#### A.    Mail and Wire Fraud

The elements of mail or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively are: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mail[] or wires to further the scheme." *United States v. Moses*, 109 F.4th 107, 117 (2d Cir. 2024). "[T]he gravamen of the offense is the scheme to defraud." *United States v.*

---

[14] Priolo also provided his position on whether the indictment, or any portion thereof, should be read to the jury or sent back during deliberations, which was discussed at the February 27, 2025 hearing. (Def.'s Suppl. Ltr. at 3.) This Order does not resolve this issue.

[15] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

*Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). "In order to prove the existence of a scheme to defraud, the government must also prove that the misrepresentations were material, and that the defendant acted with fraudulent intent." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curium); *see United States v. Saint Clair*, No. 22-2100, 2024 WL 413422, at *4 (2d Cir. Feb. 5, 2024) (same).

A statement is material for the purposes of mail and wire fraud "if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct." *Weaver*, 860 F.3d at 94. "In other words, a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal." *Id.* "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* (citing *Universal Health Servs., Inc. v. United States*, 597 U.S. 176 (2016)).

To prove fraudulent intent, the government must prove that the defendant "either intend[ed] to harm their victim or contemplate[ed] that their victim may be harmed." *United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021); *see also United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) ("Because an intent to deceive alone is insufficient to sustain a wire fraud conviction, misrepresentations amounting only to a deceit must be coupled with a contemplated harm to the victim.").

"[F]raudulent intent may be inferred from the scheme itself if the necessary result of the actor's scheme is to injure others." *Gatto*, 986 F.3d at 113 (2d Cir. 2021); *see also Jabar*, 19 F.4th at 76–77 ("Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."). The government may also prove intent to

21

defraud "through circumstantial evidence, including by showing that [the] defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *Jabar*, 19 F.4th at 76 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)); *Saint Clair*, 2024 WL 413422, at *4 (same).

While the government must prove that a defendant "*contemplated* some actual harm or injury to their victims," and that the defendant's misrepresentations had "a natural tendency to influence" the intended victims, the government is not required "to prove that the victims of the fraud were *actually* injured." *Weaver*, 860 F.3d at 94–95; *Jabar*, 19 F.4th at 77 ("Proof of actual injury to the victim is not required because the scheme need not have been successful or completed."). "[T]he only significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm." *Weaver*, 860 F.3d at 97.

### B. Conspiracy to Commit Mail or Wire Fraud

To prove a conspiracy to commit wire or mail fraud under 18 U.S.C. § 1349, the government must prove that "the defendant agreed with another to commit wire [or mail] fraud and knowingly engaged in the conspiracy with the intent to commit that offense." *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024); *see also* 18 U.S.C. § 1349 ("Any person who . . . conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."); *United States v. Jimenez*, 96 F.4th 317, 324 (2d Cir. 2024) ("To prove conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent, and that those persons agreed to participate in what they knew to be a collective venture directed toward a common goal.").

22

## II.    Evidence "Inextricably Intertwined" with the Charged Offense

Rule 404(b) of the Federal Rules of Evidence generally governs the admissibility of

"[e]vidence of any other crime, wrong, or act." Fed. R. Evid. 404(b). In the Second Circuit,

however:

> evidence of uncharged criminal conduct is not evidence of other crimes, wrongs, or acts
> under Rule 404(b) if that conduct arose out of the same transaction or series of
> transactions as the charged offense, if it is inextricably intertwined with the evidence
> regarding the charged offense, or if it is necessary to complete the story of the crime on
> trial.

*United States v. Zhong*, 26 F.4th 536, 551 (2d Cir. 2022). The Second Circuit and district courts

have applied this rule to admit evidence of uncharged conduct. *See, e.g.*, *United States v. Kaiser*,

609 F.3d 556, 571 (2d Cir. 2010) (holding that evidence of acts pre-dating the charged

conspiracy fell outside of Rule 404(b) as "inextricably intertwined with the evidence regarding

the charged offense"); *United States v. Esposito*, No. 20-2143, 2021 WL 5492935, at *2 (2d Cir.

Nov. 23, 2021) (holding that evidence of the defendant's prior conviction for attempted

enterprise corruption fell outside of Rule 404(b) as "inextricably intertwined" with the charged

racketeering and conspiracy to commit extortion and "necessary to complete the story on trial");

*United States v. Lingat*, No. 21-cr-573, 2024 WL 1051633, at *3 (S.D.N.Y. Mar. 11, 2024)

(holding that evidence of the origins and operations of a tax evasion scheme prior to the time

period charged was not governed by Rule 404(b) and was admissible to "provide context for the

jury" about the "nature, structure, and development of the scheme").

In *Kaiser*, the Second Circuit held that the district court did not err in admitting evidence

of uncharged acts that pre-dated the charged conspiracy as falling outside the scope of Rule

404(b). 609 F.3d at 571. Kaiser was charged, among other things, with conspiracy to commit

securities fraud for participating in a scheme to inflate income that his corporation, a distributer

of food and related products, received from food vendor payments—called "promotional

allowances"—for 2001 and 2002. *Id.* at 560. The indictment alleged that Kaiser lied to outside auditors about promotional allowance agreements with vendors that generated the inflated income numbers. *Id.* at 562–63. At trial, the district court admitted evidence that in the 1990s, well before the period charged in the indictment, Kaiser negotiated contracts on behalf of the corporation that required vendors to prepay promotional allowances, which artificially inflated the corporation's income. *Id.* at 561. The Second Circuit found that the evidence of these prior contracts did not constitute "other crimes" evidence under Rule 404(b) because it was "inextricably intertwined with the evidence regarding the charged offense." *Id.* at 570–71. It affirmed that "[i]t would have been impossible to intelligibly present a case about much of what went on after April of 2000 without starting at the beginning" because evidence of the prior contracts "continued to have bearing on whether Kaiser lied to auditors about the existence of prepayments and written contracts" and because the company's promotional allowance rate during the indictment period was a rate Kaiser had calculated based on previous income numbers recorded from these pre-indictment contracts. *Id.* at 571.

In *Lingat*, two co-defendants were charged with conspiracy to defraud the Internal Revenue Service ("IRS") for an alleged scheme to evade payroll taxes owed by Moishe's Moving from 2010 to 2016. 2024 WL 1051633, at *1. Before trial, the government moved to admit evidence that the tax evasion scheme with Moishe's Moving had begun before the indictment period, as early as the late 1980s. *Id.* at *2. The district court ruled in limine that "evidence concerning the origins of the payroll tax evasion scheme at Moishe's Moving and its operation prior to the charged period is likely admissible as direct evidence" because this evidence "will likely provide significant background demonstrating the circumstances surrounding the inception of the scheme and to provide background for the scheme alleged in the

24

indictment." *Id.* at *3. The court explained that testimony about the origins of the scheme "may be necessary to provide context for the jury" and excluding such evidence "may lead to jury confusion." *Id.* at *3. Accordingly, it held that testimony relating to "the nature, structure, and development of the scheme may be necessary to complete the story of the crime on trial." *Id.*

### III.    Evidence of "Other Crimes, Wrongs, or Acts" under Rule 404(b)

Under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence "may be admissible for another purpose," however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. McPartland*, 81 F.4th 101, 115 (2d Cir. 2023). This "inclusionary rule is not a carte blanche," however, "to admit prejudicial extrinsic act evidence that is offered to prove propensity, or otherwise to allow propensity evidence in sheep's clothing." *Zhong*, 26 F.4th at 551. The government must also give the defense "reasonable notice" of the evidence it intends to offer at trial of "other crimes, wrongs or acts" under Rule 404(b). Fed. R. Evid. 404(b)(3).

#### A.    Proper Purposes under Rule 404(b)(2)

In *United States v. Pitre*, the Second Circuit held that in the prosecution of a conspiracy, "[p]rior act evidence may be admitted" under Rule 404(b)(2) "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed." 960 F.2d 1112, 1119 (2d Cir. 1992). The Second Circuit affirmed the district court's admission of

25

evidence of prior narcotics transactions as "relevant in informing the jury of the background of the conspiracy charged, in that such evidence could help explain to the jury the relationship between" the co-conspirators. *Id.* at 1119. In its later, 2010 decision in *Kaiser*, the Second Circuit recognized that the type of prior act evidence permitted in *Pitre* under Rule 404(b)(2) as information about the background and development of the charged conspiracy and completion of the story of the crimes charged is now analyzed as evidence that falls outside of Rule 404(b)(2) as evidence inextricably intertwined with a charged conspiracy. *See Kaiser*, 609 F.3d at 570.

Evidence of prior acts may also be admissible under Rule 404(b)(2) to prove a defendant's intent or knowledge when those elements are in dispute. *United States v. Graham*, 51 F.4th 67, 82 (2d Cir. 2022) ("Where it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief."); *see also Pitre*, 960 F.3d at 1119 (evidence of prior drug distribution scheme admissible to prove intent and knowledge in later drug distribution conspiracy trial).[16] "Where such evidence is offered for the purpose of establishing the defendant's knowledge or intent," the government must "identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act." *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009); *Zhong*, 26 F.4th at 551 (noting that the government can offer "other act evidence to show knowledge or intent only when such evidence is sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act"). "Even

---

[16] The Second Circuit has held that these elements are at issue where they are elements the government is required to prove at trial. *See e.g.*, *Pitre*, 960 F.3d at 1119 (the intent or knowledge of the two defendants was "clearly at issue" in a heroin distribution conspiracy case because "the government was required to prove that [the defendants] knowingly or intentionally conspired to distribute heroin, or to possess it with intent to distribute it" under 21 U.S.C. §§ 812, 841(a)(1), and 846).

when the other bad acts and the charged conduct do not involve exactly the same co-conspirators, conduct, or temporal timelines, the evidence may still be sufficiently relevant or probative to be admitted." *Graham*, 51 F.4th at 82.

For example, in *Graham*, the Second Circuit considered the case of a defendant charged with a fraudulent mortgage-discharge conspiracy whose principal defense at trial was that she lacked the requisite mental state for a fraud conspiracy conviction. *Id.* It found that evidence that the defendant participated in a separate electronic funds transfer scheme was admissible as "probative of [the defendant's] fraudulent intent" because: (1) this other scheme was done at the same time as the charged conspiracy, (2) with the same co-conspirators, and (3) "with the same hallmarks—unconventional financial techniques used to purportedly discharge debt" as the charged mortgage-discharge scheme. *Id.*

Similarly, in *United States v. Moran-Toala*, the Second Circuit found that a defendant's plea allocution in a Florida state case that was nearly identical to the charges in New York was admissible under Rule 404(b)(2) to show her knowledge of the New York narcotics conspiracy. 726 F.3d 334, 346 (2d Cir. 2013). And in *Lingat*, the district court found that even if evidence of the defendant's pre-indictment participation in the alleged tax evasion scheme with Moishe's Moving was not direct evidence of the charged tax evasion conspiracy, it was alternatively admissible under Rule 404(b)(2) because it was offered for a proper purpose—"to show planning, preparation, knowledge, and intent on the part of the defendants." 2024 WL 1051633, at *4.

## B. Rule 404(b)(3)'s Reasonable Notice Requirement

Rule 404(b)(3) requires that the prosecution give "reasonable notice" to the defense of evidence it intends to offer at trial that falls within Rule 404(b). In full, Rule 404(b)(3) requires the prosecutor to:

(A) provide *reasonable notice* of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a *fair opportunity* to meet it;

(B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and

(C) do so in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b)(3) (emphasis added).

Rule 404(b)(3) does not define the term "reasonable notice." *See id.* Courts in the Second Circuit "have held that two or three weeks notice is reasonable" under 404(b), "and a longer period may be appropriate, depending on the circumstances." *United States v. Brown*, 627 F. Supp. 3d 206, 242 (E.D.N.Y. 2022) (collecting cases); *see, e.g.*, *United States v. Bracy*, No. 20-cr-483, 2022 WL 17801133, at *4 (E.D.N.Y. Dec. 19, 2022) (requiring 19 days' notice). "A court may provide for a longer notice period," for example, "in the case of a complex trial, in which the 404(b) evidence is critical to the action." *United States v. Inniss*, No. 18-cr-134, 2019 WL 6117987, at *3 (E.D.N.Y. Nov. 18, 2019). Courts have denied requests for more extended notice periods, however, where the defense has not articulated any specific reason for additional time based on the circumstances of the case. *See e.g.*, *Brown*, 627 F. Supp. 3d at 242 (setting deadline for 404(b) notice 17 days prior to trial because the defendant had "not raised any circumstances justifying [the] thirty-day notice period" requested); *United States v. Pastore*, No. 17-cr-343, 2018 WL 395490, at *6 (S.D.N.Y. Jan. 11, 2018) (denying request for 60 days' notice of 404(b) evidence where the defendant did not identify "any special circumstances that warrant . . . sixty days' notice").

## IV.    Relevance under Rule 401

Evidence is relevant under Rule 401, Fed. R. Evid., "if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of

consequence in determining the action." Fed. R. Evid. 401. "Relevant evidence is admissible

unless" its admission would otherwise violate the U.S. Constitution, a federal statute, the Federal

Rules of Evidence, or other rules prescribed by the Supreme Court rules. Fed. R. Evid. 402.

"Irrelevant evidence is not admissible." *Id.*

## V.    Rule 403 Balancing

Rule 403 provides that a "court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Fed. R. Evid. 403.

## VI.    Hearsay Rules, Rules 801–804

The admissibility of out-of-court statements is generally governed by Rules 801 through

804, Fed. R. Evid. With some exceptions, Rule 801, Fed. R. Evid., defines hearsay as "a

statement that: (1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R.

Evid. 801(c). Rule 802, Fed. R. Evid., provides that "[h]earsay is not admissible unless" a federal

statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provides

otherwise. Fed. R. Evid. 802. Rule 803, Fed. R. Evid., sets forth exceptions to the rule against

hearsay regardless of whether the declarant is unavailable to testify. Fed. R. Evid. 803. Rule 804,

Fed. R. Evid., provides exceptions to the rule against hearsay only when the declarant is

unavailable as a witness. Fed. R. Evid. 804(b).

Rule 803(3) sets forth an exception to the rule against hearsay for a "statement of the

declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3);

*see also United States v. Johnson*, 117 F.4th 28, 47 (2d Cir. 2024) (recognizing that a declaration

is admissible to "prove a relevant state of mind" under Rule 803(3) or because such a declaration

is not actually hearsay). This exception does not, however "includ[e] a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3); *see United States v. Dawkins*, 999 F.3d 767, 789–90 (2d Cir. 2021) (affirming exclusion of an out-of-court statement that was offered as an assertion of fact, rather than as a statement of motive or intent).

## DISCUSSION

### I.    Evidence of Priolo's Involvement in the Uncharged Sweepstakes Scheme

Priolo objects to the proffered evidence of his involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s, arguing that the government did not provide reasonable notice of this evidence under Rule 404(b)(3) and that this evidence is inadmissible under Rules 404(b) and 403. (Def.'s Opp'n at 3–6; *see also* Hr'g, Feb. 24, 2025). As set forth below, the government provided reasonable notice of its intent to introduce this evidence under Rule 404(b)(3), and this evidence is admissible as direct evidence of the charged conspiracy and under Rules 404(b) and 403.

#### A.  Reasonable Notice Under Rule 404(b)(3)

First, Priolo argues that the first notice he received of the government's intention to offer evidence that Priolo purportedly worked with Novis and Sean Novis in the late 1990s to send fraudulent mailings was when the government filed its Motion in Limine on January 10, 2025. (Def.'s Opp'n at 3.) Priolo contends that because this Motion was filed "within mere weeks" of trial, it did not provide him with reasonable notice under Rule 404(b)(3), and he requests exclusion of the evidence or, in the alternative, an adjournment of trial, which was originally scheduled to begin on February 11, 2025 but is now scheduled to commence on March 10, 2025.

(*Id.* at 4.)[17] The government argues that both its March 11, 2024 letter and its Motion in Limine, filed more than eight weeks before the current trial date, provided reasonable notice of this evidence under Rule 404(b)(3). (Gov't's Mot. at 6; Gov't's Reply at 2.)

### i.  March 11, 2024 Letter

The government served its March 11, 2024 letter on Priolo and Novis long before this Court issued a December 16, 2024 order severing Priolo and Novis's trials. In the letter, the government informed Priolo and Novis that it intended to offer the following evidence at trial: (1) Novis's mass-mailing sweepstakes notices, which began in around 1992; (2) the criminal investigation relating to the 1990s notices and Novis's resulting 1995 conviction and 2001 sentence of imprisonment for conspiracy to commit mail fraud; (3) an administrative action brought against Novis by the U.S. Postal Service in 1997 based on these 1990s activities, and the resulting settlement of that action; and (4) the continuation of this mailing scheme in the early 2000s as operated by Sean Novis, Priolo, and others. (Gov't's Mot., Ex. 8 at 2–4.)

With respect to Priolo's involvement in the uncharged sweepstakes scheme, the March 11, 2024 letter specifically stated the following:

> In the early 2000s, Novis's scheme continued, now managed day-to-day by his son Sean Novis, defendant Phillip Priolo, and others. At this time, the scheme continued to send $12,000 prize notices. Before and after his imprisonment, Novis participated in the prize-notice mailing operation, as did Priolo. Novis and Priolo profited from the continuing prize-notice scheme through the 2000s, worked in and collected money at the office run by Sean Novis, and otherwise continued participating in the direct-mail scheme originally started by Novis.

---

[17] Following Priolo's filing of his opposition to the government's Motion, I granted Priolo's separate motion to adjourn the commencement of trial to March 10, 2025 over the government's objection in light of documentation showing that Priolo's counsel needed time to recuperate from various health issues. (Elec. Order, Feb. 10, 2025; *see also* ECF Nos. 105, 107–08.)

(*Id.* at 3.) The March 11, 2024 letter also explained the basis for the government's belief that the evidence identified was admissible. It stated, in part:

> The continuity of operations between the early 1990s and the end of the scheme set forth in the indictment in the present matter shows that Novis and Priolo were engaged in—if not the same conspiracy—activities that were so similar in kind, scope, participants, and methods to fall squarely within the permissible uses of such other-acts evidence under Rule 404(b), including proof of modus operandi, knowledge, and intent. This evidence also illuminates the background and development of the charged conspiracies and the relationships of trust between the defendants.

(*Id.* at 4.)

The March 11, 2024 letter provided Priolo with reasonable notice that the government intended to introduce evidence about his involvement with the uncharged sweepstakes scheme. The letter specifically identified the uncharged sweepstakes scheme and Priolo's alleged involvement in that scheme. (*Id.*) The letter did not state exactly *which year* Priolo allegedly became involved in the mailing scheme, stating only that, "[b]efore and after his imprisonment, Novis participated in the prize-notice mailing operation, as did Priolo" and that "[i]n the early 2000s," Priolo helped manage the daily operations of the scheme. (*Id.* at 3.) But the letter provided clear notice to Priolo that the government intended to introduce evidence of his involvement in the scheme "[b]efore and after" Novis's 2001 imprisonment, which is reasonably interpreted to include Priolo's conduct in the late 1990s and the early 2000s. (*See id.* (stating that Novis pled guilty in 1995 and was sentenced and imprisoned in 2001).) The letter also provided Priolo notice that the government intended to introduce evidence that the scheme stretched back to the early 1990s. (*Id.* at 2–4; *see also id.* at 4 (stating the government's position that "[t]he continuity of operations between the early 1990s and the end of the scheme set forth in the indictment in the present matter" was probative of Novis and Priolo's knowledge and intent.)

Moreover, the March 11, 2024 letter was sent to Priolo nine months before I severed Priolo and Novis's trial. (*See* Min. Entry, Dec. 16, 2024.) Because I granted a separate defense motion to adjourn the commencement of trial from February 18, 2025 to March 10, 2025, the March 11, 2024 letter was provided to Priolo exactly one year prior to trial. (*See* Elec. Order, Feb. 10, 2025.) In this context, the March 11, 2024 notice provided Priolo with more than sufficient time to conduct any necessary investigation to meet the government's proffered evidence of Priolo's involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s.

### ii.  *January 10, 2025 Motion in Limine*

In addition to providing Priolo notice through the March 11, 2024 letter, the government served the instant Motion on Priolo on January 10, 2025, more than five weeks before Priolo's original February 18, 2025 trial date and eight weeks before the current March 10, 2025 trial date. In the Motion, the government identified the specific evidence the government intended to offer at trial, including many of the specific exhibits ultimately identified by the government for use at trial, and stated that:

> this motion also serves as notice under Rule 404(b) of the government's intent to admit evidence related to Priolo's involvement in Justin Grant, Sweepstakes Advisory Network, and the other activities discussed herein, insofar as it is filed more than five weeks in advance of trial.

(Mot. at 6.) This notice is reasonable under Rule 404(b)(3), especially when considering the disclosure of the government's March 11, 2024 letter one year before trial. The Motion provided Priolo with eight weeks of notice before trial commences on March 10, 2025—longer than the two to three weeks many courts in this district have found to be reasonable. *See e.g.*, *Brown*, 627 F. Supp. 3d at 242.

The fact that the government submitted seventeen additional exhibits related to this time period in its proposed trial exhibits on February 3, 2025 does not compel a different result. *See supra* notes 9–10 (describing these additional exhibits). First, the government's February 3, 2025 disclosure of trial exhibits pertaining to the government's Motion still took place two weeks prior to the original trial date of February 18, 2025, and five weeks prior to the current trial date of March 10, 2025. *See Brown*, 627 F. Supp. 3d at 242. Second, the additional exhibits all directly relate to Priolo's involvement with Justin Grant and Sweepstakes Advisory Network in the late 1990s and 2000s, and Priolo has not suggested any of these additional exhibits were not included in discovery. Thus, the March 11, 2024 letter and the January 10, 2025 Motion together provided Priolo reasonable notice of the government's intent to introduce at trial evidence of his involvement with the uncharged sweepstakes scheme in the 1990s and early 2000. Moreover, the additional trial exhibits were disclosed in pre-trial discovery. *See Kaiser*, 609 F.3d at 571 n.3 (finding that the indictment "in conjunction with the materials disclosed by the government in pre-trial discovery, was more than sufficient to put [the defendant] on notice that the government intended to introduce evidence concerning his" actions prior to the charged period).

Priolo's assertion that he requires "far longer" than the five weeks between the filing of the government's Motion on January 10, 2025 and the now-adjourned trial date of February 18, 2025 in order to confront evidence of Priolo's involvement with the uncharged sweepstakes scheme is unpersuasive. (Def.'s Opp'n at 4.) Priolo generally argues that he needs additional time because the actions at issue allegedly occurred around 25 years ago without explaining *why* this fact necessitates additional time to prepare for trial, especially since he does not argue that this evidence was not produced to him during discovery. (*See id.*) More importantly, however, Priolo's argument ignores the fact that the government's March 11, 2024 letter provided Priolo

notice that the government intended to introduce evidence of the uncharged sweepstakes scheme and Priolo's involvement in that scheme during the late 1990s and early 2000s. (*See* Gov't's Mot., Ex. 8.)

Accordingly, through both the government's March 11, 2024 letter one year before trial and filing of the government's Motion in Limine eight weeks before trial, the government has provided Priolo with "reasonable notice" of its intent to introduce evidence of his involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s. Fed. R. Evid. 404(b)(3). Accordingly, Priolo's request to adjourn the trial date in the event this evidence is allowed is denied. (Def.'s Opp'n at 4.)

### B. Inextricably Intertwined

Priolo argues that the proffered evidence about his involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s is impermissible character evidence under Rule 404(b)(1). (*Id.* at 4–5.) Specifically, Priolo moves to exclude the testimony of Ressler, the copywriter in the uncharged sweepstakes scheme, arguing that this evidence has no proper purpose other than to prove Priolo's propensity to engage in crime. (*Id.* at 3–4; Hr'g, Feb. 4, 2025.) The government asserts that this evidence of Priolo's prior involvement with the uncharged sweepstakes scheme is not "other acts" evidence under Rule 404(b) because it is direct evidence of, and is inextricably intertwined with, the charged sweepstakes scheme. (Gov't's Mot. at 7–8.)

In light of the Second Circuit's precedents, the proffered evidence—including the testimony of employee Johnson, documentary evidence about Sweepstakes Advisory Network and Justin Grant, and the testimony of copywriter Ressler—are inextricably intertwined with the charged conspiracy and are therefore admissible as direct evidence of the conspiracy. *See Kaiser*, 609 F.3d at 571; *Lingat*, 2024 WL 1051633, at *3. The proffered evidence about Priolo's

35

involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s is analogous to the evidence at issue in *Lingat*, which concerned the origins of the charged tax evasion scheme and operation of the scheme prior to the charged period, which the district court found were admissible as direct evidence of the charged tax evasion conspiracy. *Lingat*, 2024 WL 1051633, at *3. Here, the evidence of Priolo's involvement in the uncharged scheme is admissible as direct evidence of the charged sweepstakes scheme for five reasons.

First, Johnson's anticipated testimony that Priolo and Novis were working with Sean Novis in 2000 to send out sweepstakes notices similar to the Winners Circle notices in the charged sweepstakes scheme is likely direct evidence of the charged conspiracy between Priolo and Novis. As in *Lingat*, this testimony will provide background for the charged sweepstakes scheme. *Id.* Indeed, Priolo acknowledges that this testimony would "provide the jury with an appropriate background to the parties['] relationship." (Def.'s Opp'n at 6.)[18]

Second, the documentary and testimonial evidence regarding Sweepstakes Advisory Network and Justin Grant, the two corporations in which Priolo and Novis were allegedly involved and which allegedly sent out mailings in the late 1990s and early 2000s, is likewise direct evidence of the charged conspiracy between Priolo and Novis.

Third, Ressler's testimony that he created mailings used in the uncharged sweepstakes scheme will also provide direct evidence of the charged conspiracy in connection with the evidence that Priolo was involved in Sweepstakes Advisory Network and Justin Grant—including Ressler's testimony that he met Priolo at the time.[19] Priolo's objects to this testimony

---

[18] Priolo does not object to this testimony to the extent that it is the only evidence admitted of Priolo's involvement in the uncharged sweepstakes scheme. (Def.'s Opp'n at 6.)

[19] Priolo's arguments that Priolo and Ressler's interactions were minimal can be drawn out on cross-examination and argued to the jury.

on the basis that Ressler is not expected to testify that he was involved in the charged sweepstakes conspiracy is unpersuasive in light of the Second Circuit's precedents. *See* Def.'s Opp'n at 3–4; *Kaiser*, 609 F.3d 556, 570–71; *Esposito*, 2021 WL 5492935, at *2.[20]

Fourth, Priolo's attempt to distinguish this case from *Lingat* is unconvincing. According to Priolo, the defendants in *Lingat* had been continuously engaged in the "same – ongoing – uninterrupted" tax avoidance scheme for many years prior to the period charged in the indictment, whereas here, there is a "15-year interruption or gap" between the uncharged sweepstakes scheme and the charged sweepstakes scheme. (Def.'s Opp'n at 5; *see also* Hr'g, Feb. 27, 2025.) The government, however, has proffered evidence in this case arguably showing that the charged sweepstakes scheme is a continuation of the uncharged sweepstakes scheme— this same representation was made by the government in *Lingat.* (*See* Gov't's Mot. at 11.)

Fifth, Priolo's speculation that the evidence about his involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s cannot be "intrinsic" to the charged conspiracy because he was not charged or named as a co-conspirator in the prosecution of Sean Novis and Denkberg, *United States v. Sean Novis*, No. 20-cr-335, is unconvincing. (Def.'s Opp'n at 5.) In this case, the Indictment plainly charges that Priolo and Novis conspired with Sean Novis, Denkburg, and others to send fraudulent notices by mail to obtain money from recipients. (Indictment ¶ 5.)

---

[20] During oral argument on February 27, 2025, Priolo also argued that the government's decision not to call a copywriter who worked on the mailings sent out in the charged sweepstakes scheme suggests that the only basis for Ressler's testimony is an improper propensity argument. (Hr'g, Feb. 27, 2025.) This argument does not address the fact that Ressler's testimony about making notices in furtherance of the uncharged sweepstakes scheme, in which Priolo was allegedly involved, is admissible under *Kaiser*, 609 F.3d 556, as direct evidence of the conspiracy between Priolo and Novis.

For all of these reasons, the government's proffered evidence concerning Priolo's involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s is admissible as direct evidence of the conspiracy. *See Kaiser*, 609 F.3d at 571.

### C. Proper Purpose Under Rule 404(b)

In the alternative, the government argues that the evidence about Priolo's involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s is admissible under Rule 404(b)(2) to prove Priolo's knowledge of the conspiracy and intent to defraud. (Gov't Mot. at 11–13.) Priolo responds that this evidence "is not being offered for a proper purpose" under Rule 404(b) but will instead "lead the jury to conclude that Mr. Priolo has a propensity for engaging in fraudulent mass-mailings with [Novis and Sean Novis]" or in other words, that "because he engaged in fraudulent mailing before in the late 1990's he must have done it again beginning in 2015." (Def.'s Opp'n at 5.) In light of Second Circuit precedents, Priolo's knowledge of the charged conspiracy and intent to defraud are at issue in his trial. The elements of conspiracy to commit mail or wire fraud include "showing that the defendant agreed with another to commit wire [or mail] fraud and knowingly engaged in the conspiracy with the intent to commit that offense." *DiMassa*, 117 F.4th at 487. An essential element of mail fraud is the existence of a scheme to defraud, which requires proof "that the misrepresentations were material and that the defendant acted with fraudulent intent." *Weaver*, 860 F.3d at 94; *Saint Clair*, 2024 WL 413422, at *4 (same). Moreover, Rule 404(b) permits the government to present evidence of uncharged crimes or acts for any purpose other than to prove Priolo's criminal propensity. *McPartland*, 81 F.4th at 115; *see Graham*, 51 F.4th at 82; *Pitre*, 960 F.3d at 1119.

Accordingly, evidence of Priolo's involvement in the uncharged sweepstakes scheme through Johnson's testimony and documents relating to Sweepstakes Advisory Network and Justin Grant is admissible under Rule 404(b)(2) to prove Priolo's knowledge of the mail fraud

conspiracy and his intent to defraud, which are distinct from the prohibited purpose of proving criminal propensity. *Lingat*, 2024 WL 1051633, at *4 (holding that evidence of defendant's pre-indictment participation in the tax evasion scheme was admissible under Rule 404(b)(2) "to show planning, preparation, knowledge, and intent on the part of the defendants").[21] Evidence of Ressler's testimony as to the artistic and linguistic methods he used to make the notices for Sweepstakes Advisory Network and Justin Grant, when combined with evidence that Priolo was involved in the uncharged sweepstakes scheme at the time Ressler worked on notices, is probative of Priolo's intent to defraud and knowledge of the conspiracy. This evidence is probative because the uncharged scheme was carried out with many of the same co-conspirators as the charged scheme, and it included the "same hallmarks"—mailings with a similar aesthetic that notified recipients that they won a large sum of money and could collect their prize by paying a small fee. *See Graham*, 51 F.4th at 82 (finding an uncharged fraud scheme to be probative of the defendant's fraudulent intent to commit a separate fraudulent mortgage-discharge scheme because, among other things, the schemes were carried out with the same co-conspirators and with the same "hallmarks").[22]

### D. Rule 403 Balancing

Priolo asserts that the government's proffered evidence about his involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s should be excluded under Rule

---

[21] In support of its Motion, the government submitted evidence of complaints addressed to Justin Grant and Sweepstakes Advisory Network about their mailings, although the government has not identified these documents as proposed trial exhibits. (*See* Gov't's Mot., Ex. 3.)

[22] To the extent that the government seeks to offer evidence of Novis's conduct in the uncharged sweepstakes scheme, such evidence is admissible under Rule 404(b) to show Novis's knowledge as it relates to whether Novis and Priolo had "an agreement on the essential nature of the fraud" that was the object of the charged conspiracy. *United States v. Rosenblatt*, 554 F.2d 36, at 42 (2d Cir. 1977); *see also infra* Discussion Section II(A)(i).

403 because its probative value is "substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay[,] and wasting time." (Def.'s Opp'n at 5.) Priolo asserts that the government could give the jury "an appropriate background to the parties['] relationships" without depriving Priolo of a fair trial or creating a "trial within a trial" by *only* introducing Johnson's testimony that "at the time she began working for Sean Novis" in 2000, "Novis and Priolo were working with Sean Novis to send out sweepstakes mailings very similar to those sent out under the name 'Winner[]s Circle' in the 2015-2016 time period." (*Id.* at 6.) The government contends, however, that this evidence should not be precluded under Rule 403 because it is not more inflammatory than the charged offense. (Gov't's Mot. at 13–14.)

The Second Circuit has clarified that even where evidence of uncharged criminal conduct is properly offered as direct evidence of the charged offense or for a proper purpose under Rule 404(b), "a district court may admit that evidence only if it satisfies the probative-prejudice balancing test of Rule 403." *Zhong*, 26 F.4th at 551. A district court abuses its discretion under Rule 403 "when it admits evidence of uncharged conduct that was significantly more sensational and disturbing than the charged crimes." *Id.*; *cf. Moran-Toala*, 726 F.3d at 346 (no abuse of discretion in admitting prior defendant's plea allocution to prove her knowledge under Rule 403, especially where the court limited the government's evidence to "a focused and brief stipulation").

In *Lingat*, the district court found that the evidence of the defendant's participation in the tax evasion scheme prior to the charged period was admissible under Rule 403 under a similar analysis. 2024 WL 1051633, at *5. The court reasoned that the evidence was "highly probative of the charged conduct" because it "directly explains the origins and design of the charged conduct and demonstrates the defendants' longstanding knowledge of and intent to engage in the

40

charged conduct." *Id*. The evidence was not "unduly prejudicial" because "it is merely a continuation of the same charged conduct and therefore cannot be more sensational or disturbing than the charged conduct." *Id*.

In *United States v. Sterling*, the district court found that evidence of a defendant's prior conviction offered to prove his knowledge and intent was admissible under Rule 403. No. 22-cr-247, 2023 WL 1967526, at *4 (E.D.N.Y. Feb. 12, 2023). The evidence of the prior conviction was "significantly probative" of the defendant's "knowledge and intent . . . to participate in trafficking cocaine," which were both elements of the charged offense, because both the charged offense and the prior conviction involved using similar code to describe narcotics. *Id.* Further, the court found that the risk of any undue prejudice did not outweigh the probative value of this evidence under Rule 403 because the government did not have any other direct evidence of the defendant's knowledge that the code described the narcotics, the prior conviction was not more sensational than the charged offense, and any prejudice would be mitigated by a limiting instruction to the jury. *Id.*

The Second Circuit's opinion in *Moran-Toala* is instructive on the application of Rule 403 to the evidence at issue. 726 F.3d at 346. In *Moran-Toala*, the district court found that the risk of prejudice from admitting a defendant's prior plea allocution, which was nearly identical to the pending charges, did not substantially outweigh the probative value of that evidence to show that same defendant's knowledge of the charged conspiracy. *Id.* The Second Circuit found the district court had not abused its discretion. Here, as in *Moran-Toala*, the government anticipates that the evidence will show the charged and uncharged sweepstakes schemes are "nearly identical." (Gov't Mot. at 13; Gov't Reply at 2.) In this context, the probative value of the government's proffered evidence as to Priolo's knowledge and intent is significant. *See*

41

*Graham*, 51 F.4th at 82. Furthermore, the risk of potential prejudice here is also low because the uncharged acts are not "significantly more sensational and disturbing than the charged crimes." *Zhong*, 26 F.4th at 551; *see also Lingat*, 2024 WL 1051633, at *5; *Sterling*, 2023 WL 1967526, at *4. The evidence in this case is less prejudicial than the prior act evidence deemed admissible in *Moran-Toala*, which showed that the defendant actually pled guilty to a nearly identical crime. 726 F.3d at 346.

Finally, Priolo's contention that the evidence about his involvement in the uncharged sweepstakes scheme in the late 1990s and early 2000s will lead to delay because it will become a "trial within a trial" is unpersuasive. (*See* Def.'s Opp'n at 6.) The evidence the government has proffered—the testimony of two witnesses, Johnson and Ressler, and nineteen proposed trial exhibits—are not overly voluminous and will not cause undue delay or distraction from the issues at trial where the government has proposed a total of 23 witnesses and 251 trial exhibits.

Given these considerations, Rule 403 does not preclude the government from introducing at trial the evidence identified by the government concerning Priolo's prior involvement in the uncharged sweepstakes scheme.

## II.    Jeffrey Novis's Prior Conviction

The government seeks to offer the information and judgment concerning Novis's prosecution, conviction, and imprisonment for conspiracy to commit mail fraud in *United States v. Dobin*. (Gov't's Mot. at 9–11; Gov't's Tr. Mem. at 23.) There is no evidence or allegation that Priolo was involved in any of the conduct leading to Novis's prior conviction. Priolo is not alleged to have worked with Novis during the timeframe of the conduct charged in the 1995 information. (*See* Gov't's Reply at 2 (noting that the government "possesses no evidence that Priolo was . . . involved" in the conduct leading to Novis's conviction in *United States v.*

*Dobin*).) Nor was Priolo named as a defendant in the conspiracy to which Novis pled guilty. (*See* Gov't's Mot., Ex. 5 at 8–14.)

Instead, the government intends to offer evidence of Novis's prior conviction for the principal purpose of establishing *Novis's* knowledge of the charged conspiracy and intent to defraud. (Gov't Mot. at 5.) As a secondary matter, the government seeks to offer this evidence to prove Priolo's knowledge and intent to defraud, arguing that there is "circumstantial evidence" that Priolo knew of Novis's conviction. (*Id*. at 4–5.) Priolo objects, arguing that evidence of Novis's prior guilty plea and conviction is not relevant because Novis is not on trial and therefore Novis's knowledge and intent are not at issue. (Def.'s Opp'n at 6–7; *see also* Def.'s Mot. at 2.) Priolo also argues that the government's "circumstantial evidence" that he was aware of the prior conviction is "specious at best." (Def.'s Opp'n at 6–8 (citing Gov't's Mot. at 5).) Finally, Priolo objects to the admission of this evidence under Rules 404(b) and 403 and the Confrontation Clause of the Sixth Amendment to the U.S. Constitution. (*Id.* at 8–11.)

Evidence of Novis's prior conviction for conspiracy to commit mail fraud is inadmissible under Rule 403 because the probative value of this evidence is substantially outweighed by the risk of undue prejudice to Priolo, confusing the issues, and misleading the jury. Accordingly, I do not reach the question of whether admission of the information and judgment relating to Novis's prior conviction violates the Confrontation Clause.

A. Probative Value

While Novis's guilty plea and conviction in *United States v. Dobin* is relevant to Novis's knowledge of the charged conspiracy, the probative value of this evidence is reduced based on the other evidence the government intends to present at trial. Further, Novis's guilty plea and conviction has only marginal relevance, if any, to *Priolo's* knowledge and intent to commit mail or wire fraud.

### *i. Novis's Knowledge and Intent to Defraud*

The government argues that Novis's prior information and judgment is probative of Novis's knowledge and intent to defraud in the charged sweepstakes scheme even though Novis's trial has been severed from Priolo's trial. (Gov't Mot. at 7–9.) The government asserts that

> [t]he similarity of the methods and techniques set forth in the criminal information from his earlier case, to which Novis pleaded guilty, as well as the sanctions imposed upon Novis in the form of conviction and imprisonment, shows his unequivocal knowledge that the conspiracy with Priolo was both in violation of the law and had the specific object of committing mail fraud . . . .

(*Id.* at 9.) The government also argues that the evidence of Novis's prior conviction shows that Novis "*knew* that a scheme like that outlined in the conviction documents was illegal, amounted to mail fraud, and that he therefore intended to defraud consumers when he implemented a similar scheme with Priolo as set forth in the indictment." (Gov't Tr. Mem. at 22–23.)

Priolo argues that Novis's knowledge and intent are *not* at issue because Novis is no longer being tried with him. (Def.'s Opp'n at 6–7; Def.'s Mot. at 2.) The government contends that even though the trials have been severed, the government must still show Novis's knowledge and intent to defraud in order to prove that Priolo engaged in a conspiracy to commit mail or wire fraud with Novis as his co-conspirator. (Gov't Mot. at 7–9.)

The government has failed to identify a single case in which the court held that the intent of an alleged co-conspirator who is not on trial is an element the government must prove to establish that the defendant on trial engaged in a conspiracy. (*See* Gov't Mot. at 7–9; Gov't Reply at 1–2.) Nor has the government identified a single case where the court held that the prior conviction of a co-defendant not on trial was admissible at the trial of a defendant charged with conspiracy. (*See* Gov't Mot. at 7–9; Gov't Reply at 1–2.) At oral argument, the government acknowledged that despite its efforts, it has not been able to find such authority. (Hr'g, Feb. 27,

2025.) Instead, in its Motion, the government principally relies on the jury instruction on conspiracy to commit mail or wire fraud provided in the 2022 trial of Sean Novis and Denkburg to argue that the government's burden to prove that Priolo engaged in such a conspiracy requires showing the intent of co-conspirators who are not on trial. (Gov't Mot. at 7–9 (citing Trial Tr. at 1889–93, *United States v. Sean Novis*, No. 20-cr-335).)

It is true that in Priolo's trial, the government bears the burden of proving the elements of conspiracy to commit mail or wire fraud and that the first element requires proving that Priolo had an agreement with another person to commit the unlawful act of mail or wire fraud. *See DiMassa*, 117 F.4th at 487; *see also* 18 U.S.C. § 1349. Certainly, evidence tending to make more probable that there was an agreement between Priolo and Novis to engage in the charged sweepstakes scheme is relevant evidence under Rule 401. But the government stretches this requirement too far by arguing that proof of Novis's specific intent to defraud is squarely at issue in Priolo's severed trial. Rather than find a case on point, the government relies on cases in which the prior conviction of a co-defendant was admitted in trials where co-conspirators were *tried together*. *See* Gov't Mot. at 9 (citing *Iannelli v. United States*, 420 U.S. 770, 777–78 (1975), *United States v. Babilonia*, 854 F.3d 163, 175 (2d Cir. 2017), and *United States v. Martino*, 759 F.2d 998, 1005 (2d Cir. 1985).)

For example, the government relies on *Martino*, which is distinguishable. Although the Second Circuit found no error in the admission of a prior criminal conviction to prove a conspiracy to distribute narcotics, the evidence at issue concerned the appellant-defendant's *own* prior conviction—not the prior conviction of a co-conspirator who was not on trial. 759 F.2d at 1004–05.

45

Under Second Circuit precedent, because the government must prove that Priolo and a co-conspirator had an agreement to defraud, Novis's *knowledge* of the conspiracy is at issue in Priolo's severed trial. In *United States v. Rosenblatt*, the Second Circuit reversed Rosenblatt's conviction for conspiracy to defraud the United States where the evidence at trial showed that Rosenblatt himself "neither intended nor agreed to commit" the substantive crime with which his co-defendant was charged or might have been guilty "because [Rosenblatt] *had no knowledge* of such a plan." 554 F.2d 36, at 39 (2d Cir. 1977) (emphasis added). Thus, "the government neither pled nor proved *an agreement on the essential nature of the fraud*" between Rosenblatt, who was on trial, and his alleged co-conspirator, who had pled guilty. *Id*. at 42 (emphasis supplied). In determining whether there was such an agreement, the defendant's *own* knowledge and mental culpability for the conduct to which the co-conspirator had pled guilty was at issue. *Id.* at 39. *Rosenblatt* makes clear that the government must prove that co-conspirators agreed on the "essential nature of the plan" that is the object of the conspiracy. *Id*. at 38. Thus, *Rosenblatt* stands for the proposition that the *knowledge* of a co-conspirator about the essential nature of the fraud is at issue in the trial of a defendant charged with conspiracy, although it does not hold, as the government suggests, that the *intent* of a co-conspirator not on trial is squarely at issue in proving a conspiracy charge against the defendant on trial. *See id.*

The government also relies on *Rosenblatt*'s reading of prior cases: *Ingram v. United States*, 360 U.S. 672 (1959), and *United States v. Gallishaw*, 428 F.2d 760 (2d Cir. 1970). (Gov't's Opp'n at 2.) These cases are distinguishable because they both concerned the mental culpability of the *defendants on trial*, rather than a co-conspirator who was not on trial. In *Ingram*, the Supreme Court found insufficient evidence to support a conspiracy conviction to evade federal taxes imposed on lottery operations under 18 U.S.C. § 371 for two defendants who

46

were involved in the lottery operation but did not *know* that their co-conspirators "were liable for federal taxes by reason of the gambling operation." *Ingram*, 360 U.S. at 677–78. Similarly, in *Gallishaw*, the Second Circuit held that the district court erred in instructing the jury that it was not necessary for the government to prove that the defendant on trial knew the specific objectives of the conspiracy in order to be convicted of a conspiracy charge. 428 F.2d at 762–64.

If Priolo and Novis were tried together for conspiracy to commit mail or wire fraud and this Court were to deem admissible evidence of Novis's prior conviction as probative of Novis's knowledge and intent to commit mail or wire fraud, this Court would be required to provide a limiting instruction to the jury upon Priolo's request. *Pitre*, 960 F.2d at 1119. The standard jury instruction provided in such circumstances underscores that the jury cannot impute one defendant's conduct onto another. *See* Leonard B. Sand *et al*., 1 Modern Federal Jury Instructions: Criminal, Comment to Instruction 5.10 (2025) ("In multiple-defendant cases," it is appropriate to instruct the jury that "the similar act proof has been offered *solely as to the issue of the codefendant's intent* and may not be considered at all as having any independent bearing on the defendant.") (emphasis added); *see also United States v. Rosenwasser*, 550 F.2d 806, 807–09 (2d Cir. 1977) (affirming the district court's cautionary instruction in a joint trial that prior act evidence could be considered solely as to one defendant's knowledge and intent, and not as to the co-defendant's).[23]

Accordingly, Novis's intent to commit mail or wire fraud is not squarely at issue in Priolo's trial on counts of mail fraud and conspiracy to commit mail or wire fraud. Nevertheless, under *Rosenblatt*, evidence of Novis's prior guilty plea and conviction for conspiracy to commit

---

[23] *See also United States v. Spinelli*, 352 F.3d 48, 55 n.3 (2d Cir. 2003) (noting that the district court instructed the jury to consider the co-defendants being tried "separately").

mail fraud is relevant to Novis's own knowledge as it relates to whether Novis and Priolo had "an agreement on the essential nature of the fraud" that was the object of the charged conspiracy. 554 F.2d at 42.[24] The probative value of this evidence is significantly diminished, however, because the government has offered other evidence to show Novis's knowledge of the object of the conspiracy. Indeed, as detailed above, evidence of Priolo's participation in a similar uncharged sweepstakes scheme in the late 1990s and early 2000s is admissible and is proffered for the same purposes. *See supra* Discussion Section I.

### ii. *Priolo's Knowledge and Intent to Defraud Based on his Purported Knowledge of Novis's Conviction*

The government also argues that evidence of Novis's guilty plea and conviction in *United States v. Dobin* "provides circumstantial evidence of Priolo's knowledge and intent to defraud" based on further circumstantial evidence that Priolo knew about Novis's conviction and resulting sentence. (Gov't's Mot. at 5.) The government contends that the following circumstantial evidence shows that Priolo knew about this conviction: (1) other employees of the uncharged sweepstakes scheme in the late 1990s and early 2000s knew Novis had some "legal troubles," (2) Priolo was involved in the uncharged sweepstakes scheme before, during, and after Novis's prison sentence resulting from the *United States v. Dobin* conviction, and (3) Priolo held himself out as the sole owner of Winners Circle to PacNet only a few months after PacNet refused to work with Novis due to his criminal conviction, despite the fact that Priolo co-owned the company with Novis. (*Id.* at 5–6.)

---

[24] For this reason, evidence of Novis's prior guilty plea and conviction is not precluded under Rule 404(b), as it is offered for a purpose "other than to demonstrate criminal propensity." *McPartland*, 81 F.4th at 115.

For Novis's guilty plea and conviction based on a similar prior scheme to be probative of Priolo's knowledge of the charged conspiracy and intent to defraud, the government would have to establish that Priolo knew about the *nature* of the charge for which Novis was convicted in 1995—i.e., that it was a conviction relating to mail fraud. But the government's proffered circumstantial evidence fails to raise anything more than speculation that Priolo knew of the nature of this prior conviction.

First, the government proffers the following evidence to show that "it was widely known that Novis had legal troubles": (1) Johnson, who was involved in the uncharged sweepstakes scheme beginning in the early 2000s, will testify that she recalls Novis going to prison, but believed it was for tax evasion; (2) Jacquard, who was hired after Novis was released from prison, will testify that she knew Novis could not be involved in running the operation "because of legal troubles"; and (3) Spector will testify that Novis told him that Novis went to prison for mail fraud arising out of prize-notice mailings. (*Id.* at 5 & n.6.) This evidence does not even establish that *other* members of the uncharged scheme knew about the nature of Novis's conviction in *United States v. Dobin*, with the exception of Spector, who learned about it directly from Novis himself. (*Id.* at 5 n.6.) Indeed, Johnson's testimony confirms that employees did *not* know the nature of Novis's charges, because she believed his conviction to be related to tax evasion, not mail fraud. (*Id.* at 5.) Any suggestion that Priolo knew about the nature of Novis's prior conviction based on this evidence is speculation.

Second, the government's argument that Priolo was involved in the uncharged sweepstakes scheme before, during, and after Novis's imprisonment in 2001 is similarly based only on speculation that Priolo *could* have known about the nature of Novis's conviction. The government has not explained, for example, how closely Priolo and Novis worked during the late

49

1990s and early 2000s. But, as the government's description of Johnson and Jacquard's anticipated testimony confirms, even if Priolo knew that Novis was serving time in prison during that period, any argument that he knew that Novis had a conviction relating to mail fraud is mere speculation based on the government's proffered evidence.

Third, the government's argument that Priolo knew about the nature of Novis's conviction based on his representations to PacNet is likewise merely speculative. The emails at issue indicate that PacNet employees discussed Novis's "criminal record" and that PacNet would decline the application of a company called COL Trading International Corporation, noting that the application of "David Dobin" was also previously declined. (Gov't Mot., Ex. 6.)[25] The emails do not indicate that Novis was convicted of conspiracy to commit mail fraud. (*Id.*) Nor do they discuss Winners Circle—the company jointly owned by Priolo and Novis. (*Id.*) Finally, Priolo was not copied on any of these emails, and the government has not proffered evidence that Priolo was aware of the contents of these emails. (*See id.*; *see also* Gov't Mot. at 5–6.)

During oral argument on February 27, 2025, the government argued that two additional exhibits it intends to offer at trial, Proposed Government Trial Exhibits 356A and 356B, also provide circumstantial evidence that Priolo knew of Novis's prior conviction because they show that Priolo held himself out as the face of Winners Circle while Novis kept his involvement a secret from PacNet. (Hr'g, Feb. 27, 2025.) This argument is again based on speculation. The emails in Proposed Government Trial Exhibits 356A and 356B show that on two different occasions, April 28, 2015 and May 1, 2015, a PacNet representative responded to emails Priolo

---

[25] The email includes three URLs as "reference" for declining "the previous prospect of David Dobin." (Gov't Mot., Ex. 6.) The first URL refers to "Deceptive Mailings Dobin Prepared Statement." (*Id.*) The second appears to link to a NewsDay article about fraud in the mail, but the URL does not state whether the article refers only to Dobin or also to Novis. (*Id.*) The content behind the third hyperlink is not clear based on the URL address. (*Id.*)

sent from a general email address for Winners Circle, <wincirint@gmail.com>, regarding their approval of art for Winners Circle's proposed mailings. (Gov't's Proposed Tr. Exs. 356A–B.) PacNet addressed those emails to "Phil" alone. (*Id.*) The exhibits show that Novis then forwarded those emails to Priolo with the message "FYI." (*Id.*) In one of the emails forwarded to Priolo, Novis added "Chan ges [sic] approved by pac net," and in the other he added, "I will use new art when you are ready to order these again." (*Id.*) Neither of these email threads mention Novis's prior conviction. (*Id.*)

These emails show, at most, that Priolo was the point of communication for this specific representative at PacNet regarding the art for these two proposed mailings and that Novis had access to the email account for <wincirint@gmail.com>. This evidence combined with the government's evidence that Priolo misrepresented Novis's involvement in Winner's Circle could raise an inference that Novis attempted to conceal his involvement in Winners Circle. But this evidence does not show that Priolo knew of Novis's conviction, much less the nature of Novis's prior conviction.

Even considering all of this evidence together—the knowledge of three employees that Novis had legal troubles, Priolo's involvement in the uncharged sweepstakes scheme before, during, and after Novis's prison sentence, and Priolo's act of holding himself out as the sole owner of Winners Circle to PacNet—it remains entirely speculative that *Priolo* knew that Novis had a prior conviction related to mail fraud, much less the nature of the scheme to which Novis confessed. Thus, evidence of Novis's guilty plea and conviction is, if anything, only marginally

51

probative of Priolo's knowledge of the charged sweepstakes scheme or intent to defraud and is irrelevant under Rule 401.[26]

Moreover, any marginal probative value of this evidence is significantly diminished because the government has offered other evidence showing Priolo's intent to defraud and knowledge of the conspiracy. As detailed above, evidence of Priolo's participation in a similar uncharged sweepstakes scheme in the late 1990s and early 2000s is admissible and proffered for the same purposes. *See supra* Discussion Section I. As explained in detail below, I also find admissible additional evidence of Priolo's intent in the form of letters sent by mail recipients and state attorneys general acting on behalf of mail recipients and a statement from an alleged victim indicating that he believed he was going to win a prize if he paid money in response to the mailings. *See infra* Discussion Sections IV, VI.

### iii.   *Evidence that the Sweepstakes Scheme was in Continuous Operation*

Lastly, the government asserts that evidence of Novis's prior guilty plea and conviction shows that "the overarching Novis sweepstakes prize-notice mail fraud scheme was in continuous operation between the early 1990s and at least the end of 2016, and that the co-conspirators used the same techniques and methods to carry out the scheme during that entire period." (Gov't's Mot. at 10–11.) As noted, the government does not argue, much less proffer evidence to support, the notion that Priolo was involved in the specific conduct giving rise to Novis's prior conviction in *United States v. Dobin*. (*Cf.* Gov't's Reply at 2.) Nor does the government argue, or proffer evidence to show, that *Priolo* was involved in this scheme in the

---

[26] For the same reason, the government's argument that evidence of Novis's prior conviction is relevant to explain *why* Priolo misrepresented the ownership of Winners Circle to PacNet is unpersuasive, because it necessarily rests on the assumption that Priolo *knew* about Novis's prior conviction. (*See* Gov't's Mot. at 5; *see also* Gov't's Mot., Ex. 6.)

*early 1990s*. (*See id*.) Therefore, any evidence of the scheme's existence prior to Priolo's involvement is not relevant to any fact of consequence in the trial against Priolo.

Thus, the government has failed to establish that: (1) Novis's intent to defraud is squarely at issue, (2) that Priolo *knew* about the nature of Novis's prior conviction, or (3) that Priolo was involved in the uncharged scheme between 1993–1994, when Novis engaged in the conduct to which he pled guilty in 1995. Although evidence of Novis's prior conviction may have a tendency to make more probable Novis's knowledge of the conspiracy as it relates to the existence of an agreement between Novis and Priolo about the essential nature of the fraud, the probative value of this evidence is significantly diminished because the government intends to offer other admissible evidence on this issue, including evidence of Priolo's participation in the uncharged sweepstakes scheme in the late 1990s and early 2000s. *See supra* Discussion Section I. Thus, the probative value of the evidence of Novis's prior conviction on any fact of consequence in Priolo's trial is minimal.

### B. Undue Prejudice and Confusion

Concerning the risks of admitting this evidence of Novis's prior conviction, there is a significant risk of undue prejudice to Priolo, confusing the issues, and misleading the jury. Such risks are self-evident here, where Novis confessed to conspiracy to commit mail fraud and Priolo now faces trial on similar charges of mail fraud and conspiracy to commit mail or wire fraud. Moreover, the factual allegations to which Novis pled guilty are similar to the charged sweepstakes scheme. *See United States v. Massino*, 319 F. Supp. 2d 295, 300 (E.D.N.Y. 2004) ("[G]iven the inherently interrelated nature of the charges, there is an enormous risk that the jury, despite a limiting instruction, would find the fact that co-defendants pleaded guilty to be

probative of the defendant's culpability for the instant charges.").[27] The government itself argues that the scheme to which Novis pled guilty in *United States v. Dobin* is similar to both the uncharged sweepstakes scheme and the charged sweepstakes scheme. (Gov't's Mot. at 5.) In this context, evidence of Novis's prior conviction is highly prejudicial to Priolo and risks misleading the jury to believe that Priolo may have been involved in the conduct to which Novis confessed.

This case is distinguishable from the cases on which the government relies for two reasons. First, here, the probative value of the evidence of Novis's prior conviction on any fact of consequence in Priolo's trial is minimal. By contrast, in *Sterling*, the court found that Rule 403 balancing weighed in favor of admitting evidence of a defendant's prior conviction given that the evidence was "significantly probative" of that defendant's knowledge and intent to participate in the charged crime of cocaine trafficking where he used similar methods in both the crime for which he was previously convicted and the charged offense. 2023 WL 1967526, at *4. Similarly, in *Lingat*, the court found that defendant's *own* participation in uncharged activity similar to the charged conspiracy was admissible under Rule 403 because the evidence was "highly probative" and "demonstrates the defendants' longstanding knowledge of and intent to engage in the charged conduct." 2024 WL 1051633, at *5. In this action, the Rule 403 balancing is very different, however, because the evidence of Novis's prior conviction is not probative of Priolo's knowledge and intent to defraud as discussed at length. *See supra* Discussion Section II(A)(ii).

---

[27] *Massino* involved the question of prejudice resulting from the admission of the guilty pleas of thirty co-defendants at the trial of the sole defendant who had not pled guilty. 319 F. Supp. 2d at 300. The court found that under Rule 403, evidence of the co-defendants' guilty pleas was inadmissible because the guilty pleas were "not particularly probative" and the government had "a variety of alternative means of rehabilitating its cooperating witnesses' credibility—which was the intended purpose for which the government offered those guilty pleas. *Id.* at 300–01. Although the prejudice from the admission of thirty different guilty pleas in that case may be even more prejudicial than the admission of evidence of Novis's guilty plea in this case, any difference in degree does not warrant a different outcome here.

The government's cases are also distinguishable because they concern situations where a court admitted evidence of a *defendant's own* prior conviction as proof of knowledge and intent—not the prior conviction of a co-conspirator who is not on trial. *Cf. Esposito*, 2021 WL 5492935, at *2 (admitting evidence of the defendant's *own* prior conviction in racketeering and conspiracy to commit extortion trial); *Moran-Toala*, 726 F.3d at 346 (admitting evidence of the defendant's *own* prior plea allocution to prove her knowledge and intent in later narcotics conspiracy trial); *Sterling*, 2023 WL 1967526, at *4 (admitting evidence of defendant's *own* prior conviction as "significantly probative" of that defendant's knowledge and intent to participate in trafficking cocaine). Any risk of unfair prejudice, confusing the issues, and misleading the jury from the admission of a defendant's own prior conviction is multiplied when the prior conviction at issue is that of a co-defendant who is not on trial.

The government contends that a limiting instruction would cure any prejudice to Priolo from the admission of evidence about Novis's prior conviction, relying on *United States v. Archer*, No. 22-539, 2023 WL 3860530 (2d Cir. June 7, 2023), *cert. denied*, 144 S. Ct. 694 (2024) and *United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003). These cases are distinguishable, however, because they involved appeals from district court denials of defendants' motions to sever their trials from the trials of co-defendants. As the Second Circuit recognized, the denial of a motion to sever "can be reversed only if a defendant can show prejudice *so severe* that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion." *Spinelli*, 352 F.3d at 54 (emphasis added). The question before me is not whether Priolo would suffer such severe prejudice from the admission of evidence of Novis's prior conviction that his trial should be severed from Novis's trial on that basis alone. As discussed, these two defendants' trials have *already* been severed for entirely different reasons.

55

*See supra* note 1. Rather, the question before me is whether the evidence of Novis's prior conviction is substantially more prejudicial than probative of the issue of Priolo's knowledge of the conspiracy and intent to defraud.

Given the interrelated nature of the allegations in the information against Novis in *United States v. Dobin* and the Indictment against Priolo in this action, the risk of unfair prejudice and confusion that would result from admitting evidence of Novis's prior conviction in Priolo's trial is very high even if the jury were given a limiting instruction that this evidence does not suggest that Priolo was involved in those prior acts in any way.

For all of these reasons, the probative value of the information and judgment concerning Novis's 2001 conviction for conspiracy to commit mail fraud is substantially outweighed by the risk of unfair prejudice to Priolo, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403. Critical to this balancing test is the fact that the government has other evidence of Priolo and Novis's knowledge of the charged conspiracy and Priolo's intent to defraud, including the evidence of their participation in a similar uncharged sweepstakes scheme in the late 1990s and early 2000s. Accordingly, the information and judgment against Novis in *United States v. Dobin* are inadmissible in Priolo's trial under Rule 403. Therefore, I do not reach Priolo's argument that the evidence would violate his rights under the Confrontation Clause of the Sixth Amendment to the U.S. Constitution.

### III.    Payments to Sean Novis, Gary Denkberg, and Shawn Phillips's Business Entities

Priolo moves to preclude evidence relating to payments received and mailings sent by Sean Novis, Denkberg, and Phillips through their business entities—Haven, Horizon, Lakeside, and Quantum—with which Priolo is not alleged to have been involved. (Def.'s Mot. at 4; Def.'s Reply at 4.) Priolo objects to this evidence under Rule 403 and under the Grand Jury Clause of the Fifth Amendment to the U.S. Constitution. (Def.'s Mot. at 4–5; Def.'s Reply at 3–4.) For the

reasons set forth below, the government is precluded under Rule 403 from introducing evidence of payments received by the Sean Novis, Denkberg, and Phillips business entities that were not made in response to a mailing sent by or on behalf of Priolo or a Priolo-Novis business entity (i.e., Winners Circle or Feel Lucky). Additionally, admission of this subset of the government's proposed evidence would not result in a constructive amendment of the Indictment in violation of the Fifth Amendment.

### A.  The Parties' Positions

The government has indicated that it "does not intend to introduce any of the prize notices used by Sean Novis, Denkberg, or Phillips at trial." (Gov't's Opp'n at 10.) Proposed Government Trial Exhibits 390 and 391, however, are illustrative exhibits the government has prepared to show payments made by particular alleged victims to different business entities, including Winners Circle, Feel Lucky Group, Haven, Horizon, Lakeside, and Quantum. (*Id.* at 6.)[28] Priolo argues that he is not charged with operating business entities other than Winners Circle or Feel Lucky or in aiding and abetting the operation of these other entities and that evidence of payments to these other entities would "serve no purpose other than to imply guilt by association." (Def.'s Reply at 4.) Priolo contends that since "far more" payments were made to the other entities than those allegedly made to Feel Lucky and Winners Circle, irrelevant evidence would "overwhelm" the relevant evidence of payments to the entities with which Priolo allegedly participated. (Def.'s Mot. at 4.)

In its opposition to Priolo's Motion, the government argues that Sean Novis and Denkberg are specifically named as Priolo's co-conspirators in the Indictment and Phillips is a

---

[28] *See* Gov't's Proposed Tr. Ex. 390 (a spreadsheet displaying payments made to various business entities); Gov't's Proposed Tr. Ex. 391 (a series of slides displaying payments made to various business entities).

charged co-defendant. (Gov't's Opp'n at 5.) The government further argues that this evidence is relevant as proof of the charged conspiracy because: (1) each of the business entities anonymized their mailings; (2) a critical part of the charged sweepstakes scheme was the sharing of mailing lists between the business entities "because it resulted in the most vulnerable victims getting scammed again and again"; and (3) without this evidence, alleged victims' testimony as to the sheer number of mailings they received may appear "mistaken" or "exaggerated." (*Id.* at 5–6.) The government clarifies that it does not intend to argue that Priolo directly profited from payments alleged victims sent to these other business entities. (*Id.* at 7.)

On reply, Priolo argues that the government's opposition to Priolo's Motion "represents a constructive amendment of the charges against Priolo" by essentially arguing "that because the mailings did not identify the Priolo entities as opposed to other entities, and because the Priolo entities and the Novis-Denkberg entities shared mailing lists (which is routine in the direct-mail industry), all these entities were part of one big scheme." (Def.'s Reply at 3.) Priolo argues that argument and evidence of "a single unified scheme" between Priolo, Novis, Denkberg, Novis, and Phillips would violate Priolo's rights under the Fifth Amendment. (*Id.*)

### B. Rule 403 Balancing

First, I do not reach the issue of whether to preclude the government from offering any mailings by Sean Novis, Denkburg, and Phillips and their business entities because the government has indicated that it does not intend to offer these mailings at Priolo's trial. (Gov't's Opp'n at 10.)

Second, under Rule 403, I find that evidence of payments to Sean Novis, Denkburg, and Phillips's business entities may only be admitted after the government demonstrates that these entities were conducting business on behalf of Priolo or the Priolo-Novis business entities— Winners Circle and Feel Lucky. The government may not, however, present evidence of

payments made by alleged victims in response to mailings by the Sean Novis, Denkberg, and Phillips's business entities that were *not* made on behalf of Priolo or the Priolo-Novis business entities.

### i. Probative Value

Evidence of payments made in response to mailings sent by Sean Novis, Denkberg, and Phillips's business entities that were *not* sent on behalf of Priolo or a Priolo-Novis business entity has minimal probative value in a trial against only Priolo for mail fraud and conspiracy to commit mail or wire fraud for three reasons.[29]

First, to the extent the government seeks to introduce this evidence to prove that the mailings Priolo and Novis sent through Winners Circle and Feel Lucky were anonymized in order to explain the nature of the charged sweepstakes scheme and to provide circumstantial evidence of Priolo's fraudulent intent, the government fails to show how evidence of payments by victims to entities other than Winners Circle and Feel Lucky tends to prove that the mailings by these two specific entities were anonymized. Even if payments to these other entities provided some circumstantial evidence for this, the mailings themselves provide much stronger evidence of the nature of the scheme and Priolo's fraudulent intent. (*See* Gov't Tr. Mem. at 9–10.)

Second, the government argues that evidence of payments to other entities—regardless of any involvement by Priolo or a Priolo-Novis business entity in the mailing that generated the payment—is relevant because it demonstrates how Priolo, Novis, Sean Novis, Denkberg, and Phillips all shared their business entities' mailing lists and used the mailing lists of other business entities to identify mail recipients who had previously sent payments in response to mailings and

---

[29] Priolo does not contest the relevance of evidence of payments made in response to mailings sent on behalf of the Priolo or the Priolo-Novis business entities. (Def.'s Mot. at 4.)

thus might be likely to respond similarly to another mailing in the future. (Gov't's Opp'n at 6.) The government argues that list-sharing resulted in the "most vulnerable victims getting scammed over and over again." (*Id.*) But the government has proffered direct evidence that Priolo, Novis, Sean Novis, and Phillips shared mailing lists—the testimony of Mary Lilienkamp ("Lilienkamp"). (*See id.*; *see also* ECF No. 120-1.) The government expects Lilienkamp to testify as she did in the trial in *United States v. Sean Novis*, No. 20-cr-335, that each of these business entities maintained their own mailing list and that they also shared each other's mailing lists. (Gov't's Opp'n at 6; *see also* ECF No. 120-1 at 7.)

Third, Priolo represents that he does not intend to argue to the jury that the alleged victims and their relatives are lying or mistaken about the volume of mailings alleged victims received, and argues that "any prejudice to the government can be cured by an instruction telling the jury not to speculate about why all this paperwork is not in evidence." (Def.'s Reply at 3.) This representation significantly diminishes any probative value that evidence of payments to the Sean Novis, Denkburg, and Phillips's business entities in response to mailings not attributable to Priolo might have towards explaining or providing context for a witness's testimony.

### ii.  *Undue Prejudice*

There is a significant risk of undue prejudice to Priolo, confusing the issues, and misleading the jury from admission of evidence of payments sent by mailing recipients to the Sean Novis, Denkberg, and Phillips business entities in response to mailings in which neither Priolo nor his business entities were involved.

First, as previously discussed, the government argues that this evidence shows that the business entities were all sharing mailing lists, which resulted in the "most vulnerable victims" "getting scammed over and over again" by *different* entities—not only the business entities operated by Priolo (Winners Circle and Feel Lucky) or acting on behalf of Priolo's business

60

entities. (Gov't's Opp'n at 6.) The vulnerability of a particular alleged victim is not an issue for the government to prove at trial, and argument on that basis would risk unfair prejudice to Priolo. *See Weaver*, 860 F.3d at 94; *see also United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) ("[T]he victim's *gullibility* . . . is not relevant" to fraudulent intent).

Second, there is a significant risk that evidence that victims made payments to the Sean Novis, Denkburg, and Phillips's entities would sway the jury to hold Priolo accountable for mailings sent by Sean Novis, Denkberg, or Phillips on their own behalf, rather than on behalf of Priolo or a business entity in which he was involved.

Weighing the probative value of this evidence and the risks of its admission, evidence of payments to the Sean Novis, Denkberg, and Phillips's business entities is only admissible under Rule 403 to the extent that the payments were made in response to mailings issued by or on behalf of Priolo or one of the Priolo-Novis business entities.

### C. Constructive Amendment

Priolo also argues that the admission of this evidence would constructively amend the Indictment. (Def.'s Reply at 3.) I disagree.

Under the Grand Jury Clause of the Fifth Amendment to the U.S. Constitution, "an indictment must contain the elements of the offense charged and fairly inform the defendant of the charge against which he must defend." *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021); U.S. CONST. amend. V, cl. 1. A defendant's rights under this clause are violated if the indictment against him has been "constructively amended," or "when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *Id.* In order to prove a constructive amendment, a defendant "must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the

grand jury's indictment." *Id.* "The charge has been so altered either where (1) an additional

element, sufficient for conviction, is added, or (2) an element essential to the crime charged is

altered." *Id.* "[C]ourts have constantly permitted significant flexibility in proof, provided that the

defendant was given notice of the core of criminality to be proven at trial." *Id.*; *see also United*

*States v. Dove*, 884 F.3d 138, 147 (2d Cir. 2018) ("An alteration of the indictment that does not

affect the core elements of the crime is not a constructive amendment."). "The core of

criminality of an offense involves the essence of a crime, in general terms; the particulars of how

a defendant effected the crime falls outside that purview." *Khalupsky*, 5 F.4th at 293.

      Priolo relies on three cases in support of his argument that the government intends to

constructively amend the Indictment by offering proof of payments made to Sean Novis,

Denkberg, and Phillips's business entities: *Stirone v. United States*, 361 U.S. 212 (1960), *United*

*States v. Hassan*, 578 F.3d 108 (2d Cir. 2008), and *United States v. Miller*, 471 U.S. 130, 138

(1985). (Def.'s Reply at 3.)

      In *Stirone*, the indictment at issue charged the defendant with engaging in extortion that

obstructed shipments of sand intended to be used in the construction of a steel mill from coming

into Pennsylvania in violation of the Hobbs Act, 18 U.S.C. § 1951. 361 U.S. at 218. At trial, the

government attempted to prove that Stirone interfered with interstate commerce not only by

obstructing sand shipments, but *also* by obstructing the steel mill's eventual export of steel to

surrounding states. *Id.* at 218–219. The Supreme Court held that the admission of this proof

constructively amended the indictment in violation of the Fifth Amendment because the

conviction might have been based on the evidence of obstructed steel exports, which was an

element of an offense not alleged in the indictment. *Id.* at 219. Similarly, in *Hassan*, the Second

Circuit found that a conviction for importing and possessing a different controlled substance than

that which was charged in the indictment would have been an impermissible constructive amendment of the indictment. 578 F.3d at 133–34.

Miller does not support Priolo's argument. In Miller, the Supreme Court held that where proof at trial "corresponded to a fraudulent scheme much narrower than, though included within, the scheme that the grand jury had alleged," the indictment was *not* constructively amended. 471 U.S. at 135, 145 (1985). Here, however, Priolo argues that the government intends to offer proof that corresponds with a fraudulent scheme that is *broader* than that charged in the Indictment.

The Indictment in this case alleges the following:

3. The defendants SHAWN PHILLIPS, JEFFREY NOVIS, and PHILIP PRIOLO conspired with Gary Denkberg and NOVIS's son Sean Novis, who owned and controlled a direct-mail operation based on Long Island, New York (the "Direct-Mail Operation"). The Direct-Mail Operation aided and abetted PHILLIPS, NOVIS, and PRIOLO in the execution of both the Phillips and the Novis-Priolo Mass-Mailing Schemes. In furtherance of the schemes, employees of the Direct-Mail Operation handled many of the daily operations of the Phillips and the Novis-Priolo Mass-Mailing Schemes, including inventory management, working with third-party vendors to print and mail the prize notices, and maintaining and updating the schemes' mailing lists. . . .

5. As part of the schemes, the defendants JEFFREY NOVIS and PHILIP PRIOLO, together with Sean Novis, Gary Denkberg, and others, sent fraudulent prize notices by U.S. Mail to the Victims, many of whom were elderly and vulnerable. The prize notices fraudulently represented that the Victims were specifically chosen to receive a large cash prize—typically, over $1,000,000—and would receive the prize if they paid a fee, ranging from approximately $20 to $40. Victims who paid the requested fee did not receive the promised cash prize. The object and purpose of the schemes was to obtain money from the Victims by means of these false and fraudulent statements and material concealments of fact in the mailings. . . .

7. The fraudulent prize notices appeared to be personalized notices for the respective recipients. In fact, the prize notices were mass-produced, boilerplate documents that were bulk mailed to hundreds of thousands of recipients. The defendants JEFFREY NOVIS and PHILIP PRIOLO, together with others, obtained the names and addresses of recipients from mailing lists purchased from other parties. When the Victims sent payments in response to fraudulent prize notices, NOVIS and PRIOLO, together with others, sent additional fraudulent prize notices to the Victims.

(Indictment ¶¶ 3, 5, 7.) The Indictment does not allege that Priolo and Novis aided and abetted Sean Novis and Denkberg in their own mailing scheme. (*See id.*)

In light of these allegations, Priolo has not demonstrated that the evidence of payments made by mail recipients to the Sean Novis, Denkberg, and Phillips's business entities in response to mailings on behalf of Priolo or a Priolo-Novis business entity would constitute a constructive amendment of the Indictment by either adding an additional element on which Priolo could be convicted or by altering an element essential to the crime charged. *Khalupsky*, 5 F.4th at 293. The Indictment alleges that Phillips, Priolo, and Novis conspired with Sean Novis and Denkberg, and that Sean Novis and Denkberg's direct mail operation aided and abetted the Priolo-Novis business entities in a number of ways, including by maintaining the Priolo-Novis mailing lists and obtaining mailing lists from other parties. (Indictment ¶¶ 3, 7.) These allegations in the Indictment placed Priolo on notice of the essence of the crime, or the "core of criminality"—that Sean Novis, Denkberg, and Phillips contributed to Priolo and Novis's scheme to defraud mailing recipients into believing they won a large prize and needed to remit a fee in order to claim the prize. *Khalupsky*, 5 F.4th at 293. Because the government's proffered evidence goes to this "core of criminality," its admission would not constructively amend the Indictment. *Id.*

## IV.    Testimony from the Relatives of Alleged Victims

Priolo moves to preclude testimony from the relatives of alleged victims about out-of-court statements the alleged victims made when they received or responded to mailings as inadmissible hearsay and because there is insufficient evidence to connect these statements to mailings attributable to Priolo. (Def.'s Mot. at 2–3.) Priolo specifically objects to the admissibility of Teshale's deposition testimony, arguing that the government did not lay the foundation that Teshale's testimony applied to Priolo's mailings specifically, rather than mailings by other entities. (Def.'s Suppl. Ltr. at 1; Hr'g, Feb. 27, 2025.) The government seeks to

admit Teshale's deposition testimony in its entirety or to otherwise present a redacted version of the deposition to the extent the Court finds certain portions of the testimony inadmissible. (Gov't's Suppl. Mot. at 1.) The government also argues that, separate from Teshale's testimony about her husband's out-of-court statement, Teshale's testimony is relevant because she provided first-hand observations of the letters that her husband received and of her husband sending money in response to those letters. (*Id.* at 3.)

In his supplemental letter, Priolo further argues that Teshale's deposition testimony "will be typical of the relative witnesses" and thus demonstrates that the other alleged victims' relatives should be precluded from testifying at all unless the government can establish that they will testify about specific mailings sent by Priolo. (Def.'s Suppl. Ltr. at 2.)

As set forth below, Teshale's deposition testimony is admissible because it is relevant. Moreover, her testimony as to her husband's statement that he would win a prize if he sent money in response to a mailing is not hearsay because it is not offered for its truth and is alternatively admissible as a statement of his then-existing state of mind under Rule 803(3). I reserve ruling on whether the testimony of other relatives of alleged victims is admissible because I do not have sufficient information about their testimony to make this determination. For the reasons set forth below, I am inclined to permit these witnesses to testify about their own experiences and observations and about alleged victims' statements that bear on their state of mind and beliefs about the sweepstakes mailings they were receiving at the time.

A.  Relevance

Priolo argues that these out-of-court alleged victims' statements are not relevant to the issues on trial for two reasons. First, Priolo argues that evidence about the alleged victims' subjective beliefs about the mailings in this case is not an element of mail fraud or conspiracy to

commit mail or wire fraud. (Def.'s Reply at 2; *see also* Def.'s Mot. at 3.)[30] Second, Priolo contends that any such statements are also irrelevant because the government will not be able to show that the statements were specifically made in reaction to a mailing sent by or on behalf of Priolo. (Def.'s Reply at 2–3.) As to this second point, Priolo asserts that the government has included in its witness list several witnesses who previously testified in *United States v. Sean Novis*, No. 20-cr-335, about statements that their relatives, the alleged victims, made about certain mailings. (Def.'s Mot. at 2.) Priolo contends that, based on a review of the testimony in *United States v. Sean Novis*, none of these relatives will be able to connect the alleged victims' statements to any specific mailings, including any of the mailings attributable to Priolo. (Def.'s Reply at 2–3.) Priolo further argues that the testimony in *United States v. Sean Novis*, No. 20-cr-335, indicates that these alleged victims received many mailings from many different sources. (*Id.* at 2.)

The government argues that evidence that alleged victims believed they won large prizes based on mailings sent by Priolo and his co-conspirators is relevant to show that the representations in these mailings had the intended effect on the alleged victim and to otherwise serve as circumstantial evidence from which a jury could infer Priolo's intent to cause harm. (Gov't's Tr. Mem. at 31–33.)

Teshale's testimony bears on Priolo's intent to defraud and whether any misrepresentations in Priolo's mailings were material because it tends to show that the

---

[30] In his Motion, Priolo frames this argument as the reason why these alleged victims' statements do not fall under the state of mind exception in Rule 803(3). (Def.'s Mot. at 3.) On reply, however, Priolo frames this argument as one of only "relevance." (Def.'s Reply at 2.) I agree with Priolo's framing in his reply—that this is an argument regarding the relevance of this evidence, rather than whether this evidence meets the requirements for exclusion from the rule against hearsay under Rule 803(3). I separately address whether this evidence meets those requirements.

representations in the Winners Circle mailing the government showed Teshale naturally tends to lead or is capable of leading a reasonable person to change his conduct. *See Weaver*, 860 F.3d at 94. During the charged period in 2015 and 2016, Teshale testified that she was married to and living with her husband Kore, [31] and that Kore frequently received letters "which would say, you are going to win this amount of money, you are the next person to win, and his name." (Teshale Dep. at 13:14–19.) She testified that these kinds of letters came in the mail "maybe two times or three times a week" and that they were "all over the house." (*Id.* at 18:1–7.) Teshale agreed that the Winners Circle mailing the government showed her was "an example of the letters" that her husband received. (*Id.* at 14:12–18.) The government has proffered evidence that Kore paid money in June 2016 in response to the Winners Circle mailing that the government showed to Teshale, and that Kore made payments in response to four other Winners Circle mailings as well.[32] Teshale testified that when she asked her husband, Kore, why he was "paying them," Kore told her, among other things, "I'm going to win." (Teshale Dep. at 15:20–24.) A factfinder could draw an inference from this evidence that Kore was referring to the Winners Circle mailing.

Thus, Teshale's testimony, including her recollection regarding Kore's statements, is relevant evidence. Priolo can argue to the jury that Teshale's testimony and Kore's specific statements are not connected to any mailings attributable to Priolo.

---

[31] *See* Teshale Dep. at 8:20–23 (explaining that she and Kore have been married since the Ethiopian calendar year 1963); *see also id.* at 11–12 (describing how in that time period she and Kore split bills and that Kore "was taking care of the mortgage for me, for us").

[32] *See* Gov't's Suppl. Mot. at 2 n.1 & 3.

B. Hearsay

Priolo also asserts that testimony from relatives about statements made by alleged victims in response to receiving mailings is inadmissible hearsay under Rule 801. According to Priolo, the statements by alleged victims are out-of-court statements that are offered for their truth because the government offers them to show "that the mailings at issue were in fact prize notices that advised the alleged victims that they had won a prize." (Def.'s Mot. at 3.) Priolo further argues that no exception to the hearsay rule applies to the statements under Rules 803 or 804. (*Id.*; *see also* Def.'s Reply at 2.)

Contrary to Priolo's framing, the out-of-court statements by alleged victims are not offered for their truth. The statements at issue are ones in which an alleged victim stated that "they had won a prize" or "they had paid a fee to get a prize." (*Id.* at 2.) If these statements were offered for the truth of what they assert, they would be offered to show that alleged victims had in fact "won a prize" or would win a prize if they paid the fee. (*Id.*) As the parties have proffered the evidence, the statements the government intends to offer do not assert that "the mailings . . . were in fact 'prize notices'" or that the mailings "advised the alleged victims that they had won a prize." (Gov't's Tr. Mem. at 18, 31–34; Def.'s Mot. at 2–3; Gov't's Opp'n at 3–4; Def.'s Reply at 2–3.)

Because the government does not offer the alleged victims' statements to prove that they *actually did* win large prizes, it does not offer these out-of-court statements for their truth. Rather, the government offers these statements as circumstantial proof that the mailings engaged in material misrepresentations and that Priolo acted with fraudulent intent in sending them. (Gov't's Tr. Mem. at 32 ("These statements are . . . presented . . . to establish that the promises and representations contained in the Defendants' notices were effective in creating the impression in the minds of those victims that they had won."); Gov't's Opp'n at 4 (asserting that

this evidence "is circumstantial evidence of defendants' fraudulent intent and direct evidence of the charged scheme to defraud").) Consequently, alleged victims' statements that they won large prizes based on mailings they received are not hearsay. Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement that a "party offers in evidence to prove the truth of the matter asserted in the statement.").

Priolo relies on *Smith v. Arizona*, 602 U.S. 779, 795–96 (2024), for the proposition that "the truth of out-of-court declarations is put before the court even if couched as statements that other people relied on and/or based their opinion as to what was going on." (Def.'s Mot. at 3 (citing *Smith*, 602 U.S. 779).) In *Smith*, the Supreme Court considered a confrontation challenge to an expert witness' testimony about a lab analyst's out-of-court statements that she had performed certain tests according to certain protocols and gotten certain results. 602 U.S. at 793, 798. The Supreme Court rejected the government's argument that the lab analyst's statements were not offered for their truth because they were offered "to show the basis of the in-court expert's independent opinion." *Id.* at 793–94, 798. Instead, the Supreme Court found that because the in-court expert's opinion was *predicated* on the truth of the lab analyst's factual statements, her statements were offered for their truth. *Id.* at 798. The alleged victims' statements proffered by the government here are very different from the evidence introduced in *Smith* because the government does not seek to prove any fact that is predicated on the truth of the alleged victims' out-of-court statements. Unlike *Smith*, the government's evidence retains its probative value even if the alleged victims' statements that they had won a prize were false. *Cf.* *Smith*, 602 U.S. at 795, 798 ("[T]he truth of the [challenged] testimony is what makes it useful to the prosecutor; that is what supplies the predicate for—and thus gives value to—the state expert's opinion.").

These out-of-court statements from the alleged victims are also admissible under the state of mind hearsay exception, Rule 803(3), as they are statements regarding the alleged victims' state of mind when they received the mailings. Fed. R. Evid. 803(3); *see also Johnson*, 117 F.4th at 47 (recognizing that "a state of mind can be proved circumstantially by statements which are not intended to assert the truth of the fact being proved" whether under the theory that such a statement is admissible under Rule 803(3) or because the statement is not hearsay under Rule 801).[33]

Testimony from relatives about these out-of-court statements regarding the alleged victims' state of mind is therefore not precluded under Rule 802, which deems hearsay inadmissible absent an exception established by federal statute, any other rule of the Federal Rules of Evidence, or the rules of the Supreme Court. Fed. R. Evid. 802.

The government shall provide the Court with proffers of the specific testimony it intends to elicit from each of the relatives of alleged victims who will be called to testify at trial. The Court defers a ruling, at this time, on the admissibility of the particulars of the testimony from these witnesses. The government shall identify the testimony it intends to elicit regarding: (1) statements from the alleged victims concerning their beliefs about the mailings they received; (2) any financial impact on the alleged victims beyond the direct payments that are allegedly attributable to Priolo or the Priolo-Novis entities; and (3) a breakdown of the money paid by each victim that is attributable to mailings by or on behalf of Priolo or Priolo-Novis entities and the losses attributable to other mailings.

---

[33] The government does not argue that any of the hearsay exceptions under Rule 804 apply, and I do not reach that issue. (*See* Gov't's Tr. Mem. at 2–3; Gov't's Opp'n at 3–4.)

## V.    Evidence of Uncharged "Scammers" and "Scams"

Priolo moves to preclude any testimony that before receiving the mailings at issue in this case, the alleged victims had previously fallen victim to other "scams" unrelated to the charged sweepstakes scheme. (Def.'s Mot. at 3–4.) Priolo argues that this testimony should be precluded under Rule 402 as irrelevant and, in the alternative, under Rule 403, because "any marginal relevance would be entirely outweighed by the potential for unfair prejudice." (*Id.*) The government responds that it "does not intend to introduce evidence about scams that are unrelated to defendants' and their co-conspirators' prize-notice schemes" such as "lottery scams, technology impersonation scams, [or] law-enforcement impersonation scams," and it "intends to instruct its witnesses from refraining from discussing unrelated scams during their testimony." (Gov't's Opp'n at 4–5.)[34]

As explained above, evidence relating to Priolo's involvement in the uncharged sweepstakes scheme during the late 1990s and early 2000s is admissible. *See supra* Discussion Section I. Any purported "scam" that alleged victims in this case may have previously experienced that was not related to sweepstakes mailings sent by Priolo and his co-conspirators as part of the charged sweepstakes scheme or to mailings in the uncharged sweepstakes scheme in the late 1990s and early 2000s is not relevant to the issues in this case. As Priolo points out, the gullibility of a victim is not relevant to the elements of wire or mail fraud. *See Thomas*, 377 F.3d at 243 ("[T]he victim's *gullibility* or his own criminal background is not relevant" to fraudulent intent). Consequently, any testimony regarding such a "scam" is precluded under Rule

---

[34] The government maintains, however, that evidence relating to mailings sent by Sean Novis, Denkberg, and Phillips's business entities is admissible and relevant at trial. (Gov't's Opp'n at 5.) I have separately ruled on the Priolo's Motion regarding this evidence, *see supra* Discussion Section III.

402. Further, any such testimony is also inadmissible under Rule 403 because this evidence lacks probative value and would be unfairly prejudicial to Priolo and risk confusing the issues and misleading the jury about the facts of consequence to this action.

## VI.    Complaint Letters and Attorney General Letters

Priolo seeks to preclude letters from mailing recipients and state attorneys general regarding complaints and inquiries about Priolo's mailings pursuant to Rule 403. (Def.'s Mot. at 5.) At oral argument on February 27, 2025, Priolo also argued that this evidence is also inadmissible under Rule 801 and the Confrontation Clause of the Sixth Amendment. (Hr'g, Feb. 27, 2025.) For the reasons set forth below, these letters are not offered for the truth of the matter asserted, but as evidence that Priolo was on notice that the charged scheme was unlawfully deceptive and that the mailings deceived recipients and that Priolo lacked good faith and intended to defraud. Thus, these complaint letters and state attorney general notices are not precluded under the Confrontation Clause or Rule 801.

### A.    Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford v. Washington*, the Supreme Court held that under this provision, a prior testimonial statement made by a witness who does not testify at trial may not be admitted against a defendant unless that witness is unavailable to testify, and the defendant had a prior opportunity for cross-examination. 541 U.S. 36, 53–54 (2004); *see also Johnson*, 117 F.4th at 47–48. "Two limits define the scope of this prohibition" under *Crawford* and its progeny. *Johnson*, 117 F.4th at 48 (citing *Smith*, 602 U.S. at 784). First, the Confrontation Clause "confines itself to 'testimonial statements.'" *Id.* (quoting *Davis v. Washington*, 547 U.S. 813, 823 (2006)). Second, the Clause "bars only the introduction of hearsay—meaning, out-of-

court statements offered 'to prove the truth of the matter asserted.'" *Id.* (citing *Smith*, 602 U.S. at 785).

Here, the government offers the complaint letters and notices for the purposes of showing that Priolo "had notice that [his] scheme was unlawfully deceptive, that [he] knew their prize notices deceived victims." (Gov't Tr. Mem. at 26.) Thus, the government does not offer the complaints and notices for the truth of the matters asserted within the letters, but rather for their effect on Priolo and as circumstantial evidence of the writer's state of mind, which is offered to show that mailings attributable to Priolo made material misrepresentations.

For example, Proposed Government Trial Exhibit 162, a letter signed by Brenda McDonald ("McDonald"), states in part: "I am writing to you about a check (for $1,200,000.00) you were supposed to sent back in early Jan. 2016 (I sent a $20.00 M.O.) You stated I was the winner and I was very happy to hear that I had won." (Gov't Proposed Tr. Ex. 162 at 31.) This letter is offered to show McDonald's state of mind at the time she received Priolo's letter and that Priolo was put on notice that McDonald had been deceived by his mailings into thinking she was supposed to receive a check. Thus, the contents of the letter could be entirely false—the letter could have stated that McDonald was *not* the winner—yet the letter would still be probative as to McDonald's state of mind and its effect on the reader, Priolo. Accordingly, evidence of mail recipients' complaints and notices by state attorney generals' offices relaying complaints does not offend the Confrontation Clause. *Johnson*, 117 F.4th at 48.

B. Hearsay

For the same reason that this evidence does not violate the Confrontation Clause, evidence of these complaints and state attorney general notices are not hearsay under Rule 801 because they are not offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

C. <u>Probative Value</u>

Priolo argues that the probative value of these letters and notices is "marginal" because the alleged victim's complaints are only the accusations of the alleged victims, and the "the fact that someone feels that they have been ripped off or cheated is not proof that they have been." (Def.'s Mot. at 5.)

The complaints and state attorney general notices are probative of whether the mailings conveyed material misrepresentations—meaning that they had a "natural tendency to influence" the recipient—and whether Priolo acted with an intent to defraud. *Weaver*, 860 F.3d at 94. Like the alleged victims' statements, these complaints tend to make it more probable that the representations in the mailings had a natural tendency to influence recipients to believe they had won a prize. *See United States v. Baren*, 305 F.2d 527, 531, 533–34 (2d Cir. 1962) (recognizing that evidence of "disgruntled purchasers" regarding their experiences is circumstantial proof that the defendant's material representations were false); *see also supra* Discussion Section IV(A) (addressing the admissibility of alleged victims' statements regarding the mailings). Further, the fact that Priolo knew about these complaints and did not change the language of subsequent mailings made by or on behalf of his business entities to make it clear that the recipient did not win a prize is probative of Priolo's knowledge and fraudulent intent.

For example, in *United States v. Press*, the Second Circuit affirmed that evidence of complaints called to a corporation's attention was relevant on the issue of appellants' intent to defraud in a mail fraud and conspiracy to commit mail fraud trial because it concerned the corporation's continued conduct despite knowledge that the literature at issue misled recipients. 336 F.2d 1003, 1011 (2d Cir. 1964). More recently, the Second Circuit held that borrower complaints about a defendant's business were admissible in a RICO trial because the complaints "served to put [the defendant] on notice of their potential illegality" and the fact that the

74

defendant "continued to operate his business despite this notice makes the complaints probative of his intent to violate the law." *United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020).

Letters and attorney general notices that do not specifically reference the content of the mailings but nevertheless convey a mailing recipient's request to be removed from a mailing list are less probative but still bear on Priolo's intent to defraud and the materiality of any alleged misrepresentations in Priolo's mailings. These letters and notices tend to show that that there was a high volume of these mailings, which was a product of the charged scheme. The requests for the mailings to stop also have some minimal probative value as to the mailing recipients' state of mind when they received the mailing, which bears on the question of whether the mailings set forth any material misrepresentations.

Priolo argues that any probative value of the complaint letters and state attorney general notices is lessened because the government intends to offer direct evidence of the mailings and the jury may determine whether the mailings made any material misrepresentations. (Def.'s Mot. at 5.) This argument is unpersuasive. It may be that the mailings themselves are comparatively more probative of whether the mailings conveyed material misrepresentations. Nevertheless, the complaints and state attorney general notices still shed light on Priolo's knowledge and fraudulent intent even under the objective test applied to determine whether a misrepresentation is material. *See Baren*, 305 F.2d at 531, 533–34.

The government and Priolo further disagree about the relevance of the *volume* of complaint letters and state attorney general notices that were sent to Priolo and Novis. The government describes a "high volume" of complaints, while Priolo argues that the number of complaints and notices was relatively small, stating that: "out of more than a million alleged mailings and thousands of responses, the number of letters and notices is in the dozens – a

75

volume of complaints that even legitimate businesses might well expect to get." (Def.'s Mot. at 5; Gov't's Tr. Mem. at 16; Gov't's Opp'n at 7.) Priolo also argues these complaints and notices did not serve as "notice" to Priolo because "a business owner is not required to change the operation of his business every time he gets a complaint no matter how infrequent or frivolous." (*Id.*)

While Priolo can argue to the jury that the number of complaints and notices from state attorney generals was relatively small or that the concerns raised were "frivolous," the government has proffered enough complaints indicating that mailing recipients believed they had won a large prize or had received a mailing containing a misrepresentation to render this evidence probative of Priolo's knowledge and intent to defraud. (*See, e.g.*, Gov't's Proposed Tr. Exs. 52, 60–62, 151, 160–62, 171, 173–75, 175A, 177–78, 353, 363–64, and 368A–D.)

### D.  Risk of Unfair Prejudice, Delay, and Confusion

Priolo argues that even if the complaints and state attorney general letters regarding customer complaints have some probative value, that relevance "would be grossly outweighed by the risk that the jury would treat the complaints as substantive evidence of guilt." (Def.'s Mot. at 4.) The government argues that any undue prejudice could be mitigated by a limiting instruction which explains the limited purpose for which the jury may consider this evidence— that this evidence is offered only on the issue of Priolo's knowledge of the illegality of the scheme and his intent to defraud. (Gov't's Opp'n at 8; Hr'g, Jan 27, 2025.) I agree that such a limiting instruction would adequately mitigate the risk that the jury would consider these complaint letters and state attorney general notices for an improper purpose. Thus, the risk of undue prejudice does not substantially outweigh the probative value of complaints and state attorney general notices.

76

**VII.    Temporary Restraining Order in *United States v. Sean Novis*, No. 16-cv-5263**

Priolo moves under Rule 403 to exclude Proposed Government Trial Exhibits 168 and 169, which consist of the September 16, 2022 TRO issued in *United States v. Sean Novis*, No. 16-cv-5263, and a September 30, 2016 Certificate of Notice by Cathy Johnson indicating that Priolo and Novis were provided notice of that TRO. (Def.'s Mot. at 5–6.) Priolo's motion to exclude these exhibits is granted because the risk of prejudice and confusion substantially outweighs the probative value of this evidence. Fed. R. Evid. 403.

A.    Probative Value

Priolo argues that this evidence is not relevant to the charges against him because the TRO was issued close to the *end* of the charged scheme, and after this TRO was issued, he did not send out any additional mailings. (Hr'g, Jan. 27, 2025; *see also* Def.'s Suppl. Ltr. at 3 ("It is undisputed that Priolo *is not* alleged to have sent any mailings after the issuance of the [TRO]. . . .").) The TRO was issued on September 22, 2016, and the government's evidence indicates that Priolo was notified by email about this TRO on September 26, 2016 and again on September 28, 2025. (*See* Gov't's First Suppl. Ltr.; ECF No. 125-1.)[35] The government does not allege that Priolo and Novis continued to send out mailings after that date but does allege that they "continued to collect and deposit victim payments through at least the end of 2016." (Gov't's Tr. Mem. at 17.) As an example, the government proffers that Proposed Government Trial Exhibit 351-AA "contains images of victim's checks serving as the basis for Counts 3–6." (*Id.* at 17 n.51.) Count 3–6 of the Indictment alleges that Priolo and Novis engaged in mail fraud in violation of 18 U.S.C. § 1341 and that alleged victims mailed checks to Priolo and Novis between November 21, 2016 and December 21, 2016. (Indictment ¶ 33.)

---

[35] *See also* Gov't's Proposed Tr. Ex. 168 at 4; Gov't's Proposed Tr. Ex. 169.

The TRO and Johnson's Certificate of Notice are probative of Priolo's fraudulent intent and knowledge of the conspiracy *after* September 26, 2016 regarding the collecting and cashing of alleged victims' checks received in response to his earlier mailings. The documents together show that Priolo was notified that a lawsuit was pending against individuals with whom he was working to send sweepstakes mailings—Sean Novis, Denkberg, and Johnson. (*See* Gov't's Proposed Tr. Ex. 168.) They also show that Priolo was on notice that a federal court had determined there was probable cause to believe that the defendants in that action were committing mail fraud by sending mailings that, among other things, "represent, directly or indirectly, expressly or impliedly that the recipient of the solicitation has won, will win, or will receive cash, prizes or awards." (Gov't's Proposed Tr. Ex. 168 at 1–2; Gov't's Proposed Tr. Ex. 169.) Even if the mailings at issue in that civil action were "differently-worded" and "differently format[ed]," as Priolo argues,[36] the mailings were alleged to have done the same thing Priolo's mailings are alleged to have done—falsely represented in some manner that the recipient will receive a prize or award. Thus, notwithstanding the wording and formatting differences between Priolo's mailings and those of Sean Novis, Denkberg, and Johnson, the evidence that Priolo was given notice of this TRO remains probative of his intent to defraud and his knowledge of the conspiracy.

The TRO also placed Priolo on notice that cashing checks and other proceeds received in response to previous mailings of the kind at issue in the civil action was unlawful. The TRO temporarily restrained the defendants from: "receiving, handling, opening, or forwarding any mail that responded, by sending payment or otherwise, to" the advertisements, solicitations, or promotional materials that the court had temporarily enjoined the defendants from sending.

---

[36] Def.'s Mot. at 8.

(Gov't's Proposed Tr. Ex. 168 at 3, ¶ iii.) It further temporarily restrained those defendants from "handling, forwarding, or depositing any checks received from U.S. residents, including currency, bank checks, certified checks, money orders, or credit card charge authorizations, or handling any mail received from U.S. residents" which had been sent in response to those mailings. (*Id.* at 3, ¶ iv.)

Priolo also argues that "the fact that Priolo was not named as a defendant in the enforcement action might, if anything, indicate to him that the Postal Inspectors did not consider him a participant in fraud." (Def.'s Mot. at 8.) As the government points out, Priolo may make these arguments to the jury about how to *interpret* this evidence, but the fact that Priolo had notice of the TRO is what makes this evidence probative, even if he was not himself a defendant. (Gov't's Opp'n at 9.)

In his supplemental letter, Priolo argues that his notice of the TRO is completely irrelevant to his intent because he did not send any additional mailings after the TRO was issued, and mail fraud is complete upon sending the allegedly deceptive mailing. (Def.'s Suppl. Ltr. at 4.) In support of this argument, Priolo relies on *Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193, 210 (E.D.N.Y. 2006), and a case on which it relies, *United States v. Eskow*, 422 F.2d 1060, 1064 (2d Cir. 1970). (*Id.*)

These cases do not support Priolo's argument on relevance. The court in *Newsday* found that a civil complaint had failed to adequately plead the "racketeering" element of claims brought under the Racketeer Influences and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1962(c), (d), because it did not allege with particularity facts showing that the defendants had committed mail and wire fraud, as required under Rule 9 of the Federal Rules of Civil Procedure. 418 F. Supp. 2d at 198–99, 210. The court did not hold, as Priolo suggests, that cashing a check based

79

on a prior fraudulent mailing is irrelevant to a criminal charge of mail fraud or conspiracy to commit mail or wire fraud. *See id.* Rather, *Newsday* relied on *Eskow* for the proposition that "[t]he offense [of mail or wire fraud] is complete upon the mailing or wire transmission, and each such mailing or transmission is a separate offenses." *Id.* at 210 (citing *Eskow*, 422 F.2d at 1064). But this rule does not establish that evidence probative of knowledge of a conspiracy and intent to defraud that arises *after* a fraudulent mailing has been sent is irrelevant to charges of mail fraud and conspiracy to commit mail or wire fraud. Instead, in *Eskow*, the Second Circuit had rejected an argument that multiple counts of mail fraud were duplicative, finding that "each mailing pursuant to an alleged scheme to defraud constitutes a separate offenses." *Eskow*, 422 F.2d at 1064. Indeed, *Eskow* explicitly noted that the fact that victims were induced to purchase something based on the defendants' false representations was "relevant" to proving mail fraud under 18 U.S.C. § 1341. *Id.*

## B.  Risk of Unfair Prejudice, Delay, and Confusion to the Jury

On the other hand, admitting the September 22, 2016 TRO in *United States v. Sean Novis*, No. 16-cv-5263, poses a significant risk of unfair prejudice to Priolo, as well as a risk of delay, confusing the issues, and misleading the jury.

Priolo argues that "the potential for unfair prejudice from this exhibit is extensive" for two main reasons. (Def.'s Mot. at 6.) First, he asserts that a jury might interpret the TRO "as a conclusive judicial finding of fraud" because the TRO was "issued by a judge" and "a lay jury . . . does not understand the difference between the standard of proof for a TRO and the standard of proof at a criminal trial." (*Id.*) Priolo contends that notwithstanding an explanation from the Court, the jury would be confused between the difference between a preliminary injunction and a final judgment and would not understand that the federal court issued the TRO without notice to any of the defendants. (Def.'s Reply at 5.)

Second, Priolo argues that the evidence of this TRO would be highly prejudicial because the TRO ordered the defendants in that action to provide notice of the TRO to all "list brokers, printer/distributors, mailing houses, and/or caging services with which they do business regarding the [prohibited mailings] . . . informing them that they are subject to the [TRO] *as an entity in active concert or participation with Defendants*." (Gov't's Proposed Tr. Ex. 168 at 4 (emphasis supplied); *see also* ECF No. 125-1 at 2 (email from Johnson to Priolo and Novis highlighting this same language).)

The government argues that the risks identified by Priolo can be adequately mitigated by a limiting jury instruction explaining the differences between these standards of proof relating to the issuance of a TRO and a final judgment in a civil case, that a TRO may be issued ex parte, and that these matters are "no more complex or prejudicial than the myriad other issues about which the Court must instruct the jury." (Gov't's Opp'n at 9.)

Evidence of the TRO is highly prejudicial to Priolo, especially when combined with evidence that Priolo had been given notice of the TRO in accordance with its terms, which required notice to persons "in active concert or participation with Defendants . . . ." (Gov't's Proposed Tr. Ex. 168 at 4 (emphasis supplied); Gov't's Proposed Tr. Ex. 169; *see also* ECF No. 125-1 at 1 (email from Johnson to Priolo and Novis highlighting this "active concert or participation" language).) As previously discussed, the government does not allege that Priolo was involved in Sean Novis or Denkberg's business operations. *See supra* Discussion Section III. The TRO evidence, however, would suggest to the jury that a court had determined that Priolo was "an entity in active concert or participation" with Sean Novis and Denkberg based on their separate mailings conducted through their own entities.

Balancing all of these factors, the risk of unfair prejudice to Priolo and confusing the issues substantially outweighs the probative value of this evidence. Fed. R. Evid. 403. The probative value that notice of a TRO like this *could* have is diminished considerably in this case given that Priolo is not alleged to have sent any mailings after the TRO was issued. Accordingly, Proposed Government Trial Exhibits 168 and 169—the TRO issued in *United States v. Sean Novis*, No. 16-cv-5263, and the Certificate of Notice documenting service of the TRO on Priolo—and any proposed exhibit based on the email Johnson sent to Priolo and Novis (ECF No. 125-1) are inadmissible under Rule 403.

## VIII.    Reference to "Prize Notices"

Priolo seeks an order precluding the government from referring to the mailings at issue in this action as "prize notices" during the direct and cross-examination of witnesses and from eliciting witnesses to use this term. (Def.'s Mot. at 6.) Instead, Priolo requests that the Court direct the government to (1) refer to the mailings at issue as "mailings" or a "similarly neutral term" at all points during trial except for opening and summation, and (2) direct its witnesses to similarly use the term "mailings" or another "similar neutral term." (*Id.*) As part of his defense, Priolo intends to argue that the mailings did *not* notify the recipients that they had won any prize and thus asserts that "the central issue in this case" is whether or not these mailings are in fact "prize notices." (*Id.*) Thus, Priolo argues that any reference to these mailings as "prize notices" during examination of witnesses "would amount to assuming facts not in evidence." (*Id.*) In response, the government argues that the term "prize notice" is appropriate given that the mailings at issue in this case contain terms like "Prize Notification" and "Cash Prize and Award Communique." (Gov't's Opp'n at 10.) The government provides a list of its proposed exhibits that it argues use similar language. (*See id.*)

82

Priolo's request is granted in part and denied in part. The government is not precluded from referring to an exhibit as a "prize notice" where the exhibit referenced during the examination of a witness actually uses a term synonymous with "prize notification." For example, at the top of mailings the government pre-marked as Proposed Government Trial Exhibits 1, 8, and 9, the words "CASH & PRIZE ADVISEMENT" and "A GUARANTEED PRIZE NOTIFICATION" appear. (Gov't's Proposed Tr. Exs. 1, 8–9; *see also* Gov't's Proposed Tr. Ex. 21.) The government may properly use the term "prize notice" to refer to these specific exhibits during witness examination. The government may also refer to an exhibit as a "prize notice" where the exhibit uses terms the terms "Cash Prize and Award Communique" and "Cash and Prize Advisement," which are synonymous with "prize notification." (Gov't's Proposed Tr. Exs. 15, 21.) Additionally, Proposed Government Trial Exhibit 14 features a header that states "AGGREGATE $1,675,000.000 MAJOR MONEY AWARDS" and the word "NOTICE" also appears at the top of the document, near that header. (Gov't's Proposed Tr. Ex. 14.) Proposed Government Trial Exhibit 14 may also be referred to as a "prize notice" because it uses terms synonymous with "prize" and "notice," even though the terms do not appear directly adjacent to one another.

Although they present a closer question, Proposed Government Trial Exhibits 10 and 12 also may be referred to as "prize notices." Proposed Government Trial Exhibit 12 uses the terms "NOTIFICATION" and "PRIZE PAYMENT RESOURCES" and features the dollar figure $1,180,350.00 prominently at the top in large font, and Proposed Government Trial Exhibit 10 uses the terms "Prize Verification Service," "Official PVS Notification" and features the dollar figure $1,400,000.00 at the top in large font. (Gov't's Proposed Tr. Exs. 10, 12.) They may be

referred to as "Prize Notices" because the dollar figures and the terms "prize" and synonyms of the word "notice" appear close enough together in the context of the overall document.

The government may not, however, refer to an exhibit as a "Prize Notice" during witness examinations where such language or synonymous terms do not appear on the exhibit because to do so would assume facts not in evidence. There are several such exhibits within the list of exhibits the government argues "contain similarly fraudulent descriptors." (Gov't's Opp'n at 10.) For example, Proposed Government Trial Exhibit 3 does *not* feature the term "prize notice" or a synonymous term. Instead, it features the terms "CORPORATE LEGAL NOTIFICATION" and "DETERMINATION OF FULL PAYMENTS PENDING." (Gov't's Proposed Tr. Ex. 3.) Proposed Government Trial Exhibit 7 only states "NOTICE OF CASH FUNDS HELD IN TRUST" and does not contain a synonym for "prize." (Gov't's Proposed Tr. Ex. 7.) When referring to this exhibit and others that do not explicitly use a synonym for "prize notice" during witness examination, the government is precluded from using the term "prize notice."

Several proposed exhibits present a closer question, but nevertheless may not be referenced as "Prize Notices." For example, Proposed Government Trial Exhibit 23 is titled an "OFFICIAL DIRECTIVE" from the "Department of Notification," and includes a smaller subject line that states "$2.1 MILLION DOLLAR AWARD DOCUMENT TRANSFER NOTIFICATION." (Gov't's Proposed Tr. Ex. 23 at 1.) Although this exhibit uses both the terms "award" and "notification," reading these terms within the context of the entire document makes it unclear whether mailing sought to provide "notification" of the winning of a prize. The government is precluded from referring to this exhibit as a "prize notice."

**CONCLUSION**

For the reasons set forth above, the government's Motion in Limine (ECF Nos. 78, 99) is GRANTED in part and DENIED in part as set forth above, *see supra* at 4–5, the government's Supplemental Motion in Limine to admit Teshale's deposition testimony (ECF No. 127) is GRANTED, and Priolo's Motion in Limine (ECF No. 106) is GRANTED in part and DENIED in part as set forth above, *see supra* at 5–6.

Dated: Central Islip, New York
        March 4, 2025

                                                 */s/ Nusrat J. Choudhury*
                                                 NUSRAT J. CHOUDHURY
                                                 United States District Judge