UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
: 
UNITED STATES OF AMERICA, :
:
:
:
v. :
:        Case No.: 21-cr-566
:
PHILIP PRIOLO, :
:
           Defendants. :
:
\- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **<u>DEFENDANT PHILIP PRIOLO'S SENTENCING MEMORANDUM</u>**

AIDALA, BERTUNA & KAMINS, P.C.
546 5th Avenue, 6th Floor
New York, New York 10036
Tel.: (212) 486-0011

*Attorneys for Philip Priolo*

## I.        Introduction

On March 19, 2025, following a trial before Your Honor, Mr. Priolo was convicted of one count of Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, § 1349, and four counts of Mail Fraud, in violation of Title 18, United States Code, § 1341, under Crim. No. 21-cr-566.  Mr. Priolo is scheduled to be sentenced on September 17, 2025.  The purpose of this report is to provide the Court with information that is relevant to determining a just sentence for someone who has no prior criminal convictions and whose offense conduct ended in 2016.

## II.        Preliminary Statement

From the time he began delivering papers as a fourteen-year-old boy, Philip Priolo has lived a life marked by hard work, perseverance, entrepreneurship, and an unfailing commitment to his family and his businesses.  Starting with limited means and working tirelessly to achieve success, Philip has long displayed uncommon kindness and generosity to those around him. After growing up in a middle-class family in Brooklyn, where his mother was a bus driver and his father a carpenter, and without a college diploma, Philip persevered and willed himself into becoming a successful business owner, a highly regarded employer, job creator, and commercial real estate investor.  This is something no one would have predicted.  He expanded his small car wash into the go-to car detail shop on Long Island, with satellite locations throughout the city, and used it as a means to build wealth and to begin investing in real estate.  As the extraordinary letters attached to this submission attest, Philip is loved and respected as a brother, son, friend, and – most importantly – father, a fair and kindhearted employer, a dedicated friend and colleague, and as someone always willing to give a helping hand to a person in need.  The instant offense is, by any measure, a clear aberration in a life that epitomizes the American Dream – and one that Philip deeply and sincerely regrets.

Philip respects the jury's verdict and is remorseful for his role in the offense.  However, in light of Philip's exceptional history and otherwise admirable and law-abiding life, the cabined nature and circumstance of this offense, the complete absence of greed or desire to live a glamorous lifestyle, and the lack of malicious intent or desire to deprive another to benefit himself, we respectfully ask the Court to impose a term of home confinement, probation, and continued community service.  We also ask the Court to impose a fine in an amount that the

Court feels is appropriate, as the loss amount is an incredible monetary sum which vastly overstates the real-world loss in this case. Such a sentence, which would include 5 years of probation, home confinement and continued supervision, continued community service, as well as a significant fine, is plainly sufficient by any measure, and is consistent with sentences imposed in this District to those convicted of similar crimes, but which were much larger in scale and involved significantly more intention to deceive and sums of money.

In addition, a Guideline-range term of incarceration here is wholly unnecessary for deterrence purposes – particularly because Philip ceased any involvement in the mass-mailing business nearly a decade ago. In these circumstances, the requested sentence is harsh, and rightly balances Philip's misconduct against his extraordinary personal history and family circumstances.

III. <u>**Social History**</u>

A. **Family History and Childhood.**

Philip Priolo was born on April 8, 1963, to Philip Priolo, Sr. (hereafter 'the elder Mr. Priolo') and Dolores Priolo, and is the second of their three children. His siblings are James Priolo, age 65, who is retired and lives in Manhattan with his partner; and, Steven Priolo, age 58, who owns an HVAC company and lives on Long Island.

Philip, now 62 years-old, was reared in the Howard Beach neighborhood of Queens, New York, where he lived with his family in a modest private home. Philip's father worked as a carpenter, both for his own and other companies, focusing on framing homes. His mother was a homemaker until Philip was around 15 years old, when she began working as a bus driver, which is where she worked for the following thirty years. The elder Mr. Priolo died in 2019, at the age of 81, after a multiple year battle with prostate cancer. This devastated Philip. He was extremely close with his father, and Philip was primarily responsible for taking care of him during the years when he was sick. Philip's mother, now 84, continues to live in Brooklyn.

Philip reports a very normal, middle-class childhood, and one that was extremely family-oriented, and somewhat old-fashioned compared to modern times. Their neighborhood was blue-collar, and Philip would take his bike out in the morning and return at the end of the day for dinner. Every weekend was spent with his extended family at his grandmother's house in Ozone

Park. Philip was close to all his siblings, who are all very near in age. James identified as homosexual from an early age, causing friction between Philip's brother and his father. This tension at home and the negative treatment of James by children in the neighborhood engendered a sense of compassion in Philip at an early age. Philip's father was strict and filled with old-world sensibilities – there was little affection or expression of love in their home. His parents were old-school, tough, physical, intimidating, and disciplinarians. There was little outward expressions of love or affection. However, his father constantly preached the importance of hard work, and he led by example. This made a huge impression on Philip, who was a late bloomer physically, and who measured less than five feet tall when he was sixteen years old. As a result, instead of focusing on sports, as a teenager, Philip began to work incredibly hard and constantly.

Philip attended Jamaica Prep High School, from which he graduated in 1980. From the time Philip was fourteen years old, he worked. He cut lawns, collected recycling, delivered newspapers, and performed various odd jobs for people in the neighborhood. Walter Fleshe, who lived next door to Philip when he was growing up says:

> "For years, even before he was a teenager, Philip tirelessly mowed lawns on our block, and because he would never accept a dime, he was often paid in lemonade or iced tea. He was a hard worker and was a thoughtful and responsible kid. He was always genuine in doing good deeds and made a respectable reputation for himself. He wound up doing that his entire life. If you know Philip, you know that he has a kind and generous heart."

When he was sixteen, after having saved nearly $6,000 to buy a car from the various jobs he worked in the neighborhood, Philip obtained his working papers. He detailed and fixed up the car and sold it for a profit, a pattern that would re-emerge in his life as an adult. Philip's first job was at #1 Auto Body, a collision shop in Brooklyn that was owned by Philip's neighbor. There, Philip learned how to paint, assemble, disassemble, detail, and fix up cars. He was immediately enthralled with the job, and he had tremendous amount of energy and enthusiasm. This, without gilding the lily, is how Philip approached everything. He wanted to be the best at everything he did, seeking to satisfy himself that he always did the best job that he could, but also to impress his employers. He did, and still does, take tremendous satisfaction from doing good work, and in building something, no matter the arena. At the time, this energy was directed towards each vehicle he worked on. He worked at the collision shop six days each week, and then would wash and detail cars in his parents' driveway on his only day off from work. He was living at home,

making money, and feeling proud of his work and himself.  During and after high school, this is what Philip did for 4-5 years.  When Philip was twenty-four years old, he was hired as a partner at Classic Auto Body, another collision and detail shop, located in Ozone Park.  Philip worked there for several years, doing primarily the same thing he was doing at his past job, while also helping to grow the business.

### B.  Early Years in the Workforce – Multiple Jobs and Career Paths

When Philip was in his late twenties, he began to look for work outside of the car detail business.  He loved cars, the collision shop, and took immense pride in his work, but after working hard for nearly a decade, Philip began to dream of more.  He did not want to work solely with his hands for the rest of his life.  While he enjoyed individual projects, and helping others to build beautiful cars, he had an entrepreneurial spirit, and he dreamed of building other businesses - he just wasn't sure what kind.   Initially, he took the majority of the money he had earned and saved by detailing cars and used it to buy a vacant piece of land in Ozone Park.  He sold the property six months later for a small profit.  He then took those earnings and bought a two-family home in Centerville, putting down $25,000 and taking out a $100,000 mortgage.  While continuing to work at the collision shop, Philip renovated the basement of the home, and rented it out, along with the other two units.  When he began earning $800 profit per month, which was a significant amount of money to him, he realized this was the type of thing he wanted to continue doing.

When Phillip was in his late twenties, he met his first wife, Kerri.  They began dating and one year later, they were married.  Philip recalls falling in love with Kerri's family. They were loving, warm, and affectionate, emotions that he had always yearned for in his own family.  To a certain extent, Philip's mother was so focused on Philip's older brother, who seemed vulnerable because of his differences and ostracization that Philip was left to fend for himself. While this was something that he could do, it also led to Philip spending a significant portion of his life forming connections with others, both strangers and friends, to make connections. Philip and Kerri bought a home together in Plainview, New York, and Philip moved out of his parents' home for the first time.  Philip and Kerri's father became extremely close, and they began working together. His father-in-law worked for VC Transport, an oil trucking and delivery

company. Philip obtained his CDL license and left Classic Auto to work with his father-in-law, where they delivered oil throughout the city. Philip, as he always did, worked tremendously hard. He was nicknamed "Hoover," because he never stopped and he would take on as many deliveries as he could. From his perspective, he wanted to be the best and, of course, the more deliveries he made, the more he earned. At the same time, Philip and his father-in-law began investing in renovating homes in Nassau County, after which they would sell them. The two of them worked as much as they could, making deliveries and saving their money during the winter, after which they would buy a home and fix it up on nights and weekends during the summer. They would sell the home in the Fall and then begin the process all over again. The two of them got along extremely well and had a similar work ethic and drive to succeed. Together, they bought, renovated, and sold six homes.

After eight years, Philip's marriage to Kerri ended, and they amicably divorced. Although Philip was sad over the ending of his relationship to Kerri, he recalls being truly devastated to lose her family, with whom he had become intertwined and dependent. It hurt him tremendously. Following the divorce, Philip was hired as a driver for Coca-Cola. In addition to his CDL, he obtained his tractor-trailer license and ultimately was determined to purchase a delivery route of his own. Instead, Philip took a big risk. Using the skills he learned by renovating and selling homes, Philip joined a friend in purchasing an unfinished condominium development in Melville, New York, that was subject to foreclosure proceedings. It was a seventeen-unit condominium complex, with only thirteen constructed units. Philip and his partner, who was a friend and a neighbor, hired framers, contractors and sub-contractors to finish the construction. Philip resigned from delivering soda products, secured a loan, and managed the construction project himself. He had big goals and was excited to be embarking on a new venture. It took nearly a year, but the project was ultimately completed and, shortly afterwards, they sold the property. Although Philip only made a small profit, the money he earned would ultimately become life-changing, as he used it to move to Plainview, New York, where he bought a struggling car wash business.

### C.  Car Wash Business – King of Clean

Philip's career in the workforce, up until this time, had been bifurcated.  On one side were blue-collar values that made him commit to a job and put in the hours, where he tried to do the absolute best that he could.  Then, there was the aspirational side, where he sought to use the money that he had saved to invest and purchase something, in order to build something a little better, and more profitable, than it was before he touched it. He was in love with the journey of buying and selling and not knowing where each project would take him. Over the years, he did this repeatedly.  This part of him was a seeker, hustler, go-getter, and a dreamer – not often satisfied with the status quo.  As a result, when he sold his home as well as the condominium complex, he had no reservations in putting everything he had earned into the car wash business.  With the car wash, he believed he could marry his hard-working values with his entrepreneurial spirit, and build the type of car wash business that he believed could provide a better experience for the customer, and that would cause customers to return.

Initially, Philip purchased the car wash business as well as the property on which it was located.  He built the business and sold it one year later, earning a $600,000 profit, remaining the landlord, and retaining the property.  This was a huge success, and was a career-defining moment for him.  Now, he had a significant amount of money in the bank that he could use to invest in other businesses, as well as the know-how, confidence, and passion to continue in the car wash business. Next, Philip purchased a car wash business in Bohemia, New York, again purchasing both the business as well as the property.

The Bohemia car wash business became Philip's entire life for the subsequent decades.  He named it the 'King of Clean' Car Wash. He was there every single day, working tremendously hard to build the business. From day one, Philip took immense pride in exceptional customer service.  He was obsessed with quality, making connections with his customers, and providing a unique experience.  To do so, Philip was on location seven days a week, and for most of the time the business was open.  Kathy DiSalvo, childhood friend of Philip's former wife, corroborates this:

> "I always admired Phil for his consistent work ethic.  Please note that Phil worked seven days a week for a minimum of 15 years when he owned the car wash.  Phil started his day around 5:00 a.m. and he would return around dinner time.  I know this because I would be getting up to go the gym and Angela

would call me to complain how he just woke her up. We all make sacrifices. She had a good one unlike some of the other husbands."

It was chaotic, but he absolutely loved it. Philip, beyond any doubt, is an incredibly social person, with a truly unique character. He will, and does, talk to anyone and everyone. He enjoys making personal connections, which is what he would do with nearly all of his customers. Indeed, customers felt that going to the Bohemia car wash was an experience. Repeat customers expected to see Philip and interact with him. To him, it was his favorite place on the planet. He loved the customers, and he loved his business. And he loved seeing it grow. Growth took several forms. Initially, he slowly changed the business model. Instead of seeking a high volume of customers, he raised prices, with the goal of seeking higher quality, repeat customers, who would pay more for a high-quality job and exceptional service. As he had been as a teenager working various jobs, he became obsessed with quality, and doing the absolute best he possibly could at providing high-end service. He now imparted that obsession to his fifteen to twenty employees. Philip was a fantastic boss who treated everyone fairly. As a result, his employees loved him and were loyal to him. Adam Delfino, who worked as an employee at Philip's car wash "from the day it opened until he eventually sold it in 2019," says:

> "Not only did I notice Philip's caring nature with his employees, he also cared about the community surrounding the car wash. I recall multiple fundraisers he held at the carwash throughout the years.
>
> I would also describe my time working for Philip at the carwash not only as a job but also a learning experience. He taught me the importance of having a strong work ethic and was always giving me advice on how to excel in life and become successful. At some point while working at the carwash I developed an addiction to pain killers. When Philip learned about my addiction he didn't fire me, in fact he encouraged me to go away to get help and assured me I would still have a job when I returned. I went to a rehab in the Bronx after I had lost my license and car due to my addiction and I lived in the Bronx for a few years. During that time, I struggled with sobriety but throughout that period Philip continued to employ me and would also pick me up and drop me off at the train station each day so I could continue to work and was very supportive of my recovery. Today I am clean for over 6 years now and I have to give some credit to Philip who never gave up on me and has been a big part of my support network. I still to this day keep in contact with him on a daily basis, whether it be a conversation on the phone or a simple good morning text with a daily prayer.

When I learned of the allegations that Philip is associated with I was shocked because of how uncharacteristic this is of him. I have only known him as a positive role model in my life and although he started out as my boss when we first met 24 years ago I am very grateful to have him in my life and that today I can call him my friend. I can honestly say that his presence in my life ultimately shaped me into the man I am today."

Michael Coglianese, a friend and professional associate, says:

"I've had the opportunity to observe Philip manage multiple car wash businesses with integrity and responsibility. He has consistently demonstrated a strong commitment to environmental safety and compliance – areas in which many business owners often cut corners. Philip took pride in ensuring that his operations met environmental standards, reflecting his genuine desire t do right by both his customers and the community."

Philip's drive and vision succeeded, and the 80-hour work weeks paid off. The car wash grew substantially and became very successful. From 2008 – 2019, he purchased three additional car washes, re-naming each of them 'King of Clean.' They were located in Patchogue, Corum, and Coney Island. This complicated Philip's singular focus tremendously, as he was forced to split his time between the different car washes, while also dividing up his long-time and experienced staff amongst the different locations. Over time, Philip realized that he would not be able to replicate the Bohemia success at the other locations, in part because the neighborhoods and clientele were not the same, but also because he was not physically able to be present at each location to establish the connection and elevate the customer's experience.

While the car wash business is certainly not glamorous, it was truly Philip's calling for many years. He was very talented at what he did and in creating a successful business. He knew hard work, how to make people happy, and he truly loved to do both, taking great satisfaction from both the interpersonal relationships that he formed and grew, but also the success that the business experienced as it grew, both of which were a result of the sheer force and positivity of Philip's personality. It may seem self-aggrandizing, but the King of Clean business model was one that truly required Philip's presence. Without his presence at the additional locations, they did not attract a consistent enough customer base. As Philip's friend Walter Ryder says:

"In patronizing his car wash, you can see how Phil ran his business. I would sit and wait for my cars to be done and watch, and truly admire him and the way

he handled his employees and his customers. He would not ask or expect any of his employees to do anything he would not do himself. Every time I was there he was always sweeping the lot himself, and making sure all of his customers and employees were taken care of."

As a result, over time, Philip sold off all but one of the King of Clean locations, instead choosing to focus on a single location, where he could be present and ensure its standards of quality and success. In 2018, in order to move to Florida, Philip sold his last remaining King of Clean location.

After selling the additional locations, Philip sought to explore commercial real estate investments that he had been tangentially involved with in the past. With guidance from others, Philip began investing in commercial properties, many which already had existing leasing contracts with Dollar General and other franchise corporate stores. To Philip, this strategic investment, which involved purchasing property and leasing it to a corporate store, was so much easier than running the car wash, where he always had to be involved and was constantly juggling customers, employees, the bank, running around to get change, doing all of the tasks in running a business. Although for decades it was what he loved to do, as he has become older, this new way of earning passive income, which is based on a foundation of a lifetime of hard work, is much easier.

To be clear, over the several decades in the customer service business, Philip had always been reliable, honest, trusted, and a businessman whose businesses received no complaints. Now, in his next stage of life, he feels extremely lucky that his investments have also been very successful, earning him significant profits and giving him a comfortable life. His real-estate portfolio business is growing, and, with the help of trusted advisers, he is constantly buying and selling and leveraging growth in certain areas to buy additional properties, which are largely controlled by a management company. According to Philip, he is certainly no genius, and this business is easy compared to the hard work he has performed over the course of his life.

### D. Charged Conduct and Context of the Offense

Defendants with no criminal history commonly assert that an offense is uncharacteristic, driven by events and circumstances. The claim is often accurate. Good people sometimes do bad things. While this does apply to Phillip in reductive terms, we believe that the particulars here

significantly distinguish him from others convicted of Mail Fraud, Wire Fraud and other financial crimes.

Outside of the instant offense, Philip has not only lived a law-abiding life, but every person who has known him for a substantial period, from family and friends to colleagues, employees, and staff, speak to Philip's generosity, honesty, and compassion. There is no evidence of greed, big-spending, flashy jewelry, boats, yachts, or other activity associated with those who commit financial fraud for personal gain. His actions seem confounding when one considers that he has constantly, and throughout his life, both worked extremely hard and pursued a substantial and varied amount of different financial pursuits and business, all without a single complaint or allegation of misdealing.

That is, until one understands the confluence of events that led to his involvement in this "scheme." To be clear, at no point do these circumstances excuse or justify the misleading nature of the mailers, which were sent to thousands upon thousands of people, with the goal of receiving small payments from a small percentage of the responders. However, we believe that his involvement with the named co-conspirators and in the mass-mailing business is consistent with his character, lifelong pursuit of various enterprising business, and his introduction and decade long relationship with Sean and Jeffrey Novis.

In the 1990's/early 2000's, when Philip was first getting involved in trying to "flip" homes on Long Island as well as the car wash business, he met Sean Novis, and they became friendly. Jeffrey, who was Sean's father, was twenty-years older than Philip, and they were not as close. Sean and Jeffrey, and others, were involved in the sweepstakes business, which was somewhat similar to the mass-mailing business charged in this case, but different in certain, important ways. First, their company, Sweepstakes Advisory Network ("SAN"), was a sweepstakes mailing company. So, although SAN did send out mass-mailings, their mailers requested that the recipient return an entry fee in exchange for a chance to be entered into a random drawing, akin to a lottery. The person selected in the drawing would receive an award. *See*, Trial Testimony, Cathy Johnson, Page 539 (Q; Around the time you began working in 2000, you said they were doing sweepstakes. Is that different than sweeps reports? A; Yes.).

At the time, Philip's role with their business was limited, and he certainly did not think they were doing anything improper. He would go to their office a couple times every other

week, which is where he met the staff who worked for Jeffrey and Sean Novis. Then, Jeffrey Novis was arrested and prosecuted. At the time, it was Philip's understanding that Jeffrey Novis was arrested because SAN was found to be conducting an unauthorized "lottery." Shortly after Jeffrey's arrest, SAN dissolved, and Philip dissociated himself with Sean Novis.

Although Philip left, he was later aware that Sean Novis, and his staff, re-formulated their mailing operation without the lottery aspect and, instead, began mailing sweepstakes reports. This would later become the model of Philip and Jeffrey Novis's company, when it operated nearly fifteen years later. Importantly, Philip was aware that from the early 2000s until 2015, Sean Novis was running the mass-mailing business with the same staff, and that he was mailing out sweepstakes reports. To Philip, there did not seem to be anything improper about this iteration of the mailing business. In his mind, had there been, they would have been shut down, similar to how the mass-mailing 'lottery' iteration of the business had been shut down. So, when Jeffrey Novis approached him, with the request that he invest and partner with him to run a companion sweepstakes reporting business, Philip did not have reservations that their conduct was unlawful, and he was assured by them that it was not; he was told that they would be doing the same exact thing Sean Novis had been doing for the past fifteen years. In addition, their business model would be identical to Sean Novis' and their staff would be identical to the staff Sean Novis had been using the past fifteen years.

Jeffrey Novis told Philip that he was broke, and that he needed Philip's money to finance all of the start-up costs. He also needed Philip's name to be on the banking accounts and related documents because Jeffrey's prior conviction prohibited him from doing so. Philip was largely uninterested, and he ignored Novis for nearly a year, until he finally agreed to partner with him. Again, in Philip's view, this business model was the sweepstakes 'reporting' business, not the sweepstakes 'lottery' business. Instead of running the lottery, they were mailing pamphlets to individuals who sent money in. In his view, because Sean Novis had been running an identical business for over a decade, without a problem, Philip did not see a problem with being involved in such a business.

In hindsight, obviously, Philip should have known better and, had he known, he would not have involved himself. However, in his mind, this was simply another entrepreneurial opportunity to explore, with minimal financial investment, minimal day-to-day investment of his

time, and something he could participate in while also running the car wash. It's easy to say, but it is true that Philip was simply looking to get involved in another business opportunity; he was not looking to defraud anyone. His previous forty years in the workforce and decades of running and opening various businesses should corroborate that. Philip Priolo is not a scam artist and that has never been his intention or motivation. Here, foolishly, he got involved with others whose sole business was the mass-mailing business, and he did not fully understand the scope of its illegality. Indeed, his role and knowledge were objectively limited.

After Philip agreed to partner with Jeffrey Novis, and after he put up the money to get the business off the ground, it operated identically, and in the same manner as the existing mass-mailing business run by Sean Novis. Employees Cathy Johnson, Cheryl Jacquard and Mary Lilienkamp, testified that they followed practices already in place from Sean Novis, utilizing form letters, refund processing, and mailing list logistics—none of which Philip created or implemented. Cheryl Jaquard was responsible for the mailing schedules and Cathy Johnson ran the company out of her home. Philip, at the time, was living nearby. He was certainly involved, as Cathy Johnson testified, in retrieving mail, paying vendors, and signing off on refund checks. But, according to Johnson, it was her role to handle the direct interaction with customer mail, including complaints, which she simply tossed in the "trash" if "they're not asking for anything." *See*, TT, Johnson, Page 676.

Each morning, Philip would pick up the mail at their various post office boxes and drop them off at Johnson's home. He would then go to the car wash and work all day, as he had always done. Occasionally, he would communicate with Johnson or Jeffrey Novis regarding issues that would come up or decisions that needed to be made, but he was not intimately involved. He was asked to contribute financially, open the accounts for the business through Pac-Net, pickup and drop off mail, and to pay vendors and staff from the various accounts.

To be clear, the businesses Philip was charged with operating were extremely tangled up and reliant upon Sean Novis's operations, which had been in place for over a decade and a half. They shared staff, mailing lists, and methods which were simply adopted by Sen Novis's staff when doing the same type of work for Philip. This matters profoundly, as it does highlight that Philip was no mastermind in this scheme, and had no role whatsoever in developing it, but is

someone who joined, when asked, into a preexisting system set up by Sean and Jeffrey Novis. This should matter significantly when evaluating Philip's intent, knowledge, and culpability.

Overall, Philip was a part of this company for twenty (20) months, during part of 2015 and into 2016, until the office of Sean Novis was raided and he was arrested. Immediately, Philip and Jeffrey's business stopped sending out any mail, although for approximately 1-2 months afterwards, checks did continue coming in. This activity was residual and limited to depositing funds from mail already in transit; no additional mailers were sent out. The business was hardly profitable, earning just over seventy thousand dollars over the course of the twenty months in which Phillip was involved. There is no evidence that Philip took personal distributions and income tax returns filed on behalf of the business highlights this, and the filing of income tax returns speaks directly to Philip's lack of intent or understanding that he was involved in an ongoing scheme to defraud. In August of 2020, Sean Novis and his partner, Gary Denkberg, were arrested and later tried in this District, with both being convicted. Philip was not arrested until 2021.

### E. Family Circumstances, Philip's Second Marriage, and the Birth of his Son

In 2001, when Philip was thirty-eight, he met his second wife, Angela. Within the first couple months of dating, she became pregnant. This, of course, came as a huge shock to them both. They were concerned, but both firmly believed that having the child was the right thing to do. It was the best decision of Philip's life. They decided to commit to their child, and to each other, and they married before Angela gave birth. Although he was solely focused on work and the car wash business, Philip was extremely dedicated to being a father. His son, Philip, Jr., was born in January of 2002. Philip states that the birth of his son was the best thing that ever happened to him, and that his son was, and is, everything to him. Angela never worked and was a homemaker who raised Philip, Jr. During his son's early years, Philip was away all the time, working obsessively, energized by a new motivation that he was doing this for his son, and his young family. He was able to balance work and quality time with his son. However, as a result, Philip and Angela spent little time on their relationship; Philip was either at work or spending time with Philip, Jr. As such, and because their time dating and the courtship period was so short, their marriage was challenging.

When Philip wasn't working, he always tried to be with his son.  Unlike Philip, his son was extremely athletic and interested in sports.  He played basketball, soccer and baseball.  Philip had little experience with athletics so, although he did not coach, he made sure he was present for nearly every game. They were always close, and Philip calls his son his "best friend," and refers to their current relationship as "beautiful." Philip's son, says:

> "From the very beginning of my life, my father has been my role model and greatest source of strength. He is the kind of man who, despite working grueling hours - often leaving for work at 4:00 AM and not returning until 6:00 or 7:00 in the evening - never missed a single one of my games, school events, or moments that mattered to me. Weekends, holidays, and personal time were never his priority; his family always came first.   My father made sure I knew I was never alone, that I always had someone in my corner. Those early moments formed the foundation of my confidence and character. He gave me more than skills - he gave me belief in myself, and that has shaped every success I've had since. I can still hear his voice in the crowd and see the pride in his eyes. That unwavering presence during my teenage years meant everything to me."

After Philip's son graduated from high school, he moved away to go to college at High Point University in North Carolina, a small Liberal Arts college, where he ultimately graduated with a degree in Business Administration in 2023.  With their son away at school, Philip and Angela were alone together for the first time in their lives.  They soon realized that, outside of their son they had little in common with each other.  In a move born slightly out of desperation, they moved to Florida, with the hopes that the change of scenery and warm weather would spark their connection.  They tried for two years.  Unfortunately, it did not work, and Angela moved back home to New York.  Philip did not want to get a second divorce, but he realized that it was necessary, and he agreed.  It was amicable, and Angela and Philip remain very friendly and close.  She has steadfastly supported him throughout this process, and she attended each day of the trial before Your Honor.  Philip remains, above all, dedicated to his son, as well as his son's mother.  According to Victor Muro:

> "Phil is a 62-year-old single father who has spent his life working tirelessly – not only to support his own family but also to uplift those around him.  He is a devoted parent who raised his son with unwavering love and ethical values, often putting his needs before his own; as he did with his parents, and several charities."

## F. Arrest, Post-Arrest Conduct, and Current Circumstances

On November 10, 2021, Philip was arrested and ultimately released with many conditions. During the pendency of this case, Philip has fully complied with all requirements imposed through Pre-Trial Supervision, including check-ins and home visits, and travel restrictions. Indeed, he is an excellent candidate for continued supervision – not incarceration – and home confinement if necessary.

This whole process has been life-changing for Philip. Following his arrest, he initially struggled with feelings of emptiness and loss, as well as embarrassment for breaking the law, and for being accused of defrauding people of mentally infirm stature, something he absolutely never intended to do. Most importantly, he felt an overwhelming amount of stress and anxiety, exacerbated by the strain of a trial in Federal Court. Philip credits his entire family, but primarily his former wife, who supported him throughout the trial, as well as his son, for support in helping him to get through it. Following his college graduation, Philip's son moved to Florida, where he has been working as a residential real estate agent. They continue to reside together in Boca Raton. They are incredibly close. Philip thinks it is wonderful that his son has a different make-up and personality than he does. He does not have an obsessive one-track mind, but he is more well-rounded and has many interests. In that way the two of them balance and complement each other. Philip loves him tremendously and is incredibly proud of him and all of his accomplishments. He also enjoys trying to help him with his real estate job, while also participating in the managing of his own real estate assets. Philip, now 62 years old, has had success in his various business enterprises, which has been almost exclusively the product of his own extremely hard work and dedication. It's finally paying off, and he is living comfortably, and he is able to support himself, his son, and his former wife.

In May of 2025, Philip began volunteering, several times per week, at Boca Heping Hands, a nonprofit soup kitchen and food pantry. According to Jason Cascio, who is the Food Center Manager:

> "When Philip first came to volunteer, he made it known that whatever we needed done he would do. At the time we desperately needed a strong male individual to help our small team of ladies in the kitchen on Mondays. It took him about a week to get comfortable in the kitchen and since that point has been invaluable to our Monday kitchen operation.

> While every volunteer is valuable to what we do, a few go above and beyond. **<u>Philip is one of those that will go above and beyond</u>** what we expect of a typical volunteer. He will do the dirty work most volunteers would rather leave to one of the paid employees to do such as washing out a dirty trash can with a scrubber and bleach. I could tell him to go empty the grease buckets and he wouldn't blink. His work ethic while at Boca Helping Hands has been second to none. More importantly, while volunteering Philip always has a pleasant and upbeat attitude and his fellow volunteers seem to really value his presence."

Philip has found tremendous satisfaction in volunteering his time at Helping Hands, and as one of the proposed alternatives to incarceration, we propose that the Court mandate that Philip continue this community service, for a minimum of 200 additional hours.

Philip's kindness and generosity, often giving of himself and his time, is not unusual. Isabel Cassela, who has known Philip for sixty years, states:

> "Throughout the decades, Philip has consistently shown himself to be a man of integrity, compassion, and responsibility. I witnessed his kindness firsthand, particularly during one of the most difficult times in my life—when my son passed away at the age of 47. Philip was there for me, offering unwavering support and comfort when I needed it most. His selflessness and genuine care left a lasting impression on me, reflecting the depth of his empathy for others.
>
> As a business owner, I have also had the opportunity to observe Philip's professional conduct. I have interacted with him and his employees on numerous occasions, and it is clear that he treats everyone with respect and compassion. His leadership fosters a positive environment, earning him the admiration of those who work with him. Philip's dedication to fairness and his strong work ethic are qualities I deeply admire, and they speak volumes about his character. Philip's commitment extends beyond his professional life to his family, where his love and devotion shine brightly. I have always known him to be a steadfast and caring individual, someone who prioritizes the well-being of those around him."

Julianne Barresi, who is a life-long friend, states:

> "Later in years, even though he was busy, Philip always made the time to visit my aging mother. These visits meant more to my mother and family members than I think he ever realized. Philip is the kind of man you would be honored to have as a friend. Starting as a young boy, he was a hard working individual, always lending a helping hand, expecting nothing in return. He has always been a kind, honest and generous individual with anyone he comes into contact with. His genuineness always makes your day a little better."

Lastly, Stephen Wu, who is a good friend of Philip' son, says:

"Over time, our relationship has grown to the point where I consider him like family—like an uncle to me. From the very beginning, Philip has stood out to me as someone with a genuinely big heart. He is the kind of person who goes out of his way to help others, not because he has to, but because it's simply who he is. I have seen him time and time again offer support, encouragement, and guidance not just to his own family, but to friends, neighbors, and even people he barely knows. He has welcomed me into his home, treated me with kindness and generosity, and consistently shown that he cares deeply about those around him. Philip has been a steady and positive influence in my life, and I know I am not alone in feeling that way.

One of the things I most admire about Philip is how he shows up for others in both big and small ways. Whether it's helping a neighbor with a task, mentoring younger people like myself, or simply being there when someone needs to talk, his presence is reassuring and generous."

Similarly, Walter Ryder says:

"Phil is one of the most selfless human beings I have come across in my life. When I was diagnosed with a rare blood cancer, Multiple Myeloma an incurable disease that not long ago was terminal, Phil helped me emotionally and spiritually, and if needed, offered to send me money. He would, and still does, send me uplifting quotes and prayers EVERY day, that has given me the strength and positive reinforcement I need to stay strong in fighting this disease."

## III.     Sentencing Considerations

Under the Statutory Provisions, Philip is eligible for probation supervision of no less than one year, no greater than five, or a term of incarceration no greater than twenty years. In our view, the Sentencing Guidelines calculated by United States Probation, based on a Total Offense Level of 31 and a Criminal History of I, which produce a term of 108 to 135 months' incarceration, is outrageously exaggerated. This range, artificially inflated by a loss amount that did not significantly impact any single person or institution, is not representative of Philip's actions or the charged conduct.   We respectfully recommend, again unequivocally and in the strongest terms, that the Court sentence Philip to a non-incarceratory sentence with a term of Probation, home confinement, and a fine in any amount the Court feels appropriate, as well as any other appropriate conditions.  Such a sentence will satisfy 18 U.S.C. § 3553(a)—a sentence that is "sufficient, but *not greater than necessary*" (emphasis added) to comply with the purposes

set forth in 3553(a)(2). Incarceration in this instance exceeds what is necessary to satisfy those sentencing goals.

Regarding the Guidelines, they are a deficient measure of an equitable sentence; they are advisory only—a point of reference—and just one of several factors the Court must consider. For defendants like Philip, they are an especially blunt instrument because the sentencing calculus assigns numeric values to a small range of factors pertaining to some aspects of the offense and criminal history. No value is assigned to the "offense and offender characteristics" that must be reviewed under 3553(a)(1), which heavily favor him. The Guidelines miss entirely the context of an offense;

- important specifics of its commission and the defendant's specific intent.
- family circumstances and reputation in the community.
- a host of life circumstances and events that might and often do explain the offense.
- collateral consequences of incarceration, which are especially relevant when a defendant does not require incapacitation due to violence.
- a defendant's efforts to repay money lost.

None of this—the substance of a person's life, information that can affect the defendant's community—rates a single point. The PSR, though it provides a rough outline of Philip's history and condition, illustrates this problem: they are pertinent facts, but they do not figure in the sentencing calculation. This deficiency produces a harsh sentencing range for Philip because so many of his offender characteristics merit leniency but are assigned no value. It cannot, and does not, capture Philip's spirit, his energy, his friendliness, the impression he makes on nearly everyone he comes into contact with, or his lifelong dedication to working as hard as he possibly can. It does not capture his character. We hope our submission to Your Honor, as well as the attached letters, can accomplish this.

Although these factors are difficult to quantify, they are potentially far more instructive for sentencing purposes than the core case facts, and vitally important to the fairness that 3553(a) attempts to achieve. In detailing Philip's history, personal and professional life, and the case facts as we understand them, the defense does not intend to minimize the offense. We are certainly sympathetic to those who believed they won a significant sum of money, but who did not. However, we firmly believe that his history of being an honest, well-respected,

hardworking and productive member of the community, as well as a crucial member of his family, further mitigate his actions, which are far less serious than the allegations appear. All of this certainly favors a significant downward variance. A review of the factors that the Court must consider under §3553(a), as described below, supports this view. The defense urges the Court to consider the following:

## § 3553(a) factors
### (a)(1)  The nature and circumstances of the offense and the history and characteristics of the defendant

Nature and circumstances of the offense

Although Philip was found guilty of mail fraud, wire fraud, and conspiracy to commit mail fraud and wire fraud, his actions were far less nefarious and wide-ranging than the charges suggest. Specifically, his role, actions, and intent, while regrettable, were monumentally less than most convicted of similar crimes.

Regarding the broader context for the offense, Philip Priolo was, at the time, a 53-year-old businessman, car wash owner, real estate investor, and a respected member of his community, with absolutely no prior criminal or illegal conduct. Indeed, there appears to have never been so much as a complaint or an allegation of wrongdoing against him, or any of his decades old businesses.

He is someone who came from extremely humble beginnings and, without a college education, explored a variety of occupations until he found his calling in the car wash business, where he completely developed and grew a company from the ground up and used it's proceeds wisely to invest in a variety of residential and commercial properties, some of which he rehabilitated himself. He did this completely on his own, with no help - financially, or otherwise, from anyone else. To the contrary, Philip began working nearly seven days per week immediately after high school. His jobs were not glamourous. He worked at a collision shop. He delivered newspapers. He detailed cars in his parents' driveway. He delivered soda. He drove an oil truck. He bought and rehabilitated homes to sell for a small profit. He finally found success running car washes, hardly a glamourous career, but one that truly suited him and his personality. He finally was able to accumulate wealth for himself and his family by investing the proceeds of his difficult, blue-collar work. With each job, he persevered and tried to do the best

that he possibly could, which included treating colleagues, employees, and customers with respect. Importantly, he has never been previously accused of any deceitful behavior or wrongdoing. He has never been arrested, or been accused by a co-worker, employee, customer, client, colleague, or regulator of any dishonest or improper conduct. He was simply a man who foolishly and without much thought, became involved in a business situation where the underlying communications were misleading. This business, its infrastructure, and its staff were already in place, and had been for fifteen years, and Philip was brought in mainly because of his ability to contribute financially. He foolishly believed that because the company had openly existed and continued to exist for years that his involvement did not run contrary to the law. He was mistaken and accepts the jury's verdict and he deeply regrets his actions and his role in the offense. However, we believe that it is clear, primarily from his decade's long track record, that his motivation for joining in this business was not greed, or to take advantage of others. Mina Katzman, describes Philip by saying:

> "Phil is one of those rare individuals who naturally brings people together. He earned the affectionate nickname "The Mayor" because he was always the one to gather neighbors at the pool, welcome newcomers, and foster a sense of community. His kindness, warmth, and positive energy have always stood out. I've known him to be a deeply caring friend—someone who offers thoughtful advice, much like an older brother—and a devoted father who consistently puts his family first. On a personal note, I've experienced significant hardships recently, and Phil has proved to be a loyal friend who regularly checks in on me. His encouragement, prayers, and perspective have been a tremendous source of comfort and strength during a difficult time. His compassion and ability to uplift others are truly remarkable."

History of characteristics of the defendant

Philip has led a quite exceptional life. As someone who came from humble beginnings, he realized the inherent value of hard work at an incredibly early age. Through nothing but sheer determinism, hard work, honesty, trust and good nature, he transformed himself from a car detailer, to a truck delivery driver, to an owner of several of successful car washes, which have employed hundreds of people and set a shining example for his son. Philip, truly, is no con-man or con-artist. He has led a life as an extremely hard worker, entrepreneur, leader, role model, and as a shining example of the American Dream.

He is also a loving father and someone who has not only dedicated his life to his work, but also to his family.  As he grew up, through various jobs, he learned the importance of respect, determination and, above all, hard work. He has no college education. He overcame that by working an extremely wide array of jobs, and by learning from others.  While it was not easy, he did what he needed to do to make an honest living for himself.  As an adult, he has dedicated himself to his family and to providing for them. Michael Dattoma highlights these aspects of Philip's personality:

> "I first met Phillip at a professional event, and I remember that day vividly. Without hesitation, he took the time to introduce me to every friend he had at the gathering. He went out of his way to make sure I was having a great time, that I was included, and that I felt part of the community.
>
> His warmth, humor, and genuine interest in others were immediately evident. Everyone at the event seemed to gravitate toward him—his personality and sincerity break bread with people instantly. That's just who Phillip is.
>
> As our friendship grew, I saw even more of his character. Phillip is a devoted father to his only son, Phillip Jr. Through personal and legal hardships, he has never wavered in his commitment to being there for his child. He and Angela, though separated, have worked together as a team—making sacrifices for their son's future, always putting his needs first.
>
> **I have met a man who, despite being separated from his wife, loved and cared for her in such a selfless way, simply because she is the mother of his son. That kind of heart, that level of integrity, has left a lasting impression on me.**
>
> I've seen Phillip check in on Angela's well-being, ensure she is safe, and provide support—emotionally and financially—well beyond what might be expected. His actions come from a place of quiet responsibility, not obligation.
>
> Phillip came from a working-class family, growing up with very little. From a young age, he worked hard to support himself. He is not someone who pretends or postures—he is grounded, real, and humble. He's a man of substance, not flash. As a friend, he's someone you can count on—thoughtful, dependable, and always loyal. He gives of himself freely and without expectation, and he has been a constant in my life through both good times and hard ones.
>
> I do not write this letter to excuse any poor decisions he may have made—I know Phillip accepts responsibility for the path that led him here. I write to

offer a broader view of his character, the values he lives by, and the relationships he cherishes. He is a good man, a loving father, and a true friend—defined not by this moment, but by how he shows up for the people in his life."

Outside of his serious lapse in judgment in connection with this case, one cannot assert with any credibility that Philip Priolo has lived a remotely delinquent or criminal lifestyle. He is the head of his household, a relentless worker, and a respected member of society. He was and is an inherently good person and an asset to his community. Ernest DeMarco, an auto body business owner who has known Philip for decades, may have described Philip best when he says:

"Over the years, we've developed a bond that I can only describe as family. Phil has a magnetic personality – he brings a breath of fresh air everywhere he goes. He radiates positivity and lifts up the people around him. I've always admired his drive and determination. He's a self-made man who built his businesses through early mornings, hard work, and long hours. I've personally seen him wake up at 4:30 in the morning just to get everything right for the day ahead. He never cut corners and never expected anything to be handed to him.

Even when he achieved great success – at one point, he was widely known in our community as 'the king of car washes' – he stayed grounded and humble. He was always the first to jump in and get his hands dirty when something needed to be done. I've seen him support friends, employees, and strangers alike – because that's just who he is at his core.

In a world where it's easy to forget the value of character, I can confidently say that Phil Priolo is someone whose character has never changed. He's someone who has earned the respect and trust of many, including me.

Victor Muro, a friend, speaks to Philip's selflessness, when he says:

"He is a man of deep faith (we do Bible study together weekly, and share daily prayer), a quality that has shaped the way treats others-with kindness, humility, and generosity. A great example is last year while we were walking together for physical exercise: we encountered a homeless person sitting on the hot pavement with no shoes or shirt, heartbreakingly filthy and frail. Phil took his sneakers and shirt off and handed them to this person along with his water bottle. He just smiled at me and said, "he needs these far more than I". There are dozens of realities and gestures of goodwill and unsolicited kindness he continuously exhibits with complete anonymity, but I will spare you to keep this letter far shorter than his character warrants"

The defense strongly urges the Court to consider this history, for which the Guidelines entirely fail to account, in addition to the four (4) years of Pre-Trial supervision, without incident, which should all matter profoundly when determining an appropriate punishment. While Philip's offense was wrong and merits punishment, he is being punished financially in a extraordinary manner, and his role in the offense ended over 9 years ago. Philip is committed to paying a significant fine, or repaying an amount of money in restitution, although the Government has indicated they are not seeking this. On August 20, 2025, Philip sold his residence, located in Boca Raton, Florida, due to the uncertainty of his future, the concerns with his ability to pay a significant monthly mortgage should he be incarcerated, and a determination to immediately pay any fine or restitution amount ordered by the Court. In doing so, he is agreeable to an expedited repayment schedule or due date, and is committed to immediately paying whatever fine amount is ordered. Indeed, Philip accepts the jury's verdict and is not waiting for the Court's judgment to accept responsibility. He is already contributing time, energy, and resources to undo the damage caused – not as a condition imposed by the Court, but as a condition of his own conscience.

We firmly believe that the charged conduct is truly isolated and not representative of his true character. We respectfully submit that the portrait of Philip painted by the numerous letters of support, submitted by a diverse assortment of people from different walks of life, reflects his true character – and one at odds with the misguided and aberrant behavior which led to the charges underlying this unfortunate case. _See_, Letters Submitted on behalf of Philip Priolo, Attached as Exhibit A. Surely his involvement in this offense is not so serious that it outweighs his previous sixty-one years of good and often exemplary conduct. Philip's personality can be summed up by his son, Philip, who says:

> "I feel compelled to share a more complete picture of the man I know—not as a defendant, but as the extraordinary father who raised me, supported me, and shaped me into the person I am today. From the very beginning of my life, my father has been my role model and greatest source of strength. He is the kind of man who, despite working grueling hours—often leaving for work at 4:00 AM and not returning until 6:00 or 7:00 in the evening—never missed a single one of my games, school events, or moments that mattered to me. Everything he earned, he gave to us. When I left for college, he gave me his car so I could be safe and mobile in another state.

He is the most selfless man I have ever known. My father has always taken the short end of the stick without complaint. That is who he is—a man of quiet strength, humility, and deeply ingrained values. His moral compass has always guided his decisions, and I can say with complete certainty that if he had ever known that something he was involved in was illegal, he would have never taken part in it. That's simply not who he is.

This situation has deeply affected our entire family. The day he called me and told me that FBI agents had entered our home was the most shocking and confusing moment of my life. It was so far removed from the man I know that I struggled to process it. I respectfully ask that the Court take into account not just the circumstances of this case, but the lifetime of character, sacrifice, and decency my father has shown. He is not just a good man—he is the best man I know."

All of the above factors and history clearly distinguish Philip from the majority of offenders. Philip's charged conduct is inconsistent with his lifetime of positive contributions to his family, business, and community. Regarding the broader context for the offense, Philip was, at the time, a 53-year-old, car wash owner who, unfortunately, met the co-conspirators through his car wash and agreed to join in their mass-mailing business. Importantly, Philip has never previously been accused of criminality. He has never been arrested. He is a tireless worker and is a caring human being. Certainly, he acted improperly and should be held accountable; however, a punishment that includes incarceration is unnecessary, especially after considering the above-cited factors which clearly distinguish this defendant and this offense from others seemingly of their kind and favor leniency.

Collateral Consequences and Non-Judicial Punishment

The non-judicial punishments that have already, and will continue, to accrue upon Philp are substantial. Not only must he face incarceration and supervised release, but he must face the daunting task of comprehending and repaying a likely significant fine and/or restitution, of which he is committed to doing. He has suffered through a multi-year long prosecution as well as a public and reputation damaging trial.

Any sentence should take into account the self-inflicted ruination that Philip has already suffered because of his conduct and prosecution. While these costs are not a complete substitute for judicial punishment, they are critically important to assessing what further punishment should

be necessary.  Because these consequences satisfy most of the purposes of punishment, they are grounds for a below-guideline sentence.

Philip's Criminal History

In detailing Philip's background and present circumstances, we do not intend to diminish the charged offense, but to provide explanatory context and a broad picture of his life. Regarding criminal history, Philip has no previous convictions, including no history of juvenile delinquency or violent behavior, let alone criminal conduct. His decades of hard work and blemish free conduct, portray a life that is totally at odds with the conduct that led to the charges underlying this unfortunate case, which should matter profoundly when determining his punishment.

The PSR Incorrectly Calculates the Defendants' Offense Level

Here, the base offense level of 7 was elevated in the PSR to a total offense level of 31, by factoring in 16 points for a purported loss of $2,622,018.52, plus additional points for an assortment of adjusting offense characteristics that are similarly unwarranted.  To calculate loss based on the total amount of mailings that went out and returned, while disregarding the recipients who were not unsatisfied with the booklets they received, seems speculative, lacking an evidentiary basis, and patently unjust. The Department of Probation and the government concede that the exact number of victims is unknown, and witnesses testified that if any recipient was unsatisfied, or requested a refund, they received one in full.

Actual Loss Amount

Based on an unproven loss of $2,622,018.52, The PSR has increased the Defendant's guidelines level by 16 points. This staggering enhancement underpins the drastically inflated guideline range of 108-135 months, which becomes even more absurd when viewed in the context of Denkberg, who was sentenced to 60 months, despite being responsible for a mailing scheme that spanned 13 years and a loss amount of over $90 million. By contrast, Philip's spanned just 20 *months* and was responsible for just over $2 million in gross receipts, as alleged by the government.

We submit this loss calculation is demonstrably wrong, in that it is broadly unsupported by *any* evidence – much less the type of compelling evidence which would merit such a devastating sentence. To begin with, Probation and the government base this calculation upon every mailing sent. Indeed, Probation has not conditioned their recommendation on *any* proof of loss. The reason is simple: beyond the small handful of witnesses who testified, the government has *no evidence* to demonstrate that the vast majority of the mass-mailing customers were actually deceived or defrauded by the Defendants' marketing campaign. It is well established that at sentencing, "the government must prove both the existence and amount of the loss attributable to the offenses of conviction." *United States v. O'Sullivan*, No. 20-CR-272 (PKC), 2023 U.S. Dist. LEXIS 110060, at *3-4 (E.D.N.Y. June 26, 2023) (reducing Guidelines loss based upon Government's failure to prove such loss beyond a preponderance of the evidence). These PSR also inaccurately states that the loss attributable to this mass-mailing scheme is was "primarily paid in cash." PSR, Paragraph 21. Victim payments were overwhelmingly paid by check, with only a small percentage being paid in cash. Indeed, Paragraph 17 of the PSR highlights this, detailing how PacNet, a payment processor, was utilized to process the significant number of checks received. Moreover, PacNet was not used for any illegitimate reason. Because there were many bounced checks from customers, ordinary banks did not want handle mail order business accounts. PacNet was a bank that was set up to process accounts involving the mail order business.

In addition, the attributable loss amount is simply not supported by anything in the record. Instead, the loss amount assumes that every solicitation which was sent out represents a loss – this is simply unreasonable. Accordingly, we specifically object to this loss amount. Philip's trial counsel argued that the solicitations never promised cash prizes and that, instead, the language promised a booklet outlining available sweepstake opportunities, which are sought after by many people who routinely enter sweepstakes. Although Philip accepts the jury's verdict, it is unreasonable to think that each and every person who sent a payment to Philip was defrauded and is a victim. Loss must be estimated by the "approximate number of victims multiplied by the average loss to each victim." U.S.S.G. Section 2B1.1, Commentary, (3)(c)(iv). The government had no way to approximate the number of victims, so they did not. Instead, the government called a small handful of witnesses to testify that they, or someone they were related

to, were confused by the promotions, and lost a small amount of money. The government offered no evidence to establish that such confusion was widespread among the other customers – much less that 100% of Philip's customer base was defrauded. This is an assumption based on nothing, and it has profound effects on the Guidelines calculation.

Loss cannot be based on theoretical amounts. It must be based on the actual, provable monetary loss caused by the offense of conviction. In the absence of any actual evidence, or any additional proffered evidence, the loss figures should either be limited to the actual losses of the purported victims who testified at trial or, based on a conservative estimate that the government is able to prove by the preponderance of the evidence beyond gross receipts, particularly where refunds were routine and a non-trivial share of purchasers likely wanted and utilized the report they received.

Here, the PSR mentions, and the government may assert that it is *irrelevant* whether any particular customer actually wanted or was satisfied with the product which they received, and that, because the jury found a scheme to defraud, the Court is entitled to rely upon a measure of "intended loss," rather than actual loss. Under this theory, the government may assert that the Court may treat each and every prospective customer as an *intended* victim, regardless of whether they were *actually victimized*. The Court should reject this speculative approach, especially when it leads to such a draconian sentencing recommendation. This Court should not accept supposition and guesswork in the place of such actual evidence, especially where the government is seeking to rely upon such figures to justify a truly draconian sentence.

Of equal importance, is that the loss estimate is to be reduced by "money returned by the defendant….before the offense was detected." U.S.S.G. Section 2B1.1, Commentary, (3)(E)(i). The government elicited testimony that innumerable complaints and requests for refunds were received in the mail each day, which they claim should have alerted Philip to the fact that the mailings were misleading. Testimony was also elicited from several government witnesses that each individual who requested a refund, would receive a refund. *See*, TT, March 13, 2025, Johnson, pp.422-423 (Customer service issued refunds when requested). However, there is absolutely no mention nor was there any effort made to enumerate the extent of the money returned, which would significantly offset the loss amount. We concede that calculating this number would be difficult; but we likewise submit that this highlights the near impossibility of

determining the number of victims and the resulting approximate loss amount, separate from the individuals who testified or who were identified during the trial.

Defendant Should Not Receive Either Vulnerable Victim Related Enhancement

The two, 2-point enhancements based on the allegation that the Philip knew that the victims were vulnerable, due to their advanced age, or that the Philip targeted "a large number of vulnerable victims" are misplaced. There was no evidence that such recipients were targeted, and government witnesses testified that they had no idea or way of knowing the ages of the intended recipients. Indeed, the mailing lists included names, addresses, and zip codes, and no more, and were selected by geographical area. More specifically, government witness Cathy Johnson testified that the victim's ages were not on those mailing lists and that the spreadsheets just showed addresses and return data. This fact was conceded by the Government. *See*, TT, March 19, 2025, pp. 972-973 ("The victims' ages are not on those mailing lists."). In addition, the front-end and back-end practice is common practice in mail order solicitations. In fact, it is the general practice in all mail solicitations. The purpose was to identify customers interested in sweepstakes.

Crucially, as stated above, there is also no evidence that Philip "targeted a large number of vulnerable victims," or that he "knew the victims of the offense were particularly vulnerable due to their advanced age." The employees of the direct mail operation, who had been working for Denkberg and Sean Novis for years, maintained databases showing the names and addresses of prospective and existing individuals. Neither Philip nor the employees had any access to information concerning the ages of such people. There is absolutely no evidence that they intentionally targeted the elderly; rather, the direct mail business model focuses on people who have previously shown an interest in sweepstakes. In this regard, it is not different than any other business that seeks out customers who are interested in its products. Moreover, the government has adduced no evidence at all concerning the average age of the individuals who received these mailings. Applying this Adjustment would be based upon nothing more than speculation.

U.S.S.G. Section 3A1.1 (b) states that this Adjustment applies to offenses where the defendant knew, or should have known, about the victim's unusual vulnerability. This is wholly inapplicable to this case, as the trial testimony did not establish that Philip knew, or should have

known, the ages of the individuals who were receiving the mailers. Indeed, the Application Notes Commentary gives examples of such situations, such as "in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim." Neither such scenario is analogous to the charged conduct in this case.

Importantly, the Commentary further states that this Adjustment "would *not apply* in a case in which a defendant sold fraudulent securities *by mail* to the general public." This, if anything, is appropriately comparable to this instant matter. Such mailers were sent to an incredibly large number of people, based on location, not on age. Crucially, while Courts have found the vulnerable victim enhancement appropriate in certain *telemarketing* schemes, those decisions hinged on specific details unique to telephone soliciting – ones which would alert a defendant to the age of the individuals being solicited. *United States v. Beasely*, 481 Fed. Appx. 142 (5th Cir. 2012) (The voices of prospective customers sounded elderly and defendant conceded that the names of some of the victims he chose to call sounded like elderly individuals); *United States v. Scrivener*, 189 F. 3d 944 (9th Cir. 1999) (Reasonable person would have concluded by the sound of their voices that solicited victims were elderly); *United States v. Whatley*, 133 F.3d 601 (8th Cir. 1998) (Defendant described his customers as 'dupes'). Nothing close to any of these distinguishing factors warrant such an enhancement here. Moreover, the equation of "elderly" status with per se vulnerability, without a finding of unusual vulnerability, is insufficient to justify an upward adjustment. *United States v. Smith*, 930 F.2d 1450 (10th Cir. 1991).

Defendant Should Not Receive an Enhancement Because There Were Not 5 or More Participants and, More Importantly, Philip Had No Leadership Role

The overarching scheme was certainly extensive; it included employees who ran the day-to-day operations and vendors used to create the flyers. However, as the government concedes, this infrastructure predated Philip by fifteen years. He was not responsible for hiring, supervising, or instructing these employees. They were employees of Sean Novis, and had been since the early 2000s, and were not supervised by Philip, who was simply the figurehead and in charge of dealing with Pac-Net and the various bank accounts, and who knew significantly less

about the day-to-day workings of the businesses than the various individuals who worked under Sean Novis and Denkberg.

This PSR states that Priolo "led and coordinated the efforts of more than five people, and created or obtained much of the scheme's infrastructure." This is incorrect and, indeed, contradicted by the previous Paragraph in the PSR (Paragraph 11), as well as the testimony elicited at trial, and documents filed by the Government in this case, in which they state that it was well-stablished that "Priolo and Novis utilized the same infrastructure to carry out their prize-notice scheme as that employed by co-conspirators Sean Novis, Denkberg, and Philips." ECF Doc. 104.

Indeed, the testimony elicited at trial as well as the PSR (Paragraph 11) state that Philip *utilized* the "employees of the direct-mail operation" which was "owned and controlled" by Denkberg and Sean Novis, to handle the "daily operations," which included "inventory management, working with third-party vendors to print and mail the price notices, and maintaining and updating the schemes' mailing lists. Several of these employees testified to these facts during the trial. It is clear that this infrastructure predated Philip by fifteen years. Further, the business was not orchestrated by Philip, but by these employees who Philip was not responsible for hiring, supervising, or instructing. Instead, these employees were led and coordinated by Sean Novis, and had been since the early 2000s. *See*, TT, Page 80, Jaquard, Q: And did you ever meet Mr. Priolo A: Once.; Page 103, Q: Do you have any sense of who would make those decisions of what data or what mailing lists these would be mailed to? A: That would be Sean Novis and whoever was working with the lists and also Mary.

Cheryl Jaquard further testified that services she provided to Philip's business were part of a consistent, established system that was created and directed by Sean Novis, and that it was Novis who determined the specific mailing language, not Philp. Further Mary Lilienkamp testified that she viewed Philip as a "client," not her boss, and that he rarely visited the office.

## Defendant Should Not Receive a 2-Level Sophisticated Means Enhancement

The charged conduct, as applied to Philip, does not involve the use of sophisticated means. "Sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. Section 2B1.1(b)(1)(c). At

the outset, and as we highlighted above, the entire infrastructure of this business had been developed over a decade before Philip's involvement, by Sean Novis and Gary Denkberg. Philip's direct mail business was run based on this infrastructure and its employees. Philip, according to the trial testimony, set up post office boxes, from which he retrieved the return envelopes that had been mailed. After the payments were removed from the envelopes, he deposited them into PacNet accounts that he opened because domestic banks would not engage in this type of business.

Moreover, the crux of this 'scheme' was hardly sophisticated. It involved sending mass-produced and printed prize notices along with return envelopes through the mail. This is not the type of sophisticated conduct, such as creating offshore financial accounts or corporate shells to hide assets, that is contemplated by the Guidelines, and it should not apply here.

Philip qualifies for the Zero-Point Offender Adjustment

Philip has no prior criminal history and will receive no criminal history points at sentencing. Because the enhancement under U.S.S.G. Section 3A1.1(b)(1) and (2) should not apply to Philip, and neither do the Aggravating Role enhancements, Philip is eligible for the two-level reduction to his offense level pursuant to 18 U.S.C. Section 4C1.1.

Philip qualifies for the zero-point offender adjustment because he does "not receive any criminal history points" and do not otherwise fall in any of the other enumerated aggravated categories. *See*, U.S.S.G. § 4C1.1(a). The PSR declined to apply this solely because it argues that Philip should receive both a role adjustment and victim enhancements which, for the reasons explained above, do not apply here. Simply put, if the Court rejects, as it should, the vulnerable victim enhancement, Philip qualifies for this 2-level reduction; otherwise, the same equities justify a comparable variance.

If any of the Enhancements Apply, a Downward Variance Is Appropriate

There are many reasons, as discussed, to downwardly vary from any sentence that would impose a term of incarceration. The Court should also consider downward departures for two reasons that apply to both defendants, as the offense level calculated by the PSR and the Government would drastically overstate the seriousness of the offense.

Trial Penalty & Defendant's Guideline Calculation

       Without detailing or criticizing the legal advice Philip received that led to his decision to exercise his constitutional right to a trial,  there is a growing amount of support for the view that a defendant, who exercises his constitutional right to a trial, gets unfairly penalized at sentencing, by prohibiting them from receiving acceptance of responsibility points. Judge Jed S. Rakoff has referred to this as the "trial penalty," and has held that it imposes an unconstitutional burden on a defendant who demands a trial.  *See*, *United States v. Tavberidze*, 23-CR-585-03 (JSR). Indeed, Judge Rakoff held that U.S.S.G. Section 3E1.1(b) is unconstitutional, and promised the defendant that he would suffer no such trial penalty and that, even if convicted, he would award the defendant the 2 and 1-point acceptance of responsibility reduction, without any consent or motion from the Government, which he did award.  Such a view, that a criminal defendant who exercises his Sixth Amendment right to a trial, should not be sentenced harsher than one who pleads guilty, is embedded in our criminal justice system.   Here, Philip should similarly be awarded an additional 3-point reduction, as he does accept responsibility for his role in the mailing business, and has committed to making full restitution.   Were such a reduction to be applied, his Guideline level would be further reduced.


The Sentencing Guidelines Enhancements Disproportionately Punish Philip

       This case provides a prime example of what Judge Rakoff once described as "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006). The Guidelines range inherently skews in favor of greater punishment and is therefore a poor benchmark from which to gauge the suitability of a given sentence.  In this case, the Guidelines range is inflated due to the estimated amount of money which was paid to Winners Circle and Feel Lucky Group, irrespective of whether the customers felt deceived or not, which has seemingly led to an exceedingly harsh and arbitrary potential punishment. Despite no evidence that Philip gained any significant financial benefit, the Guidelines in this case have been extraordinarily inflated, resulting in a total offense level of 31.

In any event, whatever the true loss/fraud amount is in this case, it is a poor proxy for the seriousness of Philip's sentence, or what an appropriate punishment should be. We do not doubt that the crime Philip committed is serious and created harm to the overall flow and reporting of money, but by driving the sentence up based almost entirely on that amount, the Sentencing Guidelines create a situation in which Philip is subject to a sentence orders of magnitude larger than more harmful, or violent, offenses.

Courts have long criticized using the Sentencing Guidelines loss enhancement as a proxy for determining the seriousness of the offense and the appropriate sentence. The Guidelines loss enhancement was developed "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." *U.S. v. Corsey*, 723 F.3d 366, 380(2d Cir. 2013) (Underhill, J. concurring); *see also U.S. v. Musgrave*, 647 F. App'x 529, 538–39 (6th Cir. May 4, 2016) ("there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances"). The consequence of the loss enhancement lacking an empirical basis, combined with the often-disproportionate role loss plays in determining the Guidelines sentence, is that "sentencing judges are discouraged from undertaking close examination of the circumstances of the offense and the background and characteristics of the offender." *U.S. v. Corsey*, 723 F.3d at 380 (Underhill, J. concurring).

Here, 16 levels are added due solely to this amount. Thus, loss amount alone brings Philip's guideline sentence of 18-24 months to a guideline sentence of 108-135 months. That increase is out of step with the harm caused by Philip's conduct.

The Guidelines, which are not mandatory, have been criticized by the defense bar and many prominent judges, as leading to seemingly arbitrary and irrational punishments for certain offenses, based either on drug weight, loss or value. Among the several factors assigned points in the offense-level computation applicable to this matter, only one, for acceptance of responsibility, allows a possible deduction. Because it relies on a decidedly narrow and punitive calculus, and excludes § 3553(a) factors that the Court must now consider - defendant's history, condition and character; circumstances underlying offense conduct; collateral consequences of a given sentence - even the minimums are inflated. Were it possible to incorporate these meaningful qualitative elements into such a rigid algebraic scheme, thus bringing it in line with

current law, we believe that Philip would handily qualify for a much lesser sentence.  Given that the Guidelines are now merely advisory, such a sentence appropriately reflects the sentencing factors under § 3553(a). Nine years removed from the charged conduct, without re-offending, as well as robust community support, and several years on supervised release, all show that general and specific deterrence to not require imprisonment.  The defense requests that the Court take this into consideration when determining an appropriate sentence.

**<u>Comparison to Conduct of Others Convicted of Similar Crimes</u>**

After being convicted under a similar scheme, albeit one in which they organized and which occurred for over 13 years and generated close to $90 million in gross sales, Denkberg was sentenced to 60 months of incarceration and Sean Novis was sentenced to 90 months of incarceration. To contrast, Philip's charged conduct took place over 20 months and generated approximately $2.6 million in gross sales.  The sentence imposed by this Court should fall far below those of these defendants, as anything approaching the Guideline range would create a drastic and unwanted disparity. U.S.S.G. Section 3553(a)(6).

At the time of the offense, Philip was at the height of his car wash business and was in the midst of opening various King of Clean locations. He had gone to great lengths to grow the business that he created, and he had immense pride in its success.  The charged conduct, which occurred after a decade and a half since he had last been involved with Jeffrey and Sean Novis, was born not out of greed or avarice, but repeated requests from Jeffrey Novis to help financially.  After nearly a year, Philip relented.  As stated above, the companies that Philip was involved with were only active for approximately 20 months.  Again, Philip had begun working at the age of fourteen, and had maintained a spotless, law-abiding life and business career for nearly five decades.  This charged conduct was, and is, the first time in his life that he has been connected to any law-breaking or dishonest conduct.  His involvement with this mass-mailing business transpired after repeated and ongoing requests from Jeffrey Novis, who could not put his name on any business due to his prior conviction, and who had no money to open the business.  Philip joined in order to provide the start-up capital, and to ensure vendors were paid and to deal with the accounts.  Philip did not decide how to operate the business.  He did not make any strategic decisions, including what to state in the various mailers, although we do

concede that he was aware of what the mailers stated. However, he did not create the mailers, select who they were sent to, or control the marketing. His role was logistical, and to handle the banking and finances. Philip's understanding was that Sean Novis had been operating an identical business for nearly fifteen years, and that his staff would run their business identically. Crucially, Philip's involvement began in 2015, well after the cease-and-desist letter was received by Sean Novis's company, a fact which Philip had absolutely no knowledge of.

Philip was not involved in creating the mailers, developing the mailing lists, or creating the strategy for the company. By contrast, it was Sean Novis and Gary Denkberg who designed and operated the fake notice scheme over the course of 13 years. Their scheme, which victimized over 700,000 people, defrauded the victims out of more than $78 million dollars. *See*, 20-CR-335 (JMA), ECF No. 123. Indeed, government exhibits indicated that Novis and Denkberg conducted in excess of 3.7 million transactions resulting in over $92 million worth of payments to their companies. Novis and Denkberg were also found guilty following a trial in this District. They were sentenced to terms of incarceration of ninety (90) and sixty (60) months, respectively.

In sharp contrast, Philip' conduct, which was purely an extension of the mass-mailing operation they had developed and operated for over a decade, his business was only operational for twenty months and, according to the Government, the loss amount is only $2 million, with only 92 thousand transactions. *See*, 20-CR-335, Doc. 120-3. Certainly, Philip's conduct cannot be compared to the conduct of Sean Novis or Denkberg in any meaningful way. Moreover, unlike Novis and Denkberg, who had reason to know their conduct was illegal, having received cease and desist notices and innumerable other indications they were violating the law, Philip had no such knowledge. Additionally, unlike Philip, Sean Novis clearly knew his conduct was illegal, "having learned the business at the feet of his father (Jeffrey), who was charged and later imprisoned" for a similar scheme. *See*, 20-CR-335, Doc. No. 123. Philip, despite the Government's attempts to associate him more closely than he truly was because he worked for the Novis' for a period in the late 90's, was kept at a significant distance. *See*, Trial Testimony, Page 500, Mary Lilienkamp (Q: Would Mr. Priolo ever come into the office. A: Every once in a blue moon, yea; TT, Page 260, Jaquard Q: There was no difference in the way your services were provided to Mr. Priolo than to Mr. Novis or Mr. Denkberg, correct? A: Yes. It was similar to them; TT, Page 80, Jaquard, Q: And did you ever meet Mr. Priolo A: Once.; Page 103, Q: Do

you have any sense of who would make those decisions of what data or what mailing lists these would be mailed to? A: That would be Sean Novis and whoever was working with the lists and also Mary. Cheryl Jaquard further testified that her services provided to Philip were part of a consistent, established system that was created and directed by Sean Novis, and that it was Novis who determined the specific mailing language, not Philp.

In addition, Jeffrey Novis, who was convicted of a similar scheme in 2001, in which the calculated loss was over $6 million dollars, was sentenced to a term of incarceration of fifteen (15) months. *See*, 95-CR-250(TCP), ECF No. 38, 78. While Philip does not deny his involvement in this business, or awareness and complicity in the mass-mailings, its origins are relevant to sentencing. To be clear, Philip did handle certain aspects of the business and a review of many of the business-related documents list his name prominently. However, it is clear that this scheme was the product of Sean Novis and Jeffrey Novis. Even by the government's estimation, there is a massive delta between Philip's culpability and that of Novis and Denkberg. Indeed, the government concedes that Philip "utilized the same infrastructure" that was set up by Sean Novis and Denkberg. *See*, ECF No. 104, page 13; Trial Testimony, Page 510, Mary Lilienkamp ("I worked for Mr. Novis, yes.").

The sorting of the mail was done at Cathy Johnson's home, which is where she was also doing it for Sean Novis and Denkberg, and Johnson "carried out the customer service work the same way she did for [Sean Novis and Denkberg]". What this shows is that this was not a fraudulent scheme created or implemented by Philip, but a subsequent operation that he joined, after being requested to do so by Jeffrey Novis. Put simply, it was already running itself. In addition, Philip's charged conduct ended over eight (8) years ago, and he has continued to lead a productive, law-abiding, and meaningful life since.

We concede that there is significant conduct for which Philip is clearly culpable. However, almost the entirety of his conduct arose from a request from Jeffrey Novis to finance a mass-mailing business that, basically, already existed and was being operated by Sean Novis and his staff, all of whom testified during the trial before Your Honor. Philip's naivete, insofar as the illegal nature or defrauding nature of this business, is not speculative. Indeed, it is supported by his previous five decades of flawless conduct, and a life lived with integrity and compassion towards others.

Significantly, despite the losses incurred by the individuals who responded to the mailers, Philip made no profit from his twenty months in which he was involved. Quite the opposite, as he saw no return of any of the money he put into the business. Philip has never denied participating in the charged conduct and he does have remorse and embarrassment that he could be caught up in such a scheme. Certainly, he should be held accountable; however, he should does not need or deserve to be punished with an incarceratory sentence, as his actions were far less nefarious and wide-ranging than the charges suggests. Specifically, his role in the scheme was monumentally less than that of his co-defendants. Although Philip was a partner in the business with Jeffrey Novis, Philip's role was financial, and otherwise passive, besides picking up mail. While this presence and participation does not exonerate him, there is simply no way to conclude that Philip was anywhere near as culpable as the Novis's and Denkberg, who had been engaging in this scheme for decades. In fact, when viewed in light of his background and circumstances and long track record of honest dealings, it is very possible that Philip was unaware of the fraudulent nature of their mailing business. Importantly, it was Jeffrey Novis[1] who repeatedly recruited Philip to join him, asking for assistance because he had little money to open the business and pay the vendors and staff.

In comparison to the others, both in terms of role, as well as amount of time spent engaging in the charged conduct, Philip's role was insignificant. He was neither involved in the creation or implementation of this scheme, nor did he enjoy any of the fruits, transferring no money from the business accounts to any of his own. This is not meant to divert all blame away from Philip, but to illustrate that his actions were not the actions of a man who was motivated by greed or wealth. The above-cited factors clearly distinguish this defendant and this offense from others seemingly of their kind and favor leniency.

**A Downward Variance is Appropriate in Light of the § 3553(a) Factors**

In the circumstances of this case, the requested is appropriate in light of the factors set forth in 18 U.S.C. § 3553(a), as detailed above.

---

[1] It is our understanding that the Government is not seeking restitution. PSR, Paragraph 89. However, if restitution is ordered, we request apportionment consistent with Novis/Denkberg (EDNY 20-cr-335(JMA),ECF Doc 169, 172), and Philip stands ready to pay immediately from the proceeds of the recent sale of his home.

As to Philip's exceptional history and characteristics, he has lived a life of tremendous dedication to his businesses and family and generosity to his community, laboring indefatigably to achieve great success. As the many heartfelt and genuine letters attached to this submission repeatedly attest, Philip is widely admired and respected for the truly incredible generosity and kindheartedness he extends to family, friends, acquaintances, community members and employees alike.

As to the nature and circumstances of the offense, Philip, now 62 years-old, in no way seeks to minimize his culpability or the seriousness of his crime; on the contrary, he profoundly and sincerely regrets his conduct – which was, in the starkest terms, an aberration from an otherwise ethical and law-abiding life. Nonetheless, certain facts surrounding Philip's offense, both before, during and after, accurately put this conduct in context.

Finally, under 18 U.S.C. Section 3553(a)(6), the requested sentence is appropriate in order to avoid unwarranted sentencing disparities, as the sentences imposed in this District on the related co-conspirators, who, as detailed above, had much larger roles and significantly more prolonged and expansive charged conduct, were far below Philip's guideline range. Indeed, the sentence imposed on Philip should be far below the sentences imposed against these individuals.


## IV. CONCLUSION

Philip accepts the jury's verdict and is remorseful for his role in the offense. For the foregoing reasons, we respectfully ask the Court to impose a drastically reduced sentence than the one being recommended by the government; we request a sentence that does not include incarceration. Instead, we ask the Court to sentence Philip to 5 years' probation with 6 months of home confinement, 200+ hours of community service (continued at Boca Helping Hands), and a significant fine.

Philip's conduct is undoubtedly serious, and he in no way seeks to minimize his actions. This conduct, however, must be viewed in the context, not only of certain facts surrounding the offense, but also of Philip's history as a well-respected and fair-minded employer, who created a successful business through sheer hard work and determination; as a loving and devoted family man; and as a generous community leader who, time and time again, showed a truly remarkable

commitment to helping those in need.  Whatever the Court's sentence, Philip will regret the conduct that led to his conviction for the rest of his life.

Dated: New York, New York
　　　September 3, 2025

Respectfully submitted,

_____/s/ Arthur L. Aidala_____
Arthur L. Aidala
Michael T. Jaccarino
Aidala, Bertuna & Kamins, P.C.
546 Fifth Avenue, 6th Floor
New York, New York 10036
*Attorneys for Philip Priolo*