

**U.S. Department of Justice**
Consumer Protection Branch

---

**Ann F. Entwistle**
Telephone: (202) 305-3630
Fax: (202) 514-8742
Ann.F.Entwistle@usdoj.gov

**Overnight Delivery Address**
450 5th St., N.W., Room 6400
Washington, D.C. 20001

**Mailing Address**
P.O. Box 386
Washington, D.C. 20044

September 10, 2025

By ECF
The Honorable Nusrat J. Choudhury
United States District Judge
Eastern District of New York
920 Federal Plaza
Central Islip, NY 11722

      Re: *United States v. Philip Priolo*
      Case No. 2:21-cr-566 (NJC)

Dear Judge Choudhury:

      Defendant Priolo deserves a lengthy sentence that reflects the severity of his crimes, deters other fraudsters from preying on elderly and vulnerable people, and protects the public from further harm. Over the course of two years, Priolo operated two fake prize notice schemes, one in partnership with co-defendant Jeffrey Novis and later a second from which Priolo could control all of the proceeds. In total, Priolo defrauded tens of thousands of victims out of more than $2.6 million. GX 393.

      The Probation Department calculated the offense level as 31, an offense level that merits a sentence of 108-135 months under the Sentencing Guidelines. The United States asserts that the facts of Priolo's offense conduct merit one additional Guideline enhancement of 4 levels for an Aggravating Role, and that Priolo should be given a guideline sentence.

      In his sentencing memorandum, Defendant Priolo asks for a non-custodial sentence of 5 years' probation and 6 months' home confinement. Dkt. No. 184 at 38. Such a result would be disproportionate to the harm Priolo has caused to victims and their families. The Defendant deserves a significant sentence—including a substantial term of imprisonment—to demonstrate

that the justice system takes his offense seriously and that taking advantage of vulnerable people in our society through mass-mailing fraud will not be tolerated.

## I.     PROCEDURAL HISTORY

### A. Indictment and Guilty Verdict

A grand jury in this District returned the Indictment on November 9, 2021. Dkt. No. 1. The indictment charged Priolo and Jeffrey Novis with conspiracy to commit mail and wire fraud under 18 U.S.C. §1349 (Count 2), as well as four counts of mail fraud under 18 U.S.C. § 1341 (Counts 3–6). A jury trial was held from March 10, 2025 to March 19, 2025. On March 19, 2025, Priolo was convicted on all counts. Dkt. No. 156. Priolo faces a maximum of 20 years of incarceration for the § 1349 conspiracy conviction and 20 years for each of the § 1341 mail fraud convictions. Sentencing is scheduled for September 17, 2025.

### B. Status of Related Cases

Co-defendant Jeffrey Novis has no trial date scheduled, pending the outcome of ongoing competency proceedings. Co-defendant Shawn Phillips is still in Canada, facing extradition proceedings.

## II.     THE GUIDELINES ARE THE STARTING POINT FOR DETERMINING THE DEFENDANTS' SENTENCES

### A. Legal Standard

Under *Booker*, the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220, 245 (2005). Nonetheless, district courts must calculate the applicable Guidelines range under the Guidelines existing at the time of the offense before imposing sentence. *Id*. The Guidelines remain "the lodestone of sentencing" and "anchor both the district court's discretion and the appellate review process." *Peugh v. United States*, 569 U.S. 530, 549 (2013). On appeal, the use of the Sentencing Guidelines "as a benchmark helps promote uniformity by tending to iron out sentencing differences" and results in a presumption that "a within-Guidelines sentence is reasonable." *Id*. at 542.

While district courts are generally free to impose sentences outside the recommended range, when doing so they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 544, 549. Any major departure from the Guidelines "should be supported by a more significant justification than a minor one." *Id*. at 193.

### B. The Presentence Investigation Report (PSR) Calculates Priolo's Offense Level as 31

According to the Presentence Report issued on August 31, 2025, the Probation Department determined that Defendant Priolo warrants an offense level of 31. Priolo PSR ¶¶ 30-43.

The offense level is calculated from the sum of:

- a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1);

- a 16-level increase for causing victim loss of more than $1,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(I);

- a 2-level increase for an offense involving 10 or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i);

- a 2-level increase for an offense involving the use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C);

- a 2-level increase because the defendant knew victims were vulnerable due to their advanced age, pursuant to U.S.S.G. § 3A1.1(b)(1); and

- a 2-level increase under U.S.S.G. § 3A1.1(b)(2) because the (b)(1) adjustment applies and the offense targeted a large number of vulnerable victims.

Though Paragraph 38 of the PSR applies no adjustment for Role in the Offense, in the preceding description of the offense conduct, the Probation Department indicated that Priolo was an organizer of his fraud scheme which involved five or more participants. PSR ¶ 25. This would merit an additional 4-level enhancement pursuant to U.S.S.G. § 3B1.1(a), which would bring Priolo's offense level to 35.

As set out below, the Government believes an offense level of 35 is an accurate calculation of Priolo's Sentencing Guidelines.

### C. Priolo Should Receive a 16-Level Enhancement for Actual Loss of More Than $1,500,000

The undisputed trial evidence revealed that Priolo collected more than $2.6 million from the victims of his scheme in under two years. This sum represents actual losses caused by thousands of individual attempts to defraud victims throughout the United States.

### i. $2.6 million is a reasonable estimate of the actual loss Priolo caused to victims.

Priolo deserves a 16-level enhancement for causing tens of thousands of victims to lose more than $2.6 million[1] to the scheme. U.S.S.G. § 2B1.1(b)(1)(M). This figure is based on victim payment data obtained from databases maintained by Cathy Johnson on behalf of Priolo

---

[1] GX 393 shows that, combined, the Winners Circle scheme Priolo operated with Jeffrey Novis and the Feel Lucky Group scheme for which Priolo was the sole owner generated $2,622,018.52.

and Jeffrey Novis to track payments made to Winners Circle and Feel Lucky Group, as well as from bank records for those entities for the time periods before and after Priolo utilized Cathy Johnson to cage payments. GX 393; Tr. 864-866 (Reins-Jarin). At trial, Priolo never challenged the accuracy of the total victim payment figure reflected in GX 393. In fact, defense counsel displayed this exhibit during his opening statement.

Sentencing courts must make a reasonable estimate of loss based on the available information. U.S.S.G. § 2B1.1 cmt. n.3(B); *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997). For purposes of calculating the Guidelines range, loss is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) n.(A). Actual loss, in turn, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) n.C(i). The $2.6 million calculation is a reasonable estimate of actual loss based on the available information because it is based on the total payments that victims made in response to Priolo's fraudulent prize notices. The Second Circuit has consistently held that a "district court is not required to calculate loss with "absolute precision," but need only by a preponderance of the evidence "make 'a reasonable estimate of the loss' given the available information." *Id*. at 597 (citing *United States v. Coppola*, 671 F.3d 200, 250 (2d Cir. 2012)); *see also United States v. Powell*, 831 F. App'x 24, 25–26 (2d Cir. 2020).

In his sentencing memorandum, Priolo argues that the government has offered *no evidence* that any victims beyond the victims who testified at trial, or whose family members testified on their behalf, were actually defrauded. Dkt. No. 184 at 26. Priolo argues that the loss should be limited to the losses of the victims who testified at trial. *Id.* In support of his contention that the government has proffered "no evidence" that victims were defrauded, Priolo relies on the same argument he made at trial and that the jury rejected—that the solicitations never promised cash prizes, they instead promised a legitimate product, a report of sweepstakes opportunities, and that some subset of purchasers were simply confused about what the mailings were offering.

Contrary to defendant's assertion, the government introduced overwhelming evidence at trial, in addition to victim testimony, that Priolo's mailings were designed to and did deceive his victims, including: the mailings themselves, that are deceptive on their face (GX 1-30); voluminous complaints from victims of the scheme on the outside of return envelopes (GX 160) and in letters sent with or in lieu of payments (GX 162); and through state Attorney's general and other consumer protection agencies (GX 171-173). *See also* Tr. 598, 605, 622, 631-40 (Johnson testimony regarding victim notes and complaints).

Priolo's argument seeking to limit the fraud loss to that incurred by testifying victims is deeply misguided; it does not reflect the scope of Priolo's conduct, and it renders criminal intent meaningless. Priolo's argument suggests, contrary to the Guidelines' instructions on calculating loss, that in order to prove actual loss, the Government was required to put more than 40,000 victims—many of whom are elderly or have since passed away—on the stand. GX 388 (death certificates of victims referenced in Counts Three, Four and Six of the Indictment); Dep. Trans. of Alemitu Teshale at 8 (testifying that her husband has dementia and she has to take care of him). Obtaining specific information from tens of thousands of victims was neither possible nor necessary to calculate a "reasonable estimate of loss, based on the available information." For

4

this reason, the Second Circuit and other courts have rejected arguments that sentencing loss should be limited to the loss incurred by victims who testified at trial. *United States v. Bradbury*, 2000 WL 562430, *2 (2d Cir. 2000) (unpublished) (affirming inclusion of loss amounts suffered by victims not named in the indictment); *United States v. Powell*, 650 F.3d 388, 391–94 (4th Cir. 2011) (affirming inclusion of loss amounts suffered by victims who defendants did not have opportunity to cross-examine.).

The mail and wire fraud statutes prohibit the scheme and the intent to defraud, not the success in defrauding individual victims. *See United States v. Trapilo*, 130 F.3d 547, 551–52 (2d Cir. 1997) (holding that it is "the forming of the scheme to defraud" and the use of the mails and wires that is barred by the mail and wire fraud statutes, and that additional proof is not required). Priolo was not solely convicted of defrauding the four specific victims identified in the mail fraud counts of conviction—rather, he was convicted of intentionally conspiring to commit mail fraud and for intentionally operating a fraudulent prize notice scheme. That is not a mere allegation—it is the jury's unanimous determination as factfinder. Further, that is the unanimous determination of *two juries*, considering the convictions of Sean Novis and Gary Denkberg in 2022 for aiding and abetting Priolo's fraud scheme. In light of the jury's finding that Priolo operated a mailing fraud scheme with the intent to defraud, the Government is not required to obtain specific information from tens of thousands of fraud victims to establish loss amount.

Finally, the Second Circuit has rejected the very argument that Priolo makes here—that, for the purpose of calculating loss amount, the absence of a complaint is evidence that a particular victim was not defrauded. *See United States v. Mosely*, 980 F.3d 9, 29 (2d Cir. 2020) (rejecting argument that, for purposes of loss calculation, only complaining borrowers in payday-loan scam could be deemed to have been defrauded, and noting, "[t]hat a borrower may have never objected to the loan does not mean that the process that led to it was free of fraudulent representations or that those borrowers were not defrauded…"). All of the victims who sent payments to Priolo and Jeffrey Novis did so because they had received fake prize notices the Defendants mailed with fraudulent intent, and the losses those victims suffered are a reasonable and appropriate basis for the actual loss calculation.

### ii. The evidence at trial reflected that refunds totaled less than $3,000, a reduction that would have no impact on the Guideline calculation.

Priolo contends that the government did not make "any effort…to enumerate the extent of the money returned" in response to requests for refunds. This assertion is flatly wrong. Postal Inspector Christine Reins-Jarin testified at trial regarding her review of the bank records for the Winners Circle and Feel Lucky Group schemes, to determine the number and total value of refunds issued. Tr. 811-12. Inspector Reins-Jarin testified that, based on her review of the bank records, "Across all of the accounts, I believe there were approximately 30" refunds, and that the approximate value of those refund checks was "between $2,800 and $2,900." Tr. 812. Even if the Court were to deduct $2,900 worth of refunds from the calculation of the actual loss caused by Priolo's schemes, that would result in a loss of $2,619,118.52, and would have no impact on the Guideline calculation.

Further, Priolo's assertion that "if any recipient was unsatisfied, or requested a refund, they received one in full" ignores the trial testimony to the contrary. Cathy Johnson testified that

5

she only sent refunds to victims who explicitly requested their money be returned, even if it was clear from a victim's letter that the victim believed they were going to receive a large cash prize in return for their payment. Tr. 624-25, 633-34; GX 162 at 1-2. Johnson further testified that even where a victim specifically requested a refund, that victim was only refunded the amount they paid in response to that particular prize notice, not the total amount the victim had paid to Priolo and Jeffrey Novis in response to other fraudulent prize notices. Tr. 655-62. That policy is particularly troubling in light of the evidence that Priolo's mailings all appeared to come from different fake companies, making it difficult for a victim to know that Priolo's numerous mailings were coming from the same source. GX 1-30. Contrary to Priolo's assertions, his refund policy was significantly less comprehensive than he suggests, and the evidence of actual refunds issued makes a negligible change to the total loss calculation.

Finally, the Application Notes for Section 2B1.1 provide for "Credits Against Loss," directing that "Loss shall be reduced by the following: (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." U.S.S.G. § 2B1.1 n.(D). Priolo only offered refunds *after* victims had detected the offence and requested a refund, so the Credits Against Loss provision is inapplicable to the refunds issued by Priolo and Jeffrey Novis.

### iii. An intended loss calculation would be in the tens of millions.

In his sentencing memorandum, Priolo argues that the money victims paid to his schemes (GX 393's $2.6 million figure) represents intended loss, and therefore the Court should not adopt $2.6 million as the loss calculation for sentencing. Dkt. No. 184. This argument is neither factually nor legally correct. The $2.6 million is *actual* loss and is the figure upon which the government submits the Guideline sentence should be calculated. Intended loss is defined as "the pecuniary harm that the defendant purposely sought to inflict." "Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose." *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000). In a fraud scheme that involved sending out deceptive mailings, the appropriate *intended* loss figure would be the total number of payments requested in all of the deceptive mailings Priolo sent to potential victims. This number would be *significantly* higher than the $2.6 million victims actually paid in response to the mailings.

At trial, the government introduced "master spreadsheets" that recorded every outgoing mailing and the responses for Winners Circle and Feel Lucky Group. GX 158; Tr. 616-618 (Johnson). For every outgoing batch of prize notice mailings, the master spreadsheets reflect a response rate of "paid responders." Tr. 618 (Johnson identifying the column titled "% $ RESP" as "percentage of paid responders). The response rates range from around 1% to around 10%, with the majority below 5%. Assuming, on average, 5 percent of people who received the prize notices paid, then the intended loss figure—the amount Priolo would have received if all

6

recipients had made payments to the scheme—is approximately $52 million.[2] That intended loss figure would merit a 22-level enhancement instead of the 16-level enhancement recommended by the PSR. U.S.S.G. § 2B1.1(b)(1)(L). Because the significant amount of actual loss sufficiently reflects the seriousness of Priolo's crimes, the Government does not object to the PSRs' use of the lower actual loss figure instead of an intended loss calculation.

### D. Priolo Should Receive a 2-Level Enhancement for an Offense Involving 10 or More Victims

Priolo defrauded more than 40,000 victims across the United States with his fake prize notices. GX 393 reflects more than $2.6 million in payments to Priolo's schemes, paid in more than 100,000 individual transactions. In anticipation of sentencing, Postal Inspectors reviewed the same caging database records summarized in GX 393 to determine the number of unique victims of each scheme. Exhibit 1 to this memorandum contains those additional calculations, reflecting that 37,875 unique victims sent payments in response to Winners Circle mailings, and 3,919 victims sent payments in response to Feel Lucky Group mailings. When those two sets of unique victims for the two schemes were deduplicated against one another, the resulting total was 40,074 unique victims across both schemes.

### E. Priolo Should Receive a 4-Level Enhancement Because He Knew Many Victims Were Elderly or Otherwise Vulnerable to His Scheme

Priolo also objects to the application of a two-level enhancement under U.S.S.G. § 3A1.1(b)(1) for targeting vulnerable victims, as well as a two-level enhancement under U.S.S.G. § 3A1.1(b)(2) for targeting large numbers of vulnerable victims. However, Priolo "knew or should have known that a victim of the offense was a vulnerable victim," so a two-point increase is warranted under § 3A1.1(b)(1). Priolo's argument to the contrary overlooks substantial evidence that he deliberately and repeatedly targeted victims who were particularly susceptible to this type of mass-mailing fraud scheme and that Priolo received actual notice that many of his victims were elderly.

In his sentencing memorandum, Priolo argues that he did not know, nor should he have known, that some of his victims were elderly, because the mailing lists he borrowed or purchased to identify new victims did not include the age of the addressees. Dkt. 184 at 28. Priolo analogizes his conduct to an example provided in the Application Notes to Section 3A1.1(b), stating that the vulnerable victim enhancement would not apply in a case in which a defendant "sold fraudulent securities by mail to the general public and one of the victims happened to be senile." *Id.* at 29; citing U.S.S.G. § 3A1.1, cmt. n.2 (2023).

However, Priolo did not send his fraudulent mail pieces to the public at large. Instead, he and Jeffrey Novis rented and shared lists of the names and addresses of people who had fallen

---

[2] Assuming that $2.6 million represents the proceeds of 5% of the total number of mailings, 20 times that amount adds up to $52 million, the amount Priolo and Jeffrey Novis would have received if 100% of the potential victims who received their fraudulent mailings sent payments in response.

7

prey to similar mail fraud schemes, including sharing lists every month with Sean Novis, Gary Denkberg, and Shawn Phillips who sent virtually identical fraudulent prize notices. This targeting of victims who had fallen for similar schemes in the past warrants a vulnerable victim enhancement. *See United States v. Powell*, 713 F. App'x 36, 38 (2d Cir. 2017) (noting that "courts have upheld application of the vulnerable victim enhancement because the victims of lottery schemes akin to the one here are 'unusually vulnerable'").

Priolo's predation upon the vulnerable did not end there. After sending an initial fraudulent mailing to the victims on a rented list, Priolo and Jeffrey Novis kept careful track of the small percentage of recipients who responded by sending back money, then targeted those victims with repeated mailings. Tr. 458-60, 480-81 (Lilienkamp). Typically, once a victim responded to the initial mailing, that victim would receive ten or more additional fraudulent mailings in the following month. Tr. 480-81 (Lilienkamp) Thus, Priolo targeted vulnerable victims both through his purchase of victim lists and then by repeatedly bombarding those same victims who sent him money with additional requests for payment. *See United States v. O'Neil*, 118 F.3d 65, 75-76 (2d Cir. 1997) (affirming vulnerable victim enhancement where "an important part of the scheme was the re-loading process, whereby individuals who already had been victimized by the scheme were contacted up to two more times and defrauded into sending more money to the companies").

Additionally, Priolo's prize notices were so obviously fraudulent on their face to most people in light of their claims that the recipient could receive millions of dollars in exchange for payment of a relatively modest fee, that by their very nature, only those who were particularly vulnerable to those types of fraudulent claims, including the elderly, would be deceived. Tr. 530 (Johnson testified that it was "pretty apparent right from the beginning" that the mailings were deceptive because "it made it sounds like you won something instead of that you were buying something"). The Second Circuit has repeatedly held in similar cases that a vulnerable victim enhancement is appropriate where, based on the blatantly fraudulent text of mailings, a defendant "knew or should have known that only vulnerable victims would fall prey to this scheme." *See United States v. Palmer*, 830 F. App'x 26, 29 (2d Cir. 2020) (the district court assessed the "preposterous subject matter" of the mailings offering a $22 million prize revealed the vulnerability of anyone who fell victim to it); *see also Powell*, 713 F. App'x at 38 (district court properly found that elderly victims were particularly susceptible because they were "duped by 'bizarre and preposterous' mailings that '[y]ou would have to be very vulnerable to believe.'").

In addition, Priolo received direct notice that victims were elderly or otherwise vulnerable, in the form of complaints forwarded by State Attorneys General. *See, e.g.,* Tr. 644 (Johnson testimony that she provided AG letters to Priolo); GX 364 (complaint regarding victim with dementia); GX 173 at 5-16, 23-27 (AG letters forwarding complaints regarding 94-year-old parents and from elderly victims). The scheme also frequently received letters directly from victims referencing their age. *See, e.g.,* GX 52. As Priolo notes, the letters that came directly from victims were likely opened by Cathy Johnson during the caging process and may not have been seen by Mr. Priolo directly. However, Ms. Johnson testified that these types of notes and "customer service letters" were received regularly both throughout the course of the charged scheme in 2015-2016 *and* from the time she began working for Sean Novis in 2000, Tr. 622-23, 633-34; that Priolo was one of Novis's partners in 2000; and that in 2000 Priolo regularly spent

8

time caging the incoming victim mail. Tr. 537-40. Based on this testimony, it is reasonable to conclude that Priolo knew or should have known many victims of these mass-mailing schemes were elderly or otherwise vulnerable as far back as 2000, when he worked with Sean Novis and Jeffrey Novis the first time. Priolo deserves both the 2-level enhancement for victimizing people he knew were particularly vulnerable to his fraudulent scheme and the 2-level enhancement for victimizing large numbers of vulnerable people pursuant to U.S.S.G. § 3A1.1(b)(1).

### F. Priolo Should Receive a 4-Level Enhancement Because He Led a Fraud Scheme With At Least Five Participants or That Was Otherwise Extensive

i. **Priolo led and organized the fraudulent scheme.**

The facts regarding Priolo's role in the fraudulent scheme merit a 4-level enhancement for his leadership role, pursuant §3B1.1(c). The Guidelines provide factors for courts to consider in distinguishing a leadership and organizational role, which include:

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. The conspiracy for which Priolo was convicted encompassed mailing schemes under two separate shell companies: Winners Circle, which Priolo shared as a co-owner with Jeffrey Novis; and Feel Lucky Group, which Priolo owned independently, paying Jeffrey Novis for some assistance. With regard to Feel Lucky Group, Priolo was the ultimate decisionmaker on all aspects of the scheme, including control of the bank accounts, selecting the mailings, and ordering lists of potential victims. *See, e.g.,* GX 157 Feel Lucky agreement with Cathy Johnson's company Precise Services); GX 263 (Feel Lucky Group corporate records); GX 303 (email from Mary Lilenkamp to printer, copying Priolo, sending the final Feel Lucky Group's September 2016 front-end mailings); GX 400 (Feel Lucky Group Empire National Bank records); Tr. 570 (Cathy Johnson testimony that Feel Lucky Group was Phil Prioloo's company). Priolo also explicitly told Jeffrey Novis and John Greany, a list broker who sold Priolo lists and connected him with a copywriter to produce "creatives" (their term of art for fraudulent prize notices), that his reason for starting a second company was "to not have to divide up the pie." GX 374.

With regard to Winners Circle, Priolo and Jeffrey Novis were the co-owners, who shared proceeds and decision-making authority. *See* GX 351 (Priolo and Jeffrey Novis are both signatories on the Winners Circle bank account); Tr. 568-69 (Johnson testifying Priolo and Jeffrey Novis were both owners of Winners Circle). Priolo was the sole account holder with their payment processor, PacNet, and thereby the sole individual with authority to transfer proceeds of the fraud from accounts with PacNet in Canada back to the Winners Circle bank accounts in the United States. *See, e.g.*, GX 354 at 9 (Winners Circle PacNet application listing only Priolo's name under the "authorized persons" section).

9

**ii.  Priolo led and organized criminal activity with five or more participants.**

The 4-level leader/organizer enhancement is appropriate under U.S.S.G. § 3B1.1 where five or more criminally responsible persons are involved in carrying out the criminal activity. A "participant" in criminal activity is a person who is criminally responsible for the commission of the offense, but need not have been convicted. U.S.S.G. § 3B1.1, cmt. n. 4. A criminal conspiracy may have more than one leader or organizer. U.S.S.G. § 3B1.1, cmt. n. 4. Moreover, it is the activity that must have five or more persons, not the discrete group the defendant led or organized; the enhancement's prerequisites are satisfied where the defendant led or organized at least one individual in furtherance of the criminal activity carried out by five or more people. *See United States v. Thompson*, 537 F. Supp. 3d 439, 453 (W.D.N.Y. 2021) (citing *United States v. Si Lu Tian*, +, 156 (2d Cir. 2003)).

In this case, the criminally responsible persons who carried out the conspiracy of which Priolo was convicted include, at a minimum: (1) Priolo himself, (2) Jeffrey Novis, (3) Sean Novis, (4) Gary Denkberg, and (5) Cathy Johnson. All of these persons are criminally responsible for their roles in the criminal activity led or organized by Priolo. Priolo himself stands convicted of numerous counts, including a conspiracy in which he was alleged to have conspired with Jeffrey Novis, Sean Novis, and Gary Denkberg. Similarly, Sean Novis and Denkberg have been convicted of aiding and abetting Priolo's scheme. While Cathy Johnson has never been criminally charged, she testified under an order of immunity and was the subject of a civil injunction suit alleging that she was knowingly facilitating mail fraud through her role in the Sean Novis and Gary Denkberg mail fraud schemes, *United States v. Sean Novis, et al.,* 2:16-cv-5263 (SJF), and her testimony at trial provided sufficient facts to find her criminally culpable for her role in Priolo's mail fraud schemes as well. Priolo meets the criteria for a 4-level increase under Section 3B1.1.

**iii. Priolo's criminal activity was also otherwise extensive.**

The leader/organizer enhancement is also appropriate where the criminal activity was "otherwise extensive" under U.S.S.G. § 3B1.1. Criminal activity is otherwise extensive where "the unknowing services of many outsiders" are included in the execution of the fraud. U.S.S.G. § 3B1.1 cmt. n.3; *United States v. Archer*, 671 F.3d 149, 165 (2d Cir. 2011). The Court's determination under this provision is made by weighing three factors: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *Archer*, 671 F.3d at 165.

Here, the criminal activity is "otherwise extensive" by virtue of the involvement of numerous additional persons besides those who are directly criminally responsible. These include Sean Novis's employees who testified at trial: Cheryl Jacquard and Mary Lilienkamp, who carried out the day-to-day tasks associated with the mailing operation, including communicating with printers and list-brokers and processing the data. These additional persons also include another of Sean Novis's employees, Ellen McDevitt, as well as John Greany, who

has never been criminally charged, but who rented lists of potential victims to Priolo and assisted him with acquiring mailing "creative" (i.e., fraudulent prize notices) from a copywriter. Each of these roles was essential to the operation of Priolo's scheme.

### G. The Facts Support a 2-Level Enhancement for Priolo's Use of Sophisticated Means to Carry Out The Fraud Scheme

The commentary to the Guidelines defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1(b)(9)(C), n.8. In the Second Circuit, the enhancement applies "even if each step in the scheme was not elaborate," so long as "the total scheme was sophisticated in the way all the steps were linked together…" *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996). Here, the Priolo and his co-conspirators operated a mass-mail fraud scheme that sent millions of prize notices to victims across the United States. The scheme was run under the guise of numerous shell companies and fictitious names. Priolo and his co-conspirators employed a front-end and back-end mailing system that was meticulously designed to identify those victims who were most susceptible to the fraudulent scheme. Once victims responded to one notice, Priolo bombarded victims with additional prize notices, each mailed under the names of different fake companies and bearing the signatures of different fake officials. Priolo also exchanged victim data with his co-conspirators, so they could all take advantage of newly identified victims who were vulnerable to the scheme. When the Defendants received checks from victims, rather than deposit them directly into their U.S. bank accounts, for the majority of the scheme they forwarded them to PacNet in Canada, who processed the victim payments into their own accounts and then wired the proceeds to Priolo at his direction. On the whole, Priolo operated an elaborate scheme for which a "sophisticated means" enhancement is well-deserved.

### H. Priolo Does not Qualify for the Zero-Point Offender Adjustment

Because Priolo's conduct merits both the adjustments for Vulnerable Victim under U.S.S.G. Section 3A1.1(b)(1) and for Aggravating Role under U.S.S.G. Section 3B1.1, he does not qualify for the two-point Zero-Point Offender reduction.

### I. Priolo Does Not Deserve a 3-Level Reduction for Acceptance of Responsibility

Under U.S.S.G. § 3E1.1(a), the district court must decrease a defendant's offense level by two points if the defendant "clearly demonstrates acceptance of responsibility for his offense." Under U.S.S.G § 3E1.1(b), a defendant who qualifies for the 2-level decrease in Section 3E1.1(a) is entitled to an additional 1-level reduction if the defendant assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty.

Priolo argues that he is entitled to a 3-level reduction under U.S.S.G. § 3E1.1(b) because he "does accept responsibility for his role in the mailing business, and has committed to making full restitution." Dkt. 184 at 32. However, contrary to his statement that he has accepted the jury's verdict and has accepted responsibility for his conduct, throughout the majority of his sentencing memorandum Priolo minimizes his culpability for the crimes of which he was

convicted and appears reluctant to admit that the entire prize notice business was a scheme to defraud.

At its most basic, accepting responsibility would require defendant to admit that his mailings were deceptive and that his intent was to obtain money by deceiving the recipients of those mailings. Priolo is unwilling to make that basic admission, even now, months after the jury's verdict. Instead, Priolo re-asserts his trial defense that the mailings were selling a legitimate product consisting of "a booklet outlining available sweepstakes opportunities, which are sought after by many people who routinely enter sweepstakes." (Dkt. 184 at 26). Further, despite hearing the testimony of victims and their family members, who described their extensive efforts to protect their loved ones from fraudulent mailings, Priolo refers to these testifying individuals as "purported" victims who were "confused" about what the mailings were offering. *Id.* at 27. Finally, he claims that he was simply unaware of the fraudulent and illegal nature of the business. *See, e.g., id.* at 38 ("[W]hen viewed in light of his background and circumstances and long track record of honest dealings, it is very possible that Philip was unaware of the fraudulent nature of their mailing business."). Priolo has not accepted responsibility for his conduct, or the harm that it caused, and seeks now simply to minimize any punishment for himself.

Instead of truly accepting responsibility for his actions, Priolo argues based on a single Southern District of New York decision, that the 3-level reduction for acceptance of responsibility is an unconstitutional trial penalty against those defendants who exercise their right to trial. Dkt. 184 at 32 (*citing United States v. Tavberidze*, 769 F.Supp.3d 264, 23-CR-585-03 (JSR) (S.D.N.Y. 2025)). Judge Rakoff's position in *Tavberidze* is a nationwide outlier, and the government is not aware of any other district courts who have adopted the same position. Application Note 2 to Guideline 3E1.1 provides that, "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."

### III. STATUTORY FACTORS CALL FOR A SUBSTANTIAL PRISON SENTENCE

The factors listed in 18 U.S.C. § 3553 weigh in favor of imposing a sentence of imprisonment. These factors include: (A) the nature and circumstances of the offense, (B) the history and characteristics of the defendant, (C) the need for the sentence imposed to reflect the seriousness of the offense, and (D) the goal of avoiding unwanted sentencing disparities for similarly situated defendants.

**A. Nature and circumstances of the offense: Priolo targeted elderly and other vulnerable persons who were susceptible to the scheme and went to great lengths to conceal his activities.**

Priolo defrauded tens of thousands of victims out of more than $2.6 million over the course of 2015 and 2016. The fraud scheme in this case was a cruel hoax that repeatedly victimized vulnerable people. Priolo and his co-conspirators gave people false hope that they had won or would win a massive prize, took their money, gave them a worthless piece of paper with publicly available information as a cover for their fraud, then targeted those victims again

12

and again. The Court heard testimony from victims and their family members regarding the impact of this scheme and others like it on their loved ones, and how difficult it was to stop these schemes and protect their loved ones. *See, e.g.*, Tr. 301-305 (testimony of Ashley Seip discussing mailings sent to her grandfather).

In his sentencing memorandum, Priolo portrays his involvement in the scheme as simply a regrettable decision to help out an acquaintance and invest in what he believed to be a legitimate business. Dkt. 184 at 9-13. This argument disregards the evidence admitted at trial of the blatantly deceptive nature of the mailings, as well as the ways in which the mailing scheme was designed to hide the identities of those responsible from victims, banks, and law enforcement.[3] Priolo and Jeffrey Novis never put their own names on their mailings. Instead, they mailed their fake prize notices under the cover of dozens of shell companies, fictitious names, and fake officials used to distance themselves from their own scheme. That is not the way legitimate businesses operate.

Priolo received seven letters from state attorneys general in the three months between April and the end of June 2015. GX 173, 364. In response to all of them, Priolo and Jeffrey Novis, through Cathy Johnson, sent letters in the name of their shell companies and a fake customer relations employee promising a refund or to remove that specific victim from a mailing list, but making no other changes to the content of the mailings or the operation of the fraud scheme.

Priolo's contention in his sentencing memorandum that he was not motivated by greed or profit ignores the fact that nine months before the scheme was shut down by law enforcement, Priolo set up a second, identical fraud scheme under the Feel Lucky Group shell company, effectively doubling his volume of outgoing fraudulent mailings and potential proceeds and cutting out Jeffrey Novis from an ownership role in the scheme. GX 372, 373. This was so he didn't have to "divide up the pie," i.e., profits of the scheme, i.e., the victims' money. GX 374.

Even now, after sitting through a trial in which several victims and victim family members testified, Priolo's sentencing memorandum makes clear that he has never once considered—and he does not consider now—the harm he caused to victims of his scheme. He seeks only to shield himself from the consequences of his actions.

---

[3] In their recent opinion affirming the convictions of Priolo's co-conspirators Sean Novis and Gary Denkberg, the Second Circuit held that the prize notices themselves, which "used fictitious names and businesses; resembled checks and financial documents; included contrived seals or signatures to make them look official; and used confusing language to obscure disclaimers" provided evidence from which a jury could find the Defendants' intent to deceive the recipients. *United States v. Denkberg*, No. 23-6877, 2025 WL 1553619 (2d Cir. June 2, 2025). Priolo's prize notices bear all of these same characteristics.

### B. History and characteristics of the Defendant: Priolo operated virtually identical fraud schemes fifteen years apart, and entered into the second, charged conspiracy with the intent to hide Jeffrey Novis's role in the scheme.

Priolo's self-serving summary of his long history with Sean and Jeffrey Novis is inconsistent with the facts admitted at trial and with the conduct of an innocent businessman who was unknowingly lured into a fraud scheme. The evidence at trial showed that in and around the year 2000, Priolo was a partner with Sean Novis in a mailing fraud scheme that was virtually identical to the scheme he rejoined in 2015. *See* GX 383 (corporate records for Sweepstakes Advisory Network, Inc. reflecting Sean Novis and Priolo as "officer" and "director," respectively, incorporation in November 1999 and dissolution in January 2002); Tr. 538-540 (Johnson testified Priolo was one of Sean Novis's partners, meaning he would share profits from the company, had a desk in the same office as Sean Novis, and would "come in regularly to help cage the mail[4]"). Priolo asserts in his sentencing memorandum that this earlier iteration of the scheme involved mailings offering entry into a sweepstakes, not the "sweepstakes reports" that were the fulfillment and cover story for the mailings in the charged 2015-2016 scheme. Priolo relies on this distinction as a basis for his argument that he did not understand he was joining an unlawful fraud scheme when he agreed to work with Jeffrey Novis in 2015.

However, at trial the government introduced evidence that Priolo, through Sweepstakes Advisory Network, mailed sweepstakes report mailings in and around the year 2000. *See, e.g.,* GX 401, 408, 413 (Sweepstakes Advisory Network sweepstakes report mailings dated Nov. 2000 through Jan. 2001); Tr. 764-71, 773-76 (Ressler testimony regarding the creation of sweeps report mailings for Sweepstakes Advisory Network); Tr. 539-40 (Johnson testimony that Priolo's company Sweepstakes Advisory Network was sending sweepstakes report mailings when she started with the company in 2000). This inconsistency between the facts admitted at trial and Priolo's statements in his sentencing memorandum cast significant doubt on his assertion that he believed the mailing operation he joined with Jeffrey Novis in 2015 was different in kind from the earlier operation and was therefore not "unlawful." Dkt. 184 at 11.

Further, Priolo admits that he knew Jeffrey Novis had previously been convicted of a crime related to his past sweepstakes mailings,[5] Dkt. 184 at 12, and that Jeffrey Novis needed

---

[4] At trial, the government introduced substantial evidence regarding the daily receipt of notes victims wrote on the outside of envelopes and on the return forms with their payments regarding their beliefs that the mailings were a scam or their belief that they were entitled to receive a large cash prize. *See, e.g.,* GX 160, 162, 368A-D; Tr. 564, 593, 624-44, 732-33 (Johnson testimony regarding notes on outside of envelopes, notes from non-buyers saying "take it out of my winnings," and notes on response forms). Given that Sweepstakes Advisory Network was essentially the same scheme, it is reasonable to infer that similar notes were also present in the return victim mail in the year 2000, when Priolo regularly assisted with caging.

[5] A copy of the Information and final judgment are attached hereto as Exhibit 2. Notwithstanding the fact that the mailings for which Jeffrey Novis was previously charged used entry in a sweepstakes, rather than delivery of a sweepstakes report, as their fulfillment and cover story, the scheme outlined in the Jeffrey Novis Information is virtually identical to that for

Priolo's "name to be on the bank accounts and related documents because Jeffrey's prior conviction prohibited him from doing so." *Id.* These facts indicate that in 2015, when Priolo entered into the charged conspiracy, he knew his business partner and co-conspirator had previously been convicted of a crime involving mass-mailing fraud, and he entered into the conspiracy with the specific intent of financing the fraud scheme and helping Jeffrey Novis conceal his involvement in the scheme from financial institutions.

### C. The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide adequate deterrence, to protect the public, and to provide just punishment.

Priolo's scheme defrauded more than 40,000 persons of more than $2.6 million. Exhibit 1. By any definition this is a serious offense. The sheer size and scope of Priolo's fraud indicates the need for a substantial sentence, including a lengthy sentence of imprisonment.

Further, Priolo's willingness to rejoin the fraud scheme in 2015, despite the virtually identical nature of the fraudulent mailings, and his admission that he was aware of Jeffrey Novis's prior conviction related to operating a fraudulent mass-mailing scheme, require a sentence that will deter Priolo from operating such schemes in the future. This is particularly true in light of Priolo's focus, throughout his sentencing memorandum, on the impact this case has had on himself, and the short shrift Priolo gives the impact his crimes have had on his victims and their families.

General deterrence is also required—the government asks the Court to send a clear message to other fraudulent mailers that they cannot buy their way out of the consequences of defrauding vulnerable victims through purely paying financial penalties, which they may view as the cost of doing business.

The Court's sentence should be sufficient to demonstrate to Priolo and to the broader community that they cannot commit fraud with impunity.

### D. The need to avoid unwarranted sentencing disparities among similarly situated defendants.

Mail fraud, wire fraud, and conspiracy convictions for operating similar mass-mailing fraud schemes, in the Second Circuit and elsewhere, frequently result in significant terms of imprisonment. For example:

   a. *United States v. Gary Denkberg*, 20-CR-335 (E.D.N.Y., Azrack, J.) Dkt. Nos. 133 and 135. In August of 2023, Priolo's co-conspirators Sean Novis and Gary Denkberg were sentenced to 99 and 66 months incarceration, respectively, following their convictions at trial for both operating their own mail fraud schemes, and aiding and abetting the schemes of Priolo, Jeffrey

---

which Priolo was convicted. The Jeffrey Novis Information was publicly available, and available to Mr. Priolo had he wished to read it prior to entering into business with Jeffrey Novis in 2015.

15

Novis, and Shawn Phillips. Novis was ordered to pay a $500,000 fine; Denkberg was ordered to pay a $250,000 fine.

b. *United States v. Thomas Ressler*, Case No. 6:18-CR-4 (D. Mont.), Dkt. No. 26. Copywriter Thomas Ressler, who testified at trial against Priolo, pled guilty and agreed to cooperate for his role drafting fraudulent solicitations for another mass-mailer. In that case, Ressler was paid $1,036,000 to create fraudulent mailings. Ressler was sentenced to 36 months incarceration.

c. *United States v. Ryan Young*, 18-cr-46 and 23-cr-70 (E.D.N.Y., Azrack, J.). Ryan Young pleaded guilty to conspiracy in two separate cases for operating two mass-mailing schemes. Total victim loss between the two schemes exceeded $49 million. In January 2024, Young was sentenced to 72 months incarceration.

d. *United States v. Patrice Runner*, 18-cr-578 (E.D.N.Y., Seybert, J.). Patrice Runner was convicted following a trial of conspiracy, mail fraud, wire fraud, and money laundering for operating a mass-mailing fraud scheme under the guise of fake psychics for more than 20 years, and causing victim losses of more than $175 million. Runner was sentenced in April 2024 to 120 months incarceration.

e. *United States v. Mario Castro, et al.*, 2:19-CR-295 (D. Nev.) Dkt. Nos. 837, 839, 841. In this mass-mailing fraud case, the defendants were convicted of conspiracy and mail fraud over the course of an eight-year scheme, resulting in victim losses of more than $10 million. Mario Castro was sentenced to 240 months confinement and a $500,000 fine. Miguel Castro was sentenced to 235 months of confinement and a $500,000 fine. Jose Mendez was sentenced to 168 months of confinement and a $100,000 fine.

In his sentencing memorandum, Priolo compares his culpability only to that of Sean Novis and Gary Denkberg, and argues that the shorter duration and lower loss caused by his schemes merit a *significant* downward departure from the guidelines and a non-custodial sentence of probation. However, the cases set out above demonstrate that fraudsters who operate similar mass-mailing fraud schemes, targeting elderly and vulnerable populations, are regularly sentenced to significant terms of imprisonment. The government requested guidelines sentences of incarceration for Sean Novis and Gary Denkberg, and makes the same request with regard to Priolo.

### E. The Government has already distributed restitution to victims of the scheme, without any contribution by Priolo.

The Government does not anticipate seeking a restitution order given the large number of victims (over 40,000). The mandatory restitution statute that typically governs fraud cases does

16

not apply because the "number of identifiable victims is so large as to make restitution impracticable."18 U.S.C. § 3663A(c)(3); U.S.S.G. § 5E1.1(b)(2); *United States v. Rigas*, 409 F.3d 555, 563 (2d Cir. 2005) (finding that mandatory restitution under section 3663A did not apply in the case where the defendant victimized tens of thousands of individuals and determining the amount of restitution owed to each victim would be too complex).

However, in this case, many victims of Priolo's scheme, as well as those of co-conspirators Sean Novis and Gary Denkberg, have obtained restitution for their losses through the resolution of a separate criminal matter. In 2021, the Department of Justice entered into deferred prosecution agreements with two separate companies, Epsilon Data Management and KBM Group, under the terms of which the two companies admitted to selling or renting the data of millions of American consumers to the perpetrators of mass mailing fraud schemes, including the schemes operated by Sean Novis and Gary Denkberg. These two companies paid a total monetary penalty of $191 million, of which $161 million was to be distributed to victims via a claim administrator. *See* "Consumer Data Victim Compensation," https://www.justice.gov/civil/consumer-data-victim-compensation (last accessed September 10, 2025).

Using the data obtained from the victim payment databases seized from the offices of Sean Novis, Gary Denkberg, and Cathy Johnson, the United States instructed the claim administrator to reimburse all living victims who paid $20 or more to the fraudulent schemes of Sean Novis, Gary Denkberg, or the co-conspirators they were convicted of aiding and abetting, including Priolo. This restitution process returned 126,938 checks for a total of $16,488,514 to all living and located victims of these schemes.

### F. Priolo should be ordered to pay a criminal fine of $400,000.

To calculate an appropriate fine, the Guidelines instruct courts to consider various factors, including the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victims and the gain to the defendant and any restitution the defendant has made or is obligated to make. *See* U.S.S.G. § 5E1.2(d). Based on an offense level of 31, the Probation Department concluded that the criminal fine range is $30,000 to $300,000. An offense level of 35 would increase that fine range to $40,000 to $400,000.

The Court should order Priolo to pay the maximum guidelines fine of $400,000. Priolo defrauded tens of thousands of victims of more than $2.6 million and has not paid a dime to a single victim in restitution. As a result of the Government's efforts described above, Priolo will likely never be obligated to pay victims back for the harm he caused. At a minimum, Priolo should be obligated to pay a fine representing a fraction of the proceeds he stole from victims.

### G. Criminal Forfeiture

The United States did not include a forfeiture allegation in the Indictment, and does not anticipate seeking an order of forfeiture.

## CONCLUSION

The sentence imposed should leave Priolo with no doubt that his scheme was unlawful, and that society will not tolerate taking advantage of the vulnerable so that criminals may line their pockets. The Court should sentence Priolo to a significant period of incarceration, which will deter him from engaging in similar conduct, protect the public from further harm, and account for the seriousness of his conduct and the harm he caused victims.

Dated: September 10, 2025

Respectfully submitted,

/s/ Ann F. Entwistle

ANN F. ENTWISTLE
CHARLES B. DUNN
JASON FELDMAN
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
(202) 305-3630
Ann.F.Entwistle@usdoj.gov
Charles.B.Dunn@usdoj.gov
Jason.B.Feldman@usdoj.gov