**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| United States of America,<br><br>     -v-<br><br>Philip Priolo.<br><br>       Defendant. | 2:21-cr-566 (NJC) |

## OPINION AND ORDER

On November 9, 2021, Defendant Philip Priolo was indicted on charges of conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349, and four counts of mail fraud in violation of 18 U.S.C. §§ 2, 1341 arising out of his alleged involvement in a fraudulent sweepstakes mailing scheme. (Indictment, ECF No. 1.) During a jury trial in March 2025, at the close of evidence from both sides and before the case was submitted to the jury, Priolo's counsel made an oral motion for judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."), which the government opposed. The Court reserved judgment on the motion pursuant to Rule 29(b). On March 19, 2025, the jury found Priolo guilty of all five counts. The Court permitted Priolo to brief the Rule 29(a) motion, which he declined to do. Instead, Priolo made a brief oral motion and the government opposed orally as well.

For the reasons explained below, Priolo's Rule 29 motion is denied. The record contains sufficient evidence for a rational jury to find that the government has proven beyond a reasonable doubt all of the elements of conspiracy to commit mail and wire fraud and the four substantive mail fraud counts against Priolo.

# PROCEDURAL HISTORY

The charges against Priolo were tried before a jury over the course of a six-day jury trial, which began with jury selection on March 11, 2025. (Min. Entry, Mar. 11, 2025.) On March 17, 2025, following the close of evidence, Priolo made an oral motion for a judgment of acquittal under Rule 29(a). (Min. Entry, Mar. 17, 2025; Trial Tr. 884:10–885:19.) I reserved ruling on the motion in order to permit the parties to brief it. (Trial Tr. 884:12–15.) Priolo's counsel then had the following colloquy with the Court:

> Priolo's counsel: Do we have to do a briefing if I ask Your Honor is it required, because I just make my motion orally. That's what I normally do. If Your Honor requires it, of course, we'll comply.
>
> The Court: Well, you have to state the grounds for the motion.
>
> Priolo's counsel:  I don't think they made a *prima facie* case out, Judge. No way. They've called witnesses, first of all, who have never reviewed the documents. Every victim witness they called, not one of them had reviewed the documents. Every one during cross-examination admitted that they hadn't reviewed the documents. Nobody even bothered to show them to them in the case. They haven't had one witness who could stand up and give actually even an articulable reason why they were defrauded.
>
> Again, none of them saw the consumer information. None of them saw anything. I was actually shocked at the witnesses that came in on the stand.
>
> That's it. So, I don't know how they make out a *prima facie* case that way, Judge.
>
> The Court: Anything further you would like to say?
>
> Priolo's counsel: No, because nobody else had personal knowledge, so there really is nothing else I would like to say. That's their witnesses.

(Trial Tr. 884:19–885:19.)

In response, the government made the following oral opposition:

> Government: As you know, on a motion under Rule 29, when reviewing the sufficiency of the evidence, the Court must view the evidence in the light most favorable to the Government drawing all inferences in the Government's favor and, of course, the jury will make any rulings on witness credibility.

In this case, the text of the mailings themselves we submit, Your Honor, presents *prima facie* evidence for which the jury could compare the statements on the front of those mailings with the statements [defense counsel] has highlighted on the back of those mailings, and a reasonable trier of fact could determine that they were deceptive and he had the intent to defraud.

In addition to that evidence, we have, of course, presented the evidence of two witnesses who, themselves, testified they were deceived by the mailings -- Ms. Pamela Pence and Ms. Marilyn Burks -- who, themselves, testified that they were deceived by the mailings.

In addition, as Your Honor heard, we had testimony from multiple victim family members regarding similar types of mailings that their family members received and the stated beliefs of their family members regarding what those mailings communicated.

In addition to that, we have put in numerous complaint letters received by Mr. Priolo from state attorneys general as well as other complaints evincing that the recipients of Mr. Priolo's mailings believed they had won money. That information is in evidence.

There is the testimony of Ms. Johnson who worked caging for Mr. Priolo that, on their face, the mailings were deceptive and that non-buyers frequently sent in $20 payment -- or sent in -- I'm sorry, payment coupons with no money and we have seen multiple examples of recipients of those mailings asking that those payments be taken out of their winnings.

So on the question of whether there was intent to defraud, the Government has submitted substantial evidence by which a rational jury could find the defendant guilty.

(*Id.* 885:23–887:12.) After hearing from both parties, I reserved ruling on the Rule 29(a) motion.

(*Id.* 887:13–18.)

On March 19, 2025, the final day of trial, after the parties presented their summations and the jury was charged, the jury returned a verdict of guilty on all counts. (Min. Entry, Mar. 19, 2025; ECF No. 156.) After dismissing the jury, I provided the parties an opportunity to propose a post-trial briefing schedule. Priolo's counsel responded: "Judge, I have no plans on making a post-trial motion. We can just go to right to the Circuit, I think [that] makes the most sense." (Trial Tr. 1126:8–15.)

Priolo has not provided any additional briefing or argument in support of the Rule 29(a) motion made orally at the close of evidence. Nor did he pursue a Rule 29(c) motion for judgment of acquittal following discharge of the jury. Accordingly, I scheduled sentencing, which was initially to take place on September 17, 2025 and was subsequently moved to November 18, 2025.[1]

After trial, on April 7, 2025, attorneys Arthur Aidala and Michael Jaccarino filed notices of appearance on behalf of Priolo. (ECF Nos. 163–64.) On June 27, 2025, the government filed a letter with the court providing "additional authority in opposition to . . . Priolo's oral motion for judgment of acquittal," citing the Second Circuit's decision in *United States v. Denkberg*, 139 F.4th 147 (2d Cir. 2025), which affirmed the conviction of two of Priolo's co-conspirators, Sean Novis and Gary Denkberg. (ECF No. 173.) I ordered Priolo to file a response, if any, to the government's June 27, 2025 letter by July 7, 2025. (Elec. Order, June 30, 2025.) Priolo did not file a response.

On September 17, 2025, I held a telephone conference with the parties concerning the pending Rule 29(a) motion. (Min. Entry, Sept. 17, 2025.) Counsel for Priolo confirmed that Priolo wished to have a ruling on the oral motion, but did not request oral argument or the opportunity to provide any supporting written submissions. (Sept. 17, 2025 Status Conf. Tr. 3:15–24.) I indicated that I would issue an oral ruling. (*Id.* 3:25–4:2.) Since then, I determined that a written ruling is appropriate.

---

[1] *See* Min. Entry, Mar. 19, 2025; Elec. Order, Sept. 11, 2025 (rescheduling sentencing to October 6, 2025); Elec. Order, Sept. 30, 2025 (rescheduling to October 16, 2025); Elec. Order, Oct. 9, 2025 (rescheduling to October 30, 2025), Elec. Order, Oct. 27, 2025 (rescheduling to November 18, 2025).

## LEGAL STANDARDS

### A.  Motion for Judgment of Acquittal

Rule 29(a) of the Federal Rules of Criminal Procedure provides that after the close of evidence "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Pursuant to Rule 29(b), the court may reserve decision on the motion until after the jury returns a verdict of guilty. Fed. R. Civ. P. 29(b). Under Rule 29(c), if the jury returns a guilty verdict, the "court may set aside the verdict and enter an acquittal" in the event there is insufficient evidence to sustain a conviction. Fed. R. Civ. P. 29(c).

A defendant challenging the sufficiency of the evidence that was the basis for a conviction "bears a heavy burden" because the Rule 29 "standard of review is exceedingly deferential." *United States v. Torres*, 124 F.4th 84, 94–95 (2d Cir. 2024).[2] "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013). Rather, it is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Osuba*, 67 F.4th 56, 61 (2d Cir. 2023) (emphasis in original). Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004).

In considering the sufficiency of the evidence supporting the guilty verdict, the court "must consider the Government's case in its totality rather than in its parts," and the sufficiency

---

[2] Unless otherwise indicated, case quotations omit all internal quotation marks, brackets alterations, and citations.

test "may be satisfied by circumstantial evidence alone." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008). The court must also "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Torres*, 124 F.4th at 94–95; *see also Osuba*, 67 F.4th at 61 (the court must "resolve all issues of credibility in favor of the jury's verdict"). Indeed, "[i]t is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011). As the Second Circuit has emphasized, "the proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury," not in a motion to the court. *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989).

B. Mail and Wire Fraud

The offense of mail fraud is governed by 18 U.S.C. § 1341, whereas wire fraud is governed by 18 U.S.C. § 1343. In order to sustain a charge of mail fraud or wire fraud, the government must prove each of the following elements beyond a reasonable doubt with respect to each count: first, that there was a scheme or artifice to defraud an alleged victim of money or property by false and fraudulent pretenses, representations, promises, or omissions as alleged in the indictment; second, that the misrepresentation, promise, or omission was material; and third, that the defendant knowingly participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud. *United States v. Thomas*, 377 F.3d 232, 242 & n.7 (2d Cir. 2004); *see also United States v. Moses*, 109 F.4th 107, 117 (2d Cir. 2024); *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curium); *United States v. Saint Clair*, No. 22-2100, 2024 WL

413422, at *4 (2d Cir. Feb. 5, 2024). The government must also prove a <u>fourth</u> element beyond a reasonable doubt: for a mail fraud charge, that the defendant used or caused the use of the mails as specified in the indictment; or for a wire fraud charge, that the defendant used or caused the use of interstate or foreign wires as specified in the indictment. *Moses*, 109 F.4th at 117; *see also Weaver*, 860 F.3d at 94; *Saint Clair*, 2024 WL 413422, at *4.

With respect to the second element of both mail fraud and wire fraud, a statement is material "if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct." *Weaver*, 860 F.3d at 94. "In other words, a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal." *Id.* "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.*

With respect to the third element of mail fraud and wire fraud, to prove fraudulent intent, the government must prove that the defendant "either intend[ed] to harm their victim or contemplate[ed] that their victim may be harmed." *United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021). As the Second Circuit has made clear, "[b]ecause an intent to deceive alone is insufficient to sustain a wire fraud conviction, misrepresentations amounting only to a deceit must be coupled with a contemplated harm to the victim." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). "[F]raudulent intent may be inferred from the scheme itself if the necessary result of the actor's scheme is to injure others." *Gatto*, 986 F.3d at 113. "Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Jabar*, 19 F.4th at 76–77.

The government may also prove intent to defraud "through circumstantial evidence, including by showing that [the] defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *Jabar*, 19 F.4th at 76; *Saint Clair*, 2024 WL

413422, at \*4 (same). While the government must prove that a defendant "*contemplated* some actual harm or injury to their victims," and that the defendant's misrepresentations had "a natural tendency to influence" the intended victims, the government is not required to "prove that the victims of the fraud were *actually* injured." *Weaver*, 860 F.3d at 94–95. As the Second Circuit indicated in *Jabar*, "[p]roof of actual injury to the victim is not required because the scheme need not have been successful or completed." 19 F.4th at 77. "[T]he only significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm." *Weaver*, 860 F.3d at 97.

### C. Conspiracy to Commit Mail and Wire Fraud

The crime of conspiracy to commit mail and wire fraud is governed by 18 U.S.C. § 1349. The government must establish the following two elements of the crime beyond a reasonable doubt: <u>first</u>, that two or more persons entered into the particular unlawful agreement charged in the indictment to commit mail fraud or wire fraud; <u>and</u> second, that the defendant knowingly and intentionally became a member of the conspiracy. *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024); *United States v. Jimenez*, 96 F.4th 317, 324 (2d Cir. 2024).

### DISCUSSION

### A. The Parties' Arguments

Priolo's counsel made a brief oral motion for judgment of acquittal under Rule 29 consisting of two sparse arguments. First, Priolo argues that the government has failed to offer evidence establishing a prima facie case. (Trial Tr. 884:25–885:1.) Although Priolo does not specify whether this argument concerns any of the four substantive counts of mail fraud or the count of conspiracy to commit mail and wire fraud for which he was convicted, he appears to make it with respect to all of the charged offenses. I therefore understand this argument to be that

evidence in the record does not establish beyond a reasonable doubt the elements of either the four substantive mail fraud counts or the single count of conspiracy to commit mail and wire fraud for which the jury convicted Priolo.

Second, Priolo argues that the government's witnesses "never reviewed" the disclaimer information on the mailings prior to testifying at trial and that "nobody else had personal knowledge." (Trial Tr. 885:1–9, 17–19.) Although Priolo does not elaborate on this argument, he appears to argue that none of the government's witnesses saw the disclaimer located on the back of the allegedly fraudulent mailings and, accordingly, could not "give actually even an articulable reason why they were defrauded." (*Id*. 885:7–9.)

As noted, Priolo declined the Court's request for written briefing in support of the Rule 29(a) motion, electing to address the motion only orally and briefly at the close of the submission of evidence. The government orally opposed the Rule 29(a) motion and filed a letter with "additional authority in opposition" to Priolo's oral motion on June 27, 2025. (ECF No. 173.)

B.  Analysis

The trial record contains sufficient evidence to support the jury's finding that Priolo committed four substantive counts of mail fraud and one count of conspiracy to commit mail fraud and wire fraud, particularly when viewing the record evidence in the light most favorable to the government, crediting inferences in the government's favor, and deferring to the jury's assessment of both witness credibility and the weight of the evidence, as the Court must do on a Rule 29(a) motion.

*1.  Mail Fraud*

Priolo does not argue that any particular element of the offense of mail fraud was not met with respect to any of the specific substantive counts of mail fraud. Instead, he makes a general

argument that the record does not contain evidence to support a prima facie case of mail fraud on any of the four substantive counts. However, the record contains more than sufficient evidence to sustain the jury's finding that all four elements of mail fraud were met with respect to each of the substantive mail fraud counts set forth in the Indictment.

### a. Element 1: A Scheme or Artifice to Defraud

The record contains extensive evidence supporting the jury's finding that there was a scheme or artifice to defraud an alleged victim of money or property by false and fraudulent pretenses, representations, promises, or omissions, as required to satisfy the first element of mail fraud. The jury heard testimony and saw documentary evidence that, between around March 2015 and December 2016, Priolo owned and operated two companies known as "Winners Circle" and "Feel Lucky Group," through which he sent hundreds of thousands of mailings to consumers nationwide, which were designed to deceive recipients into believing that they had won a large cash prize of more than one million dollars. These mailings are appropriately called "prize notices" because they are reasonably understood to instruct recipients that they could claim the promised large cash prize by paying only a small processing fee, typically between $20 and $40. Moreover, the jury heard testimony that Priolo's direct mail operation never provided any cash prizes to those who paid the fee and never intended to do so. (Trial Tr. 141:8–14.) Instead, Priolo only provided these consumers a "sweepstakes report" or "sweeps report"—a short booklet listing publicly available information about third-party sweepstakes, which anyone could enter to win cash prizes. (Trial Tr. 140:10–141:14; Gov't Exs. 134, 137.) Accordingly, a rational jury could conclude that Priolo's mailings were fake prize notices mailed to hundreds of thousands of people nationwide.

The record contains numerous examples of Priolo's Winners Circle and Feel Lucky Group fake prize notices, which were personalized to recipients, used fictitious names and businesses, resembled checks or financial documents, used prominent font and other techniques to convey that the person had won a significant amount of money, included fictitious seals or signatures to make them look official, and used confusing language and difficult-to-read text to obscure disclaimers stating that in exchange for paying a fee of around $20 to $40, the recipient would receive a report compiling information about third-party sweepstakes. (*See, e.g.*, Gov't Exs. 1–15, 21–30.)

Priolo owned and operated Winners Circle with co-conspirator Jeffrey Novis, as shown by documentary evidence and witness testimony. However, he established Feel Lucky Group on his own so that he would not have to share any proceeds from the mailings with anyone else. (*See* Gov't Ex 263, 374.) Priolo worked with Sean Novis, Gary Denkburg, Cathy Johnson, Cheryl Jacquard, Mary Lilienkamp, and others in executing the Winners Circle and Feel Lucky Group direct mail operations. Jacquard served as a production manager who communicated with the vendors that printed the mailings, while Lilienkamp performed data processing, "maintaining databases for the company of names and addresses" to which mailings were sent. (Trial Tr. 77:18–80:12, 82:6–23, 454:18–457:8.).

The record contains numerous documents that, along with witness testimony, explain how Priolo's fraudulent prize notice schemes were carried out. Government Exhibit 158 is a spreadsheet detailing Winners Circle and Feel Lucky Group mailings over certain months in 2016. Jacquard testified that the exhibit identifies the Winners Circle house file, which consists of the mailing addresses of people who had previously sent money in response to Winners Circle prize notices. (Trial Tr. 251:6–254:15.) The exhibit also identifies mailing lists used by alleged

co-conspirators, including Sean Novis and Gary Denkburg. Jacquard and Johnson testified that Priolo and Novis had an agreement to share mailing lists with Sean Novis, Denkburg, and others in order to target recipients who had paid money in response to prior similar mailings. (Trial Tr. 474:23–475:18, 478:12–479:6.) Government Exhibit 158 shows that Priolo and Novis sent a March 2016 mailing, known as a "front end" mailing and assigned the acronym "NPF," to more than 78,000 people, which generated more than $45,000 from around 2,276 people—around 3% of all recipients. (Gov't Ex. 158 at 22–23; *see also* Trial Tr. 616:13–621:20.) Johnson also explained that the exhibit details the schedule for mailing follow-up "back end" mailings. (Trial Tr. 619:8–621:5; Gov't Ex. 158 at 23.) Lilienkamp testified that according to a back-end schedule for Winners Circle for July and August of 2016, people who had sent money to Priolo in response to a front-end mailing in July were sent fourteen back-end mailings over the next month notifying them that they had won large cash prizes. (Trial Tr. 480:18–481:8.)

### b. Element 2 - Material Misrepresentation

The record contains voluminous evidence that would permit a rational jury to conclude that Priolo's elaborate fake prize notices sent through the Winners Circle and Feel Lucky Group direct mail operations were designed to convey material misrepresentations, promises, and/or omissions in an attempt to secure people's money.

A material misrepresentation is a "misinformation or omission [that] would naturally tend to lead or is capable of leading a reasonable person to change his conduct." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017).[3] A material misrepresentation exists where there is a

---

[3] Three months after the jury convicted Priolo, the Supreme Court decided *Kousisis v. United States*, 145 S. Ct. 1382 (2025). Prior to the Court's decision in *Kousisis*, Second Circuit precedent drew "a fine line between schemes that do no more than cause their victims to enter

"discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *United States v. Runner*, 143 F.4th 146, 158 (2d Cir. 2025). Here the government presented significant evidence to support the jury's findings that Priolo's prize notices were designed to materially misrepresent the "benefits reasonably anticipated" from the transaction. *Id.*

The jury had numerous Winners Circle and Feel Lucky Group mailings, which on their face convey the material misrepresentation that the recipient had won a large cash prize and was required to send in a payment of around $20 to $40 to claim it. (*See, e.g.*, Gov't Exs. 1–15, 21–30.) They do so using several distinct techniques. The mailings feature fake seals, signatures, stamps, and company names to create the misimpression that the mailings were from certain fictitious companies or financial institutions, and never accurately represent Winners Circle, Feel Lucky Group, Priolo, or any of the other individuals involved in the scheme. Each mailing is personalized to the recipient, resembles a check or financial document, includes fictitious seals, signatures, and/or certificates to make it look official, and uses confusing language with undefined terms, prominent font, and other techniques to convey that the recipient has won a large sum of money. The back of each prize notice features an obscure disclaimer in grey, difficult-to-read font, which states that in exchange for paying a $20 to $40 fee, the recipient

---

into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Runner*, 143 F.4th 146, 154 (2d Cir. 2025). The Supreme Court "erased [that] 'fine line'" in *Kousisis*, and held that "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property." *Id.* at 156 (quoting *Kousisis*, 145 S. Ct. at 1388). However, the line of cases abrogated by *Kousisis* were not at issue here and the jury charge was consistent with the holding in *Kousisis*.

would receive a report compiling publicly-available information about sweepstakes offered by third-parties. Buried in the disclaimer is the statement that the recipient has "not won a prize."

Government Exhibit 1 provides an illustrative example. This mailing, dated September 9, 2016 and addressed to recipient "Andrew Kluczinsky," advertises a cash prize of "**$1,200,000.00.**" (Gov't Ex. 1.) The text, formatting, and design of the mailing conveys that it is a prize notification. It features in prominent font across the top: "CHECKS SCHEDULED FOR RELEASE" and "$1,200,000." In smaller font at the top left, the mailing states "GUARANTEED PRIZE NOTIFICATION," and in similar font on the top right, it states "CASH & PRIZE ADVISEMENT." (*Id.*) The mailing refers to the figure "$1,200,000" in numbers and text no less the seven times, frequently immediately next to the terms "IN CASH AWARDS," "IN PRIZES," and "CASH AND AWARDS PRIZE-WIN OPPORTUNITY." (*Id.*) The first paragraph of the mailing can be read to convey that Kluczinsky is receiving a formal letter announcing available sweepstakes prize payments for which his name has been confirmed on the record and registered. The second paragraph of the mailing refers to "entrant directives"— an undefined and confusing term. The only references to a "report" on the front of the mailing are a reference to the "NPF Reports Division" in small font near the top of the page, two confusing references to "report of entrant directives," and a reference to a "$20 report fee" buried in the body of the mailing. The back of the mailing features a disclaimer presented in a large block of text in small, grey, all caps font that is difficult to read. It states as follows:

> NPF IS A RESEARCH AND REPORTING SERVICE. WE SPECIALIZE IN RESEARCHING SWEEPSTAKES SPONSORED AND CONDUCTED BY CORPORATE ORGANIZATIONS WITH WHICH NPF IS COMPLETELY UNAFFILIATED. WE COMPILE THESE SWEEPSTAKES OPPORTUNITIES IN A REPORT WHICH SETS FORTH ALL NO PURCHASE ENTRY REQUIREMENTS, BASED ON EXISTING FEDERAL, STATE, AND LOCAL REGULATIONS. YOU HAVE NOT WON ANY MONEY OR PRIZE. NPF IS NOT LIABLE FOR ANY ENTRIES MADE OR ATTEMPTED BY READERS OF ITS REPORTS. ALL

SWEEPSTAKES RESEARCHED AND REPORTED ARE FREE TO ENTER, AS
BASED ON THE INFORMATION SUPPLIED BY THE SPONSORS. NPF USES ALL
DUE DILIGENCE TO ACCURATELY REPORT THE ENTRY DETAILS OF EACH
SWEEPSTAKES. NPF IS NOT A LOTTERY COMPANY, AND DOES NOT OFFER
LOTTERY, CONTEST OR SWEEPSTAKES ENTRIES. THIS PROMOTION MAY BE
UNDER DIFFERENT CREATIVE PRESENTATION. VOID WHERE PROHIBITED
BY LAW. RESPONDERS WILL BE REFUNDED THEIR PURCHASE PRICE OF
OUR REPORT IN FULL IF THEY ARE DISSATISFIED WITH THE REPORT.
REFUND CLAIMS MUST BE MADE IN WRITING TO THE ADDRESS ON OR BY
USING THE ENCLOSED REPLY ENVELOPE WITHIN 60 DAYS OF PURCHASE.
IF YOU DO NOT WISH TO RECEIVE FURTHER MAIL SOLICITATIONS FROM
NPF, JUST RETURN THIS ENTIRE LETTER IN THE ENCLOSED ENVELOPE TO
NPF, WITH THE LETTERS "DNM" NEXT TO YOUR NAME/ADDRESS AREA.
PLEASE BE INFORMED THAT YOUR INFORMAITON MAY BE SHARED WITH
A THIRD PARTY. BY PAYING FOR YOUR PURCHASE WITH YOUR CHECK,
YOU ARE ACCEPTING OUR CHECK ACCEPTANCE POLICY. IN THE UNLIKELY
EVENT THAT YOUR CHECK IS RETURNED UNPAID, YOU UNDERSTAND AND
AGREE THAT YOUR CHECK MAY BE ELECTRONICALLY REPRESENTED AND
WE WILL ALSO COLLECT A RETURNED CHECK PROCESSING CHARGE AS
ALLOWED BY STATE LAW. IF YOUR CHECK IS ELECTRONICALLY
REPRESENTED, IT WILL NOT BE PROVIDED TO YOU WITH YOUR BANK
STATEMENT, BUT A COPY CAN BE RETRIEVED BY CONTACTING YOUR
FINANCIAL INSTITUTION. WE ARE COMMITTED TO YOUR PRIVACY AND
WE HAVE A PRIVACY POLICY WHICH IS AVAILABLE UPON REQUEST AT
THE ADDRESS LISTED ON THE OUTER ENVELOPE. THIS COMMUNICATION
IS NOT A SWEEPSTAKES OR AWARD NOTIFICATION AND DOES NOT
GUARANTEE THAT YOU WILL WIN ANY SWEEPSTAKES. FOR SPECIFIC
ODDS OF WINNING, ELIGIBILITY REQUIREMENTS, END DATES AND OTHER
TERMS AND CONDITIONS IN CONNECTION WITH A SWEEPSTAKES, YOU
MUST REFER TO THE SPECIFIC RULES FOR THAT SWEEPSTAKES. YOU DO
NOT NEED TO PURCHASE THE REPORT TO ENTER ANY SWEEPSTAKES. ALL
CUSTOMER SERVICE ISSUES SHOULD BE IN WRITING TO THE ADDRESS ON
THE ENCLOSED ENVELOPE.

(Gov't Ex. 1.) Buried in the middle of this hard-to-read block of grey text on the back of the

mailing is the statement, "THIS COMMUNICATION IS NOT A SWEEPSTAKES OR

AWARD NOTIFICATION AND DOES NOT GUARANTEE THAT YOU WILL WIN ANY

SWEEPSTAKES." Notably, the front and back of the mailing refer repeatedly to "NPF," which

Jacquard testified is not a real entity, but an acronym used to describe this direct mail piece.

(Trial Tr. 101:3–13.)

A rational jury could view Government Exhibit 1, in its entirety, as conveying the material misrepresentation that Andrew Kluczinzky was the recipient of a cash prize of $1,200,000, which he could claim by paying a $20 fee. A reasonable jury could also conclude that the disclaimer on the back of the mailing was intentionally obscure and confusing in order to cover up the fact that payment of the fee would not secure any cash prize for Kluczinzky.

Similarly, other prize notice mailings sent by Priolo to consumers nationwide used fake signatures, fake seals, and fake certificates that a reasonable jury could conclude were intended to make somebody think that they were going to receive a large sum of money, not a request to purchase a report about sweepstakes hosted by third parties. (*See, e.g.*, Gov't Exs. 9–10.) Other mailings were formatted such that they appeared to be from a "trust," which fraudulently conveyed that the mailer was a financial institution, like a bank. (*See, e.g.*, Gov't Ex. 7.) Although some of the mailings listed a post office box address, none of them provide a phone number, street or web address, or email to which the recipient could reach out and ask questions about the terms of the advertised transaction. (*See, e.g.*, Gov't Ex. 1, 7, 9–10.)

### c. Element 3: Intent to Defraud

The record includes ample evidence to support the jury's conclusion that Priolo knowingly participated in the scheme to defraud consumers through fraudulent mailings, with knowledge of its fraudulent nature and with specific intent to defraud, as required for a mail fraud conviction. The jury had Priolo's Winners Circle and Feel Lucky Group mailings and documentary evidence that Priolo was aware of the contents of the mailings. (*See, e.g.*, Gov't Exs. 180, 303; Trial Tr. 482:16–483:12.) Lilienkamp testified that Priolo received a copy of every single Winners Circle mailing as of at least July 2016. (Trial Tr. 472:22–474:22; Gov't Ex. 309; *see also* Trial Tr. 676:19–22 (Johnson testimony about her email to Lilienkamp requesting

that Priolo's name and address be added to all mailing files for Winners Circle).) The jury also heard testimony by Jacquard, Johnson, and Lilienkamp that, in return for paying the requested fees, recipients were mailed only a third-party sweepstakes report. (Trial Tr. 140:10–141:2, 144:17–146:12, 481:14–482:1, 687:13–21.) Based on this evidence, the jury could reasonably conclude that through his mailings, Priolo intended to deceive recipients into believing they had won large cash prizes that could be obtained only by paying a fee, even though he only ever intended to provide them with a short document containing publicly-available information in exchange for their money. *See Gatto*, 986 F.3d at 113 ("[F]raudulent intent may be inferred from the scheme itself if the necessary result of the actor's scheme is to injure others"); *Jabar*, 19 F.4th at 76–77 (recognizing that "a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver" can demonstrate harm supporting demonstration of fraudulent intent).

The jury saw evidence and heard testimony concerning Johnson's role in processing the mail received in response to the direct mailings sent by Priolo and co-conspirators, a process known as "caging." (*See, e.g.*, Trial Tr. 530:7–13.) She testified that she received packages via express mail, priority mail, and sometimes even Federal Express from prize notice recipients who sought to claim the cash prizes referenced in the mailings. (Trial Tr. 564:8–565:3, 595:13–605:24.) In evidence are photographs of large bins of mail received by Johnson in response to Winners Circle and Feel Lucky Group mailings, which include packages sent through these priority and express forms of mail. (Gov't Ex. 394.) Johnson also testified that Priolo picked up the mail five days a week and saw these priority and express mail packages. (*Id.*; Trial Tr. 564:8–565:3, 595:13–605:24.) Also in evidence are text messages between Priolo and Johnson concerning Priolo's handling of the mail, including a text from Priolo to Johnon showing a

photograph of express mail parcels. (Gov't Ex. 394.) The jury could reasonably conclude from this evidence that recipients of Priolo's mailings believed that the mailings were promising them something important and life-changing, and that Priolo was aware of this perception.

The jury heard evidence that Priolo received numerous responses and complaints from mailing recipients indicating their belief that the mailings conveyed that they had won a large cash prize. For example, the record includes documentary evidence and testimony that Priolo was aware that mailing recipients sent in notes in which they asked for the $20 to $40 fee to be deducted from their prize money, which placed Priolo on notice that these recipients did not have the money to pay the fee, but believed they were being promised a large cash sum. (Trial Tr. 658:11–667:21) Based on such evidence, a reasonable jury could conclude that Priolo knew that the disclaimers on the back of the mailings failed to inform recipients that all they were being offered for their $20 to $40 fee was a booklet advertising sweepstakes by third parties.

The record also includes numerous photographs of return envelopes sent by recipients of Priolo's mailings, on the front of which were notations indicating that the recipients believed the mailings were a "scam" or a "fraud," or consisted of lies. (*See, e.g.*, Gov't Ex. 160.) The jury heard testimony and saw documentary evidence indicating that Priolo was aware of these markings on the return envelopes, and that nevertheless, he did not change the content or nature of the mailings to eliminate the deception. (Trial Tr. 658:19–667:21.) A reasonable jury could conclude that these complaints put Priolo on notice of the deceptive nature of the mailings.

The record includes numerous examples of letters sent with Priolo's authorization to people who wrote to inquire about the status of their prize money in response to a fake prize notice from Winners Circle or Feel Lucky Group. (Gov't Ex. 162.) Johnson testified that Priolo instructed her to respond to these inquiries with "customer service letters" signed with fake

names—such as "Christine Peters." (Trial Tr. 622:18–623:18, 633:9–18, 645:18–647:3.) Johnson testified that if an inquiry indicated that the consumer believed they had won a prize, she would send a letter restating information from the disclaimer on the back of the mailing, and that she would only provide a refund if the consumer explicitly asked for a refund of a specific payment made in response to the mailing. (Trial Tr. 631:9–634:21; *see, e.g.*, Gov't Ex. 162.) The jury saw documentary evidence showing that Johnson sent such response letters to consumers in response to the NPF promotion, which was a mailing sent through Priolo's Winners Circle direct mail operation. (Trial Tr. 632:21–633:8; Gov't Ex. 162.) This evidence further supports a reasonable conclusion that Priolo was fully aware of the deceptive nature of his mailings.

The jury also saw evidence and heard Johnson's testimony about letters from state attorneys general and county consumer protection authorities, which the jury could reasonably conclude placed Priolo on notice that his mailings were fraudulent and violated the law. Johnson testified that she gave the attorney general and county consumer protection complaints regarding Winners Circle mailings to Priolo. (Trial Tr. 598, 605, 622, 631–40.) Her testimony and emails and letters in the record support the conclusion that Priolo was aware that Pinellas County Consumer Protection was concerned about a complaint from an individual named Gerry Dellavalle that Priolo's mailings were fraudulent (*See* Gov't Exs. 171, 172.) The jury also had letters from the Minnesota Attorney General's Office raising similar concerns about a Priolo mailing (Gov't Ex. 173) and an email by which Sean Novis forwarded that letter to Priolo (Gov't Ex. 364). Johnson testified that Priolo instructed her respond to such correspondence with letters using a fake name, such as "Christine Peters," rather than signing the letters with Priolo's name or even her own. (Trial Tr. 622:18–623:18, 633:9–18, 645:18–647:3.) The jury reasonably concluded that these letters from state and local government officials placed Priolo on notice that

his mailings were deceptive and fraudulent, and that Priolo instructed Johnson to respond in a way that would permit him to conceal that Winners Circle and Feel Lucky Group were shell companies engaging in fraud, rather than legitimate businesses.

The jury also heard testimony about the victims' understanding that the mailings entitled them to large cash prizes. For example, Marilyn Burks and Pamela Pence testified that when they received the mailings, they understood them to convey that they had won money. (Trial Tr. at 314–15 (Burks: "Because I thought I was going to win some money and I thought that if I sent the $20, like they asked me, then I would win some money."); Gov't Ex. 62 (NPF mailing to Marilyn Burks requesting her "attention" in order to "release the entire $1,200,000.00 IN CASH AWARDS PRIZE OPPORTUNITY"); Trial Tr. at 186 (Question: "How did you interpret this letter? What did you think it meant?" Pence: "Well, they didn't send me a check and they didn't put the money in the bank."); Gov't Ex. 63 (NPF mailing to Pamela Pence "FOR RELEASE" of $1,200,000); Gov't Ex 63-OE.

Both Burks and Pence testified that they could not remember whether they viewed the disclaimer on the back of the mailings before sending in the requested fees. (Trial Tr. 203:12–204:5 (Pence); *id*. 319:10–13 (Burk).) However, based on witness testimony and the mailings themselves, a reasonable jury could conclude that Priolo authorized mailings intentionally designed so that recipients, including Burks and Pence, focused on the front of the mailings, which fraudulently promised large cash prizes, rather than the disclaimer buried on the back and presented in small difficult-to-read font. In addition, the jury also heard testimony from the family members of John Single, Art Montilla, and Wendell Brooks, who testified about similar types of mailings that their family members received and that their family members had believed they had won money. (Trial Tr. 46:14–72:13, 288:12–310:15, 419:11–444:10.)

Finally, the jury heard testimony from Postal Inspector Christine Reins Jarins and saw documentary evidence that can be reasonably understood to show that Priolo did not make changes to one of his mailings even after the company that he used to process payments, PacNet, raised concerns that certain text in the mailing "may mislead the consumer into believe he/she has won a prize," including the following sentence: "No one else notified. If you wish to keep any money won secret from your spouse or family, please consult your lawyer." (Gov't Ex. 362 at 37; Trial Tr. 825:7–833:12.) Finally, as discussed, the jury saw documentary evidence and heard testimony showing that Priolo requested that staff add his own name and address to his mailing lists, so that he received copies of his fake prize notices and was fully aware of their content. (*See* Gov't Ex. 309; Trial Tr. 472:22–474:22; 676:19–22.) A rational jury could thus conclude that Priolo did not make any meaningful changes to the deceptive nature of the mailings, even after receiving customer complaints, notices demonstrating that mail recipients believed they had won a large cash prize, and after receiving inquiries from county consumer protection officials and state attorneys general. And a rational jury could also reasonably conclude that Priolo was not only aware of the deceptive nature of his Winners Circle and Feel Lucky Group mailings, but that he also intentionally continued to send out these mailings in an effort to secure money from people duped into believing they were winning large cash prizes.

Throughout the trial, the jury heard evidence that Priolo authorized refunds for certain mailing recipients who wrote to complain that they never received the promised large cash prize. (Trial Tr. 655:2–658:12, 666:13–667:13, 810:10–813:19.) Based on documents in the record and Johnson's testimony, the jury could reasonably conclude that the refund policy was not carried out in good faith and was instead used to prevent people from escalating their complaints. For example, the jury saw letters from consumers who asked for a refund and documents showing

that the consumers were refunded for one specific payment. (Gov't Ex. 174; Trial Tr. 655:5–17, 656:7–657:17.) However, Johnson testified that consumers were not refunded for additional payments made in response to Priolo's mailings if they did not specifically request refunds of those other payments. (Trial Tr. 624:12–625:4, 633:3–634:21.) Inspector Reins-Jarin testified that she had reviewed bank records for Priolo's operations and identified around 30 refund checks, amounting to at most around $2,900 out of $2.6 million in revenue generated through Priolo's direct mailings, even though there were dozens, if not hundreds, of notes from victims conveying some form of belief that Mr. Priolo's mailings informed them that they had won large monetary prizes. (*See* Trial Tr. 812.)

### d.  Element 4 – Use of the Mails

The record is replete with evidence that Priolo used the mails to carry out the scheme to defraud. All of the fraudulent mailings were sent to recipients through the U.S. mail. (*See, e.g.*, Gov't Exs. 1–15, 21–30.) Additionally, the checks, cash, and complaint letters from recipients were sent back to Priolo through the U.S. mail, Federal Express, and UPS, and Johnson sent responses to inquiries from mailing recipients on behalf of Priolo through the U.S. mail. (*See, e.g.*, Gov't Exs. 62, 63, 160, 162, 171; Trial Tr. 825:12–827:10.)

The jury also heard testimony and viewed documentary evidence sufficient to sustain the four specific counts of mail fraud detailed in Counts Three, Four, Five, and Six of the Indictment. The jury was shown copies of, and Inspector Reins-Jarins testified about, four specific checks sent by victims to Long Island in response to Priolo's fraudulent mailings: one from victim Audrey Gibson mailed on or around November 21, 2026; another from victim Margaret Tousignant mailed on or around December 11, 2016; another from victim Alemu Kore mailed on or around December 15, 2016; and another from victim Nuby Green mailed on or

around December 21, 2016. (Trial Tr. 867:10–870:9.)  The jury heard testimony that checks from these victims were deposited directly into the Winners Circle bank account. (Trial Tr. 852:10–854:22)

Based on other examples of Priolo signatures in the evidence, including two examples of his notarized signature, a reasonable jury could conclude that Priolo's signature appears in the endorsement on the back of each of the checks at issue for the counts of mail fraud set forth in Counts Three, Four, Five, and Six of the Indictment. (*See* Gov't Ex. 355 at 7, 16; Trial Tr. 814:1–9.)

### 2. *Conspiracy to Commit Mail and Wire Fraud*

#### a. Element One

As discussed, the first element of the conspiracy charge requires the government to prove that Priolo entered into the unlawful agreement to commit mail or wire fraud charged in Count Two of the Indictment with at least one other person. Viewing the record evidence in the light most favorable to the government, there is ample evidence to support the jury's finding that Priolo engaged in a conspiracy to conduct mail and wire fraud with Jeffrey Novis, Sean Novis, and potentially others as charged in Count Two.

As already explained, voluminous documentary evidence and witness testimony support the conclusion that between around March 2015 and December 2016, Priolo owned and operated the Winners Circle direct mail operation through which he sent to consumers nationwide hundreds of thousands of mailings, which were designed to convince people that they had won a large cash prize of more than one million dollars that could be obtained upon payment of a fee. *See supra* Discussion § B.1.a. The record includes evidence showing that Priolo and Novis jointly owned and operated Winners Circle and were fully aware of the

contents of the fraudulent mailings sent through the operation. According to documentary evidence, Priolo and Jeffrey Novis were both on the same bank account for Winners Circle as of November 13, 2024, with Novis as "corporate secretary or authorized signer" and with Priolo as "president and authorized signer." (Trial Tr. 805:8–19.) The jury saw evidence that both Jeffrey Nois and Priolo were associated with the Winners Circle Gmail account and acted together to carry out the operation to mail fraudulent prize notifications in order to secure payments from people duped into thinking they had won large cash prizes. (*See, e.g.*, Trial Tr. 816:2–14, 823:22–825:6.) Documentary evidence and witness testimony indicate that Priolo and Jeffrey Novis worked with Jacquard, Lilienkamp, and Johnson on different aspects of the operations including: to develop and mail the prize notices to mailing lists purchased from co-conspirators and other sources, receive payments in the mail, deposit payments into bank accounts, and to respond to customer inquiries and complaints with letters from fake companies and fake officials with letters stating information from the disclaimers buried in hard-to-read text on the back of the prize notices.

For example, Johnson testified that she had a signed service agreement with Priolo regarding Winners Circle, by which they agreed that she would respond to people who mailed money and/or the return form after receipt of a Winners Circle mailing. (*See* Gov't Ex. 156.) The record also includes evidence of a similar signed agreement between Johnson and Priolo regarding her role in responding to inquiries and complaints relating to Feel Lucky Group mailings. (Gov't Ex. 157.) Johnson also testified that she understood Winners Circle to be owned by both Priolo and Novis, and that she would send both of them a summary of the mail received in response to Winners Circle mailings. (Trial Tr. 568:20–69:15, 616:19–619:11.)

Additionally, documents and testimony in the record reasonably support the conclusion that Priolo and Jeffrey Novis had an agreement with Sean Novis that Jacquard, Lilienkamp, and Johnson, all of whom worked for Sean Novis at various times, would perform services for the Winners Circle direct mail operation, including working with letter shops to print mailings and process the address files. For example, the jury also saw evidence and heard testimony that Sean Novis's bookkeeper, Ellen McDevitt, transmitted invoices to Priolo and Jeffrey Novis for caging services and for the creation of sweeps reports as fulfillment for the Winners Circle's mailings. (Gov't Exs. 358, 360; Trial Tr. 822:3–823:12.) Accordingly, based on the evidence in the record, a reasonable jury could conclude that Priolo had an agreement with Jeffrey Novis and Sean Novis to use the mail to send hundreds of thousands of fake prize notices to consumers nationwide as part of the Winners Circle direct mail operation between around March 2015 and December 2016.

Finally, concerning use of the wires, Johnson testified that she sent checks received in response to Winners Circle and Feel Lucky Group mailings to PacNet, a company located in British Columbia, Canada, for processing. (Trial Tr. 613:16–21.) Based on her testimony and other evidence, including the testimony of Inspector Reins Jarins, PacNet wired money from its bank in Chicago to Priolo and Jeffrey Novis's accounts at Empire Bank in Islandia, New York. (*See* Gov't Ex. 351V; Trial Tr. 863:9–864:3.)

### b. Element Two

There is ample evidence to support the jury's determination that the government proved the second element of conspiracy to commit mail and wire fraud: that Priolo knowingly and intentionally became a member of the charged fake prize notice conspiracy.

As discussed at length, the jury saw documents and heard testimony showing that

Priolo knowingly established and operated Winners Circle with Jeffrey Novis, including by creating the corporate entity, opening joint bank accounts, creating a Gmail account they both used to conduct company business, and working with PacNet. (*See, e.g.*, Gov't Exs. 351, 354 at 9; Trial Tr. 568:20–69:15.)

Evidence in the record also supports the conclusion that Priolo intentionally authorized Winners Circle and Feel Lucky Group mailings, that he received these mailings after they were sent out, and that despite his awareness of inquiries and complaints indicating that recipients understood the mailings to convey that they had won a large monetary prize and numerous complaints from state attorneys general and county consumer protection officials that the mailings were fraudulent, Priolo did not change the mailings to cure the deception. *See supra* Discussion § B.1.c. Moreover, the jury also saw evidence and heard testimony that after PacNet recommended that Priolo remove from a mailing misleading information suggesting that the recipient had won money that needed to be hidden from others, Priolo did not make any changes. *See id.* The jury also saw evidence and heard testimony showing that even after being on notice of these complaints about Winners Circle mailings, rather than changing his conduct, Priolo founded Feel Lucky Group in order to keep a greater share of proceeds from these mailings for himself. (Gov't Exs. 263, 374; Trial Tr. 570:2–6.) And, as previously discussed, the jury also heard testimony from witnesses about how once Priolo learned that a victim paid money in response to a front-end mailing, Priolo and his co-conspirators targeted the same person with even more back end mailings, which also promised large cash prizes upon the recipient of a fee ranging from $20 to $40. *See supra* Discussion § B.1.a.

In summary, the jury heard testimony and saw evidence showing that, even after receiving complaints, inquiries from county consumer protection officials and state attorneys general, and inquiries demonstrating that the mailings convinced recipients that they had won a large cash prize, Priolo made no changes to address the deceptive and fraudulent nature of his Winners Circle and Feel Lucky Group mailings. Viewed in its totality, the record was more than sufficient to permit a rational jury to conclude that Priolo was not only aware of the deceptive nature of his mailings, but that he knowingly and intentionally became a member of the charged conspiracy with Jeffrey Novis and Sean Novis to mail hundreds of thousands of fraudulent prize notices to secure money from people duped into believing they had won large cash prizes when in fact the only product they would receive was a short report listing publicly-available third-party sweepstakes. Accordingly, sufficient evidence supports Priolo's conviction for conspiracy to commit mail and wire fraud as charged in the Indictment.

## CONCLUSION

For all of the reasons set forth in this Opinion and Order, sufficient evidence supports Priolo's conviction on four substantive counts of mail fraud under 18 U.S.C. § 1341 and one count of conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349. This Court therefore denies Priolo's oral motion for judgment of acquittal made under Rule 29, Fed. R. Civ. P., at the close of evidence and before the case was submitted to the jury.


Dated: Central Islip, New York
        November 18, 2025

                                             _/s/ Nusrat J. Choudhury___
                                             NUSRAT J. CHOUDHURY
                                             United States District Judge